**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| SAVE LONG BEACH ISLAND, et al., | |
| Plaintiff, | |
| v. | Case No. 3:23-cv-1886-ZNQ-JBD |
| | Hon. Zahid N. Quraishi |
| | Hon. Brendan Day |
| UNITED STATES DEPARTMENT OF COMMERCE, et al., | **Motion Return Day: July 17, 2023** |
| Defendants. | |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

Plaintiffs hereby move pursuant to Federal Rule of Civil Procedure 65 for a preliminary injunction prohibiting: 1) Intervenor-Defendants Orsted North America Inc. and Atlantic Shores Offshore Wind, LLC from engaging in all offshore surveying activities utilizing noise-devices for seabed characterization in the New York Bight; 2) suspending all active incidental take/harassment authorizations issued by the Federal Defendants which presently permit surveying activities in the New York Bight; and, 3) suspending review and issuance of the currently pending incidental take/harassment authorizations for the New York Bight region.

Plaintiffs make this motion for a preliminary injunction on the grounds that (1) Plaintiffs have demonstrated a likelihood of succeeding on the merits of their claim that Federal Defendants

have violated various provisions of the Marine Mammal Protection Act ("MMPA"), National Environmental Policy Act ("NEPA") and the Administrative Procedures Act ("APA") by way of the issued and pending incidental take/harassment authorizations ("ITA"); (2) Plaintiffs are likely to suffer irreparable harm in the absence of the relief requested; (3) the harm Plaintiffs are likely to suffer if the preliminary injunction is denied outweighs the harm that Defendants are likely to suffer as a result of the preliminary injunction; and (4) the public interest favors issuing the preliminary injunction.

Law Office of Thomas Stavola, Jr., LLC
Thomas Stavola Jr., Esq.
NJ Bar ID number: 380012022
209 County Road 537
Colts Neck, NJ 07722
E: tstavolajr@stavolalaw.com
P: 732-790-0639
Attorney for Plaintiffs
SAVE LONG BEACH ISLAND
Bob Stern, Ph.D.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................... 4

PRELIMINARY STATEMENT ................................................................................... 5

STATEMENT OF FACTS .......................................................................................... 8

    A. INCREASE IN CETACEAN MORTALITY COINCIDENT WITH SURVEYING ............................ 16

    B. NOISE DEVICES ARE PRIMARY CAUSE OF MORTALITY INCREASE ..................................... 18

    C. EVIDENCE FROM STUDIES ON BEHAVIOR AND STRANDINGS ............................................ 20

    D. NECROPSIES HAVE NOT AND CAN NOT ELIMINATE NOISE AS CAUSE .............................. 22

LEGAL STANDARD ................................................................................................. 23

ARGUMENT ........................................................................................................... 24

    I.    PLAINTIFFS HAVE DEMONSTRATED THAT THEY CAN PREVAIL ON THE MERITS ........... 24

        A.    MMPA and APA ................................................................................................... 24

        B.    NEPA AND APA .................................................................................................... 31

II.    PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT INJUNCTIVE RELIEF ................... 34

    A.    STANDING AND PLAINTIFFS' ATTENDANT HARM ........................................................ 34

III.    INJUNCTIVE RELIEF WILL NOT POSE SIGNIFICANT RISK OF HARM TO OTHERS INCLUDING DEFENDANTS .......................................................................................................... 37

IV.    INJUNCTIVE RELIEF FURTHERS THE PUBLIC INTEREST ..................................................... 38

V.    PLAINTIFFS ARE NOT REQUIRED TO POST SECURITY DUE TO THE PUBLIC INTEREST EXCEPTION TO PRELIMINARY INJUNCTIONS ................................................................... 39

VI.    CONCLUSION .................................................................................................... 40

## TABLE OF AUTHORITIES

**Cases**

Alexander v. Primerica Holdings, Inc., 811 F. Supp. 1025 (D. N.J. 1993) .................................. 40

City of Los Angeles v. U.S. Dept. of Agriculture, 950 F. Supp. 1005, 1012 (C.D. Cal. 1996) ... 35

City of Sausalito v. O'Neill, 386 F.3d 1186, 1200 (9th Cir. 2004).............................................. 35

Clarke v. Secs. Indus. Ass'n, 479 U.S. 388, 399 (1987) ............................................................. 35

Crowley v. Furniture & Piano Moving, Furniture Store Drivers, etc., 679 F.2d 978 (1st Cir. 1982)
.................................................................................................................................................. 40

Ctr. for Biological Diversity v. Salazar, 695 F.3d 893 (9th Cir. 2012) ...................................... 25

Delaware River Port Authority v. Transamerican Trailer Transport, Inc., 501 F.2d 917 (3d Cir.
1974) ....................................................................................................................................... 23

Douglas County v. Babbitt, 48 F.3d 1495, 1499 (9th Cir. 1995)................................................. 35

Earth Island Inst. v. United States Forest Serv., 351 F.3d 1291  (9th Cir. 2003) ........................ 32

Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167 (2000) ............... 36

Greater Yellowstone Coalition v. Reese, 392 F. Supp. 2d 1234 (D. Idaho 2005)........................ 32

Idaho Press Club, Inc. v. State Legislature, 142 Idaho 640 (2006) ............................................ 27

Kanoa Inc. v. Clinton, 1 F. Supp. 2d 1088, 1094 (D. Haw. 1998) ............................................. 35

Kleppe v. Sierra Club, 427 U.S. 390 (1976) .............................................................................. 32

Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992) ......................................................... 35

Native Ecosys. Council v. Dombeck, 304 F.3d 886,893-94 (9th Cir. 2002)................................ 32

Natural Resources Defense Council, Inc. v. Morton, 337 F. Supp. 167 (D.D.C. 1971).............. 41

NEC Corp. v. Intel Corp., No. C-84-20799 WPG, 1989 U.S. Dist. LEXIS 1409 (N.D. Cal. Feb.
6, 1989) ................................................................................................................................... 26

Nevada Land Action Assoc. V. U.S. Forest Service, 8 F.3d 713, 715-16 (9th Cir. 1993) ........... 35

Nken v. Holder, 556 U.S. 418, 434 (2009)................................................................................. 24

NRDC v. Evans, 232 F. Supp. 2d 1003 (N.D. Cal. 2002) ........................................................... 25

Reilly v. City of Harrisburg, 858 F.3d 173 (3d Cir. 2017) ......................................................... 22

Temple Univ. v. White, 941 F.2d 201 (3rd Cir. 1991) ................................................................. 40

United States v. AVX Corp., 962 F.2d 108, 116 (1st Cir. 1992)................................................... 36

**Statutes**

16 U.S.C. § 1362 .......................................................................................................................... 9

16 U.S.C. § 1371(a)(5)(D),(i),(I) ............................................................................................... 24

17 U.S.C.S. § 405(a)(1) .............................................................................................................. 25

42 USCS § 4332(2)(C)................................................................................................................ 31

**Other Authorities**

THE PRELIMINARY INJUNCTION STANDARD: UNDERSTANDING THE PUBLIC
INTEREST FACTOR, 117 Mich. L. Rev. 939........................................................................ 39

**Rules**

FRCP 65(c) ................................................................................................................................. 40

**Regulations**

40 CFR § 1508 ............................................................................................................................ 31

50 CFR 18.27(b) ......................................................................................................................... 25

**PRELIMINARY STATEMENT**

Robert Stern, Ph.D., the president and founder of Save Long Beach Island, Inc., and Save Long Beach Island Inc., an environmental non-profit organization in New Jersey ("Plaintiffs"), have been closely involved in the protection of marine mammal life in the offshore waters of New Jersey. December 2022 marked the initiation point of an unusual mortality event ("UME") in marine mammal cetaceans of the NJ/NY waters, specifically, whales and dolphins. There has been an exponential, unprecedented increase in whale mortality events since December 2022, when the number of survey vessels increased from 2 to 6. Both the increases in dolphin and whale mortality events have been highly statistically significant, redolent of the recent introduction of a new variable. Such an exponential increase in deaths over a short temporal period cannot occur absent a new variable.

Plaintiffs have adduced substantial evidence demonstrating that a causal connection exists between the offshore surveying activity, namely, the high-intensity noise devices (used for seabed stratigraphy mapping) and the UME in whales and dolphins. Plaintiffs' complaint, filed on April 4, was replete with studies and data evincing this causal connection. Based on the recent deaths, NJ Whale deaths would reach 24 in 2023, heretofore

unprecedented in New Jersey's record. This projection equates to 200% of the previous highest death count in one calendar year, and 365% of the 20-year baseline average deaths of 6.3 per year. Dolphin deaths are projected to reach 94 in 2023, which is 224% of average annual dolphin deaths.

The North Atlantic Right Whale ("NARW") population size is now under 350, and as a critically endangered species, may be rapidly devolving toward extinction if these surveying activities continue. The Humpback whale, which was hitherto listed as an endangered species, may regain that status if the surveying activities continue. Plaintiffs contend in our original complaint that both the MMPA and NEPA require consideration of the cumulative impact of similar activities - in this case vessel surveys -in the same geographical area. The cumulative impact of the issued, active ITAs for the coastal waters of the NJ/NY region is such that it violates the "small numbers" and "negligible impact" provisions of the MMPA. When including the pending ITAs, the exceedances of the "small numbers" and "negligible impact" standards are even further augmented. More than "small numbers" of both the NARW and Humpback whale population are being taken by virtue of the ITAs, and such ITAs impart more than a "negligible impact" on same.

In addition to the MMPA violations applicable to all ITAs active and pending, some of the ITAs were granted to foreign nations (e.g., such as Orsted), and not, "citizens of the United

States," within the meaning of the MMPA, requiring examination by the Court.

Moreover, Federal Defendants violated NEPA's requirement to conduct a cumulative environmental impact statement. Defendant National Marine Fisheries Services' ("NMFS") final agency action by way of issuing multiple ITAs off the New Jersey/New York coastlines constitutes a major federal action which significantly affects the quality of the human environment. Federal Defendants have failed to assess the cumulative, aggregate impact of the active and pending ITAs on marine mammals.

In direct violation of the APA, the NMFS arbitrarily and capriciously underestimates the maximum spatial extent of Level B noise levels, and as a result, underestimates Level B takes, which can lead to harm and fatality, and therefore Level A takes as well. Defendants erroneously assume that virtually no marine mammal deaths will occur as a result of the surveying activities. This is belied by both the recent empirical evidence and the significant amount of data adduced in Plaintiffs' complaint.

Absent the grant of a preliminarily injunction, the high-intensity noise devices will continue to disturb marine mammals, in many cases, leading to their untimely injuries and deaths. These deaths have been incorrectly ascribed to vessel strikes and entanglements, when only 20% of the washups have been ascribed to that, and even those could be secondary to the precipitating cause

of avoidance level noise. In addition, vessel activity in the area decreased from November to December.[1] Necropsies have not, and typically cannot, establish cause of death due to noise levels sufficient to cause avoidance behavior and generally insufficient to cause hearing organ damage.

Beyond the violations of federal statutes, the practical effect of a preliminary injunction denial is the continued harm (in many cases lethal) committed against whales and dolphins, marine mammals which Plaintiffs have sought to guard and protect. Plaintiffs have invested significant time and energy to protect these marine mammals and will be irreparably harmed by the absence of a preliminary injunction.

Therefore, a preliminary injunction must be granted to halt this devasting assault on marine mammal life in the offshore waters of NJ/NY.

## STATEMENT OF FACTS

Numerous wind energy companies received authorization from Federal Defendants, NMFS, to conduct surveying activities to prepare for and eventually construct wind turbines in the offshore waters of NJ/NY. These authorizations, in the form of ITAs, were largely issued in 2022. There are currently nine (9) active ITAs

---

[1] See Atlantic Shores' Draft EIS, Figure 3.6.6-4: https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/AtlanticShoresSouth_DEIS_Volume%201_Chapters%201-4.pdf

issued for the NJ/NY offshore waters, and eight (8) pending ITAs. This denotes a change from the list of ITAs set forth in the Complaint (ECF No. 1, p. 13-15). Those active and pending ITAs are as follows. The total requested takes[2] for the two key whale species in question, Humpback and NARW, are set forth in association with each ITA.  First, the 9 active ITAs:

- South Fork Wind, LLC received an ITA for the construction of the South Fork Offshore Wind Project near New York (off of Rhode Island and Massachusetts) on December 21, 2021, for the period November 15 2022 through November 14 2023. Humpback whale requested Level B takes: 10 (0.72% of population). NARW requested Level B takes: 13 (3.16% of population).[3]

- NextEra Energy Transmission Mid-Atlantic Holdings, LLC received an ITA for marine site characterization surveys off New Jersey on June 29, 2022 for the period July 1, 2022 through June 30, 2023. Humpback whale requested Level B

---

[2] The term "take" within the meaning of 16 U.S.C. § 1362 (13) "means to harass, hunt, capture, or kill, or attempt to harass, hunt, capture, or kill any marine mammal. Level A harassment is defined as, "has the potential to injure a marine mammal or marine mammal stock in the wild." 16 USCS § 1362(18)(A)(i). Level B harassment is defined as, "has the potential to disturb a marine mammal or marine mammal stock in the wild by causing disruption of behavioral patterns, including, but not limited to, migration, breathing, nursing, breeding, feeding, or sheltering." 16 USCS § 1362(18)(A)(ii).

[3] https://media.fisheries.noaa.gov/2021-02/SouthForkWind_2021proposedIHA_App_OPR1.pdf?null=

takes: 6 (0.43% of population). NARW requested Level B takes: 8 (2.17% of population).[4]

- Park City Wind, LLC received an ITA for marine site characterization surveys for the New England Wind Project Phase 1, off Massachusetts to New York on July 19, 2022 for the period September 1, 2022 through August 31, 2023. Humpback whale requested Level B takes: 46 (3.3% of population). NARW requested Level B takes: 30 (8.2% of population).[5]

- Atlantic Shores Offshore Wind Bight, LLC received an ITA for the marine site characterization surveys off of New Jersey and New York on August 10, 2022 for the period August 10, 2022 through August 9, 2023. Humpback whale requested Level B takes: 8 (0.57% of population). NARW requested Level B takes: 24 (6.56% of population).[6]

- Attentive Energy, LLC received an ITA for marine site characterization surveys off of New Jersey and New York on August 16, 2022 for the period September 15, 2022 through September 14, 2023. Humpback whale requested Level B

---

[4] https://media.fisheries.noaa.gov/2022-05/NEETMA_2022IHA_App_OPR1.pdf
[5] https://media.fisheries.noaa.gov/2022-05/Park%20City%20Wind_App_508_OPR1_0.pdf
[6] https://media.fisheries.noaa.gov/2022-06/AtlanticShoresBightHRG_2022PropIHA_App_OPR1.pdf

takes: 2 (0.017% of population). NARW requested Level B takes: 3 (0.51% of population).[7]

- Vineyard Northeast, LLC received an ITA for marine site characterization surveys from Massachusetts to New Jersey on July 27, 2022 for the period July 27, 2022 through July 26, 2023. Humpback whale requested Level B takes: 47 (3.4% of population). NARW requested Level B takes: 40 (10.9% of population).[8]

- Orsted Wind Power North America, LLC received an ITA for marine site characterization surveys from New York to Massachusetts on October 6, 2022 for the period October 6, 2022 through October 5, 2023. Humpback whale requested Level B takes: 34 (2.44% of population). NARW requested Level B takes: 17 (4.62% of population).[9]

- TerraSond received an ITA on May 15, 2023 for Limited Marine Site Characterization Surveys in the New York Bight and Central Atlantic Call Area for the period April 1, 2024 through March 31, 2025. Humpback whale requested Level B takes: 53 (3.8% of population). NARW requested Level B takes: 16 (4.3% of population).[10]

---

[7] https://media.fisheries.noaa.gov/2022-06/AttentiveEnergyNYBight_2022IHA_App_OPR1.pdf.pdf
[8] https://media.fisheries.noaa.gov/2022-05/Vineyard%20Northeast%20LLC_HRG%20IHA%20Application%20508_OPR1_0.pdf
[9] https://media.fisheries.noaa.gov/2022-08/OrstedNEHRG_2022IHA_App_OPR1.pdf
[10] https://media.fisheries.noaa.gov/2022-11/TerraSond_2022IHA_App_OPR1.pdf

- Bluepoint Wind, LLC received an ITA on February 28, 2023 for Marine Site Characterization Surveys off of New York and New Jersey in the New York Bight for the period March 1, 2023 through February 29, 2024. Humpback whale requested Level B takes: 36 (0.31% of population). NARW requested Level B takes: 14 (3.42% of population).[11]

The eight (8) pending ITAs are as follows:

- Ocean Wind, LLC – for the construction of the Ocean Wind 1 wind energy facility off New Jersey. Humpback whale requested Level B takes: 35 (2.87% of population). NARW requested Level B takes: 66 (17.93% of population).[12]

- Atlantic Shores Offshore Wind, LLC – construction of the Atlantic Shores offshore wind energy projects. Humpback whale requested Level B takes: 25 (2.08% of population). NARW requested Level B takes: 33 (8.97% of population).[13]

- Empire Offshore Wind, LLC construction of the Empire Wind Project(EW1 and EW2) off New York. Humpback whale requested Level B takes: 93. NARW requested Level B takes: 44.[14]

---

[11] https://www.fisheries.noaa.gov/s3/2023-01/BluepointWind_2023IHA_App_OPR1.pdf.pdf
[12] https://media.fisheries.noaa.gov/2022-03/OceanWind1OWF_2022_508APP_OPR1.pdf
[13] https://media.fisheries.noaa.gov/2022-09/AtlanticShoresOWF_2022_Application_OPR1.pdf
[14] https://media.fisheries.noaa.gov/2022-09/Empirewind_2024LOA_App_OPR1.pdf

- Sunrise Wind, LLC - construction and operation of the Sunrise Wind Offshore Wind Farm off New York. Humpback whale requested Level B takes: 567 (40.6% of population). NARW requested Level B takes: 70 (19.0% of population).[15]

- Invenergy Wind Offshore, LLC's site characterization surveys off New Jersey and New York. Humpback whale requested Level B takes: 13 (0.11% of population). NARW requested Level B takes: 6 (1.44% of population).[16]

- Community Offshore Wind, LLC Marine Site Characterization Surveys off New Jersey and New York. Humpback whale requested Level B takes: 46 (0.40% of population). NARW requested Level B takes: 24 (5.74% of population).[17]

- Attentive Energy, LLC Marine Site Characterization Surveys off New Jersey and New York (2023). Humpback whale requested Level B takes: 24 (0.21% of population). NARW requested Level B takes: 12 (2.87% of population).[18]

- Atlantic Shores Offshore Wind, LLC's Site Characterization Surveys off New Jersey and New York (2023). Humpback whale requested Level B takes: 8 (0.57%

---

[15] https://media.fisheries.noaa.gov/2022-11/SunriseWind_2022ITR_App_PR1.pdf
[16] https://www.fisheries.noaa.gov/s3/2023-05/InvenergyHRG-2023IHA-App-OPR1.pdf
[17] https://www.fisheries.noaa.gov/s3/2023-04/COSWHRG-2023IHA-App-OPR1.pdf
[18] https://www.fisheries.noaa.gov/s3/2023-04/AENYBight-2023IHA-App-OPR1.pdf

of population). NARW requested Level B takes: 17 (4.62% of population).[19]

Totaling up the requested takes for all active/issued ITAs yields 242 Humpback whales, which amounts to 17.3% of the population stock (1,396 total population) for this region per NMFS.[20] Totaling the requested takes for all pending ITAs yields 811 Humpback whales. The 811 plus the 242 yields 1,053 for both active and pending ITAs, which amounts to 75.4% of the population stock in this region.

For NARWs, totaling the requested takes for all active/issued ITAs yields 165 NARWs, which amounts to 44.8% of the stock population (368 total) per NMFS.[21] Totaling the requested takes for all pending ITAs yields 272 NARWs. 272 plus the 165 is 437 for both active and pending ITAs, which is more than 100% of the stock population, meaning that particular animals are exposed repeatedly.

Plaintiffs collated a significant amount of evidence in our filed Complaint evincing the causal connection between the offshore usage of high-intensity noise devices and the recent

---

[19] https://www.fisheries.noaa.gov/s3/2023-03/AtlanticShoresHRG_2023_Proposed_App_OPR1.pdf
[20] https://www.fisheries.noaa.gov/national/marine-mammal-protection/marine-mammal-stock-assessment-reports-species-stock; https://s3.amazonaws.com/media.fisheries.noaa.gov/2020-10/2019%20humpback%20whale%20gulf%20of%20Maine%20508.pdf?null
[21] https://www.fisheries.noaa.gov/national/marine-mammal-protection/marine-mammal-stock-assessment-reports-species-stock; https://media.fisheries.noaa.gov/2022-08/N%20Atl%20Right%20Whale-West%20Atl%20Stock_SAR%202021.pdf

exponential increase in dolphin and whale strandings. The issuance of the ITAs are de facto concessions of the impact of the noise devices on marine mammals, as the ITAs were, and are, sought for the impact of high-resolution geophysical ("HRG") surveys (which use the noise devices) on marine mammals. NMFS even concedes on its own website[22] that ocean noise is a "threat" to whales such as the NARW:

**Quick Facts**

| | |
|---|---|
| WEIGHT | Up to 140,000 pounds |
| LENGTH | Up to 52 feet |
| LIFESPAN | Up to 70 years |
| THREATS | Changes in distribution and availability of prey, Climate change, Entanglement in fishing gear, Habitat degradation, Ocean noise, |

/www.fisheries.noaa.gov/species/north-atlantic-right-whale

Plaintiffs recently submitted a letter to various political leaders on the local, state, and federal level, dispelling common myths, which may prove illustrative to the Court.[23]

The evidence can be demarcated into four broad categories: 1) exponential and statistically significant increase in dolphin/whale deaths coterminous with the spate of issued ITAs in the past 6-12 months; 2) Sound Physics; 3) Studies of whale behavior in response to noise and studies of strandings concurrent with ocean noise; and, 4) Necropsies and their failure to nullify

---

[22] https://www.fisheries.noaa.gov/species/north-atlantic-right-whale.
[23] Exhibit A – Letter to CEQ responsive to NJ Democratic Delegation Letter.

the hypothesis that the ocean noise is primarily causing these deaths.

## A. INCREASE IN CETACEAN MORTALITY COINCIDENT WITH SURVEYING

Since the issuance of the hereinabove cited ITAs, an exponential and unprecedented increase in whale and dolphin deaths initiated in December 2022. This UME is unprecedented in the NJ record for whales, and virtually unprecedented for dolphins, absent the 2013 morbillivirus episode. As a graphical illustration of the exponential increase in mortality, the following depicts the projection of whale deaths for 2023 based upon an extrapolation of rate of death in the December 2022-May 2023 period:



-Produced by TWS

Versus the 2002-2022 baseline average deaths of 6.3, extrapolated 2023 deaths based on recent rate of whale mortality events is **statistically significant, p = 0.0005 versus baseline 2002-2022 average deaths. Z score = 3.29 (circa +3 SD)**

Methodology: the NY Bight Survey was used to establish estimates of existing whale population. The rate of NJ whale deaths since early December 2022 through present was extrapolated, and p values calculated. https://www.dec.ny.gov/docs/fish_marine_pdf/dmrnyb acousticone(1).pdf

Twenty-four (24) deaths are projected for 2023, which is statistically significant at p = 0.0005,[24] versus the average annual NJ whale deaths of 6.3.[25] Congruently, the following graphical depiction of dolphin deaths denotes a projected total of 94 for 2023. This, too, is statistically significant at p < 0.001 versus the average annual NJ dolphin deaths of 42.



Note that no morbillivirus or other widespread pathogen has been detected in the necropsies conducted on dolphins in 2023, so the principal cause is something entirely different than the 2013 morbillivirus mediated mortality spike.

---

[24] The p-value is the probability of obtaining test results at least as extreme as the result actually observed, under the assumption that the null hypothesis is correct. When the p-value is statistically significant, as here, it means the result is unlikely to be due to chance, and a real effect exists. Here, the difference between the baseline average death and projected deaths is statistically significant, meaning some new variable is causing this real phenomenon to occur.

[25] This value is calculated from raw data provided by the Marine Mammal Stranding Center in NJ. https://mmsc.org/cetaceans-2002-2023.

## B. NOISE DEVICES ARE PRIMARY CAUSE OF MORTALITY INCREASE

Wind energy companies such as Orsted and Atlantic Shores, among others, utilize high-intensity noise devices for the primary purpose of undersea stratigraphy mapping in preparation for wind turbine construction. These noise devices exhibit operational bandwidth frequencies which project strongly upon the frequencies of marine mammals such as dolphins and whales. In other words, whales and dolphins hear within the sound frequency ranges of these noise devices. Note the following screenshots derived from an Atlantic Shores ITA application[26] and an Orsted Ocean Wind I application[27] respectively. Note particularly the operational frequency ranges column; the frequencies extend from 0.01 kHz (that is, 10 Hertz) up to 115 Khz (115,000 hertz).[28]

**Table 1-2    Representative Equipment Specifications with Operating Frequencies Below 180 kHz**

| HRG Survey Equipment (Sub-Bottom Profiler) | Representative Equipment Type | Operating Frequencies Ranges (kHz) | Operational Source Level Ranges (dB$_{RMS}$) | Beamwidth Ranges (degree) | Typical Pulse Durations RMS$_{90}$ (millisec) | Pulse Repetition Rate (Hz) |
|---|---|---|---|---|---|---|
| Sparker | Applied Acoustics Dura-Spark 240 | 0.01 to 1.9[a] | 203[a] | 180 | 3.4[a] | 2 |
| | Geo Marine Geo-Source | 0.2 to 5[b] | 195[b] | 180 | 7.2[b] | 0.41 |
| CHIRP | Edgetech 2000-DSS | 2 to 16[b] | 195[c] | 24[d] | 6.3 | 10 |
| | Edgetech 216 | 2 to 16 | 179[e] | 17, 20, or 24 | 10 | 10 |
| | Edgetech 424 | 4 to 24[f] | 180[f] | 71[f] | 4 | 2 |
| | Edgetech 512i | 0.7 to 12[f] | 179[f] | 80[f] | 9 | 8 |
| | Pangeosubsea Sub-Bottom Imager™ | 4 to 12.5[d] | 190[d,g] | 120[d] | 4.5 | 44 |
| | INNOMAR SES-2000 Medium-100 Parametric[h] | 85 to 115[d] | 241[i] | 2[d] | 2 | 40 |
| | INNOMAR deep -36 Parametric[h] | 30 to 42 | 245 | 1.5 | 0.15 to 5 | 40 |

---

[26] https://media.fisheries.noaa.gov/2022-01/AtlanticShoresHRG_2022_App_OPR1.pdf.
[27] https://media.fisheries.noaa.gov/2022-03/OceanWind1OWF_2022_508APP_OPR1.pdf.
[28] One Hertz is one full cycle of the sound wave per second.

Application for MMPA Rulemaking and Letter of Authorization



**Table 1-3. Summary of Representative HRG Equipment.**

| | Operating Frequency (kHZ) | SL$_{rms}$ (dB re 1 µPa m) | SL$_{P-P}$ (dB re 1 µPa m) | Pulse Duration (width) (millisecond) | Repetition Rate (Hz) | Beamwidth (degrees) | CF = Crocker and Fratantonio (2016) MAN = manufacturer |
|---|---|---|---|---|---|---|---|
| **Non-parametric shallow penetration SBPs (non-impulsive)** | | | | | | | |
| ET 216 (2000DS or 3200 top unit) | 2–16 | 195 | - | 20 | 6 | 24 | MAN |
| | 2–8 | | | | | | |
| ET 424 | 4–24 | 176 | - | 3.4 | 2 | 71 | CF |
| ET 512 | 0.7–12 | 179 | - | 9 | 8 | 80 | CF |
| GeoPulse 5430A | 2–17 | 196 | - | 50 | 10 | 55 | MAN |
| Teledyne Benthos Chirp III - TTV 170 | 2–7 | 197 | - | 60 | 15 | 100 | MAN |
| **Medium penetration SBPs (impulsive)** | | | | | | | |
| AA, Dura-spark UHD (400 tips, 500 J)[1] | 0.3–1.2 | 203 | 211 | 1.1 | 4 | Omni | CF |
| AA, triple plate S-Boom (700–1,000 J)[2] | 0.1–5 | 205 | 211 | 0.6 | 4 | 80 | CF |

Likewise, note that whale and dolphins hear in frequencies[29] ranging from as low as 10 Hz up to 33 Khz, which falls well within the ranges of the noise devices.

As such, both marine mammals and the noise devices operate in the low/mid Hertz through kilohertz frequency range. The magnitude of the noise is such that it is powerful enough to penetrate the seabed to a depth of 328 feet. The noise extends, spatially, away from the vessel between the seabed and the surface, disturbing marine mammal behavior, for the controlling Dura Spark unit, 16-34 miles from the noise source. The following table is derived from analysis conducted by Dr. Robert Stern, former manager, Office of Environmental Compliance, U.S. Dept. of Energy.

---

[29] https://dosits.org/animals/effects-of-sound/measure-marine-mammals-reaction-to-sound/hearing-sensitivity-studies/#:~:text=The%20most%20reliable%20model%20data,at%20or%20near%201%20kHz.

**Vessel Surveys –Noise Impact**

| | National Marine Fisheries Service (NMFS) | More realistic |
|---|---|---|
| Source Level | 203 decibels (dB) | 205-211 dB |
| Transmission Loss - per tenfold increase in distance | 20 dB | 15 dB |
| Criteria- Noise Level to Get Down to | 160 dB | 140 dB (for baleen whales) |
| **Range to 140 dB** | **?** | **13-34 miles** |
| **Range to 160 dB** | **1/10 mile** | **1/2-1.6 miles** |

The Table demonstrates the extreme sensitivity in the range of elevated noise level that occurs - and hence the number of animals affected - depending upon parameters such as the noise source level, transmission loss rate and acceptable noise level to get down to. The parameters in the right-hand column, are not ours, but rather ones that National Marine Fisheries Service ("NMFS") has used in many other Take authorizations. The parameters in the left-hand column are those being used for by the NMFS for vessel surveys off NJ. There are significant unexplained disparities between the two, leading to a systemic underestimation of noise impact for the ITAs issued here.

### C. EVIDENCE FROM STUDIES ON BEHAVIOR AND STRANDINGS

In Plaintiffs' Complaint (ECF No. 1, p. 23-42), numerous studies were cited that demonstrate robust correlational and causal evidence evincing the connection between ocean noise and whale strandings, by way of citations to behavior/experimental

studies and numerous other studies describing stranding events
coterminous or shortly following the use of noise devices of
various types and frequencies (air guns, non-air gun seismic
sources of low to mid frequencies, including naval/military
maneuvers and activities). Those studies in conjunction with the
noise-based calculations provided by Dr. Stern demonstrate that
the noise emanated from the survey devices extends miles and
results in Level B harassment noise resulting in marine mammal
avoidance behaviors that can lead to injury and death. For
efficiency, see cited Exhibit B,[30] which outlines the lengthy list
(17 cases) of whale strandings throughout the world coincident
with the various high resolution geophysical survey ocean events
using air guns and mid-frequency sonars, and shows similarities
between the devices used there and here.

The relevance of those past events to the surveys here has
been dismissed by some on the basis that nominal noise levels,
e.g., for air gun arrays, are much higher than the Sparker units
used here. However, when one looks at the directionality of the
sources as shown in the example schematic below, and described in
greater detail in Exhibit B, the noise levels emanating in the
horizontal direction, which affect the great majority of marine

---

[30] Exhibit B. Dr. Robert Stern perlustrates the numerous stranding events
coincident with air guns, non-air gun seismic sources, including low-mid
frequency sonars, and shows similarities between those devices and the
sparker units used here.

mammals in the area, are still generally higher for the air guns, but nowhere near the difference that some claim.



Therefore, in terms of the noise propagated away from the vessel, which affects the great majority of animals in the area, the devices involved in those events are comparable to the noise devices employed in the case at bar.

### D. NECROPSIES HAVE NOT AND CAN NOT ELIMINATE NOISE AS CAUSE

The necropsies being conducted on the marine mammal are of insufficient rigor to establish diagnosis. Of the whale necropsies conducted by the Marine Mammal Stranding Center in NJ (colored in red or green on the chart[31]), the descriptions indicate that whales were generally necropsied on site, and buried on scene or taken to landfills, or that Level A data was collected. Level C (a/k/a Tier 3) necropsies are needed to ascertain cause of death.[32] Nonetheless, even if the Tier 3 necropsies were conducted, hearing

---

[31] https://mmsc.org/cetaceans-2002-2023.
[32] See Exhibit C, necropsy manual, pages 13-16, which explains that Level C/Tier 3 necropsies are needed to establish cause of death.

damage would likely not manifest in the results, since the noise exposure is of a magnitude that results in avoidance behaviors, that can also lead to injury and death, but generally not direct ear organ damage (unless the mammal is very close to the noise source).

## LEGAL STANDARD

The 3rd Circuit Court of Appeals in <u>Reilly v. City of Harrisburg</u>, 858 F.3d 173 (3d Cir. 2017), clarified the standard for preliminary injunctions. Therein, the Court emphasized that a movant must meet the threshold for the first two, critical factors, "it must demonstrate that it can win on the merits (which requires a showing significantly better than negligible but not necessarily more likely than not) and that it is more likely than not to suffer irreparable harm in the absence of preliminary relief."[33] These are the two "gateway" factors as per the Court. If these two prongs are satisfied, the Court can then consider "(3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest."[34] Moreover, "we have repeated that a district court—in its sound discretion—should balance those four factors so long as the party seeking the injunction meets the threshold on the first two."[35]

---

[33] *Id.* at 179.
[34] *Id.* at 176.
[35] *Id.*

As such, the prior governing third circuit jurisprudence on preliminary injunctions, namely Delaware River Port Authority v. Transamerican Trailer Transport, Inc., 501 F.2d 917 (3d Cir. 1974), was not overturned by Reilly v. City of Harrisburg (notwithstanding a line of cases subtly misinterpreting it per the Court in Reilly) but rather clarified it.

The Reilly Court's clarification was not to say that only two factors should be considered, but rather, the first two factors are of elevated value and most important, consonant with the U.S. Supreme Court holding in Nken v. Holder, 556 U.S. 418, 434 (2009)(explaining that the first two factors of the traditional standard are the most critical).

**ARGUMENT**

**I.    PLAINTIFFS HAVE DEMONSTRATED THAT THEY CAN PREVAIL ON THE MERITS**

**A. MMPA and APA**

Plaintiffs hold the burden of demonstrating that they have a reasonable probability of prevailing on the merits in the eventual litigation.[36] Plaintiffs surmount that threshold as to each of their counts set forth in the Complaint (ECF No. 1).

The MMPA at 16 U.S.C. § 1371(a)(5)(D),(i),(I), requires that Defendants authorize harassment for only "small numbers of marine mammals of a species or population stock," and further that such harassment "will have a negligible impact on such species or stock

---

[36] Reilly, 858 F.3d at 180.

and will not have an unmitigable adverse impact on the availability of such species or stock . . ."[37]

"Small numbers" is defined as "a portion of a marine mammal species or stock whose taking would have a negligible impact on that species or stock," and "negligible impact" is defined as, "an impact resulting from the specified activity that cannot be reasonably expected to, and is not reasonably likely to, adversely affect the species or stock through effects on annual rates of recruitment or survival."[38] Cases interpreting these provisions, including analysis of legislative intent and history, such as Ctr. for Biological Diversity v. Salazar, 695 F.3d 893 (9th Cir. 2012), have determined that the "small numbers" and "negligible" clauses are two separate and distinct standards. "Specifically, the "small numbers" determination focuses on the portion of a species or stock subject to incidental take, whereas the "negligible impact" analysis focuses on the impact of the anticipated take.

"Small numbers of marine mammals" is not quantified by the statute or regulations, so one must invoke interpretive case precedent and tools of statutory construction given the term is not unambiguous. As a threshold matter, the regulations governing small takes at 50 CFR 18.27(b) clearly evinces an intent to conduct a cumulative, not individual, analysis of takes; the note to (b)

---

[37] 16 U.S.C. § 1371(a)(5)(D),(i),(I).
[38] 50 CFR 18.27.

provides in pertinent part, "The information is being collected to describe the activity proposed and estimate the cumulative impacts of potential takings by all persons conducting the activity."

The only case that directly attempts to quantify "small numbers" within the context of the MMPA was California district court case, which elucidated, "[a] definition of 'small number' that permits the potential taking of as much as 12 percent of the population of a species is plainly against Congress' intent." NRDC v. Evans, 232 F. Supp. 2d 1003 (N.D. Cal. 2002).

Other cases have grappled with the meaning of "small numbers" in other contexts. For instance, 17 U.S.C.S. § 405(a)(1), the Copyright Act, uses the term, "a relatively small number," and like the MMPA, implies a percentage/proportion: "the statute appears to require a comparison between the number of copies without the notice and the total number distributed, in other words, a percentage."[39]

In that California case, the Court expounded that it examined twenty disparate decisions interpreting the meaning of "small numbers" and none of those twenty decisions concluded that > 10% was a small number, "none in which 10.6% was held to be a relatively small number. The highest percentage found to have been within the exception is 9% . . ."[40] Thus, the interpretations of "small

---

[39] NEC Corp. v. Intel Corp., No. C-84-20799 WPG, 1989 U.S. Dist. LEXIS 1409 (N.D. Cal. Feb. 6, 1989).
[40] Id. at 11.

numbers" in both the MMPA and Copyright Act contexts are fairly harmonious, with court analyses in both contexts concluding that the cut-off for "small numbers" is approximately 10-12%.

Additionally, the ordinary meaning of "small numbers" affirms that interpretation, in view of the Merriam-Webster definition of "small" which includes words such as: minor, trivial, of little consequence, and limited."[41] And the Merriam-Webster definition of "negligible" is: "so small or unimportant or of so little consequence as to warrant little or no attention."[42]

The interpretation also must be "reasonable and practical . . . in accord with common sense."[43] Recognizing that the overarching purpose of the MMPA is to "prevent marine mammal species and population stocks from declining beyond the point where they ceased to be significant functioning elements of the ecosystems of which they are a part,"[44] it follows a fortiori, that the exception to the MMPA, the incidental take provisions, should not permit so many takes as to completely countermand the purpose of the Act.

---

[41] https://www.merriam-webster.com/dictionary/small#:~:text=small%2C%20little%2C%20diminutive%2C%20minute,a%20relatively%20small%20backyard

[42] https://www.merriam-webster.com/dictionary/negligible#:~:text=%3A%20so%20small%20or%20unimportant%20or,little%20or%20no%20attention%20%3A%20trifling

[43] Idaho Press Club, Inc. v. State Legislature, 142 Idaho 640 (2006).

[44] Marine Mammal Protection Act Policies, Guidance, and Regulations, NOAA Fisheries (Mar. 22, 2023), https://www.fisheries.noaa.gov/national/marine-mammal-protection/marine-mammal-protection-act-policies-guidance-and-regulations#:~:text=The%20Marine%20Mammal%20Protection%20Act%20was%20enacted%20on%20October%2021,which%20they%20are%20a%20part.

And so, an interpretation of no greater than 12% of a species' stock is reasonable as to small numbers.

In applying the interpretations of "small numbers" and "negligible impact" to the case at bar, one deduces that the requested ITAs, in some cases individually, but certainly as a cumulative total, constitute more than a small number of the NARW species and the Humpback whale species. The cumulative amount of active ITAs easily surmounts the upper limit of "small numbers" and when including the pending ITAs in the total, that upper limit is surpassed by an even larger margin. As delineated *supra*, the cumulative total of requested takes for the NARW for the active ITAs constitutes 44.8% of the Atlantic stock. With inclusion of the pending ITAs, over 100% of the NARW stock is taken. The active ITAs total requested takes of 17.3% of the Humpback North Atlantic stock, and when including the pending ITAs, 75.4% of the stock.

It is incontrovertible that by any definition, these percentages are diametrically opposed to the meaning of "small numbers." All of these percentages exceed the upper limits described in the hereinabove cited case precedent as reasonable upper limits for "small numbers."

Moreover, it is irrefragable that this number of requested takes contravenes the "negligible impact" statutory directive of the MMPA as well. The potential biological removal level for NARWs is 0.9 whales per year; this means that less than 1 whale can

suffer mortality per year without causing their population stock to fall under optimal. Ostensibly, in view of 272 Level B harassment takes for the active ITAs, and 437 with the pending ITAs included, Defendants erroneously assume that this will result in no deaths per year to the NAWR. If Level B takes were that innocuous, the Congress would not have placed it in the Act for them to be scrutinized by the NMFS.

In addition to the small numbers and negligible impact violations, certain companies run afoul of 16 U.S.C. § 1371(a)(5)(D)(i) by issuing ITAs (and considering pending ITAs) to certain foreign national companies,(i), "Upon request therefore by citizens of the United States who engage in a specified activity . . . the Secretary may specify, the incidental, but not intentional, taking by harassment . . . ." Only U.S. citizens are afforded the legal ability to obtain ITAs. Of the 9 issued, active ITAs, and 8 pending, the following ITAs were requested by non-U.S. citizens, in part or whole: Orsted Wind Power North America, LLC,[45] Vineyard Northeast, LLC,[46] Ocean Wind,[47] South Fork Wind, LLC,[48]

---

[45] Danish State holds the majority of shares, https://orsted.com/en/investors/shares.

[46] Vineyard Wind is a joint venture between Avangrid of Connecticut and Copenhagen Infrastructure Partners of Denmark.

[47] Orsted – Danish; https://oceanwindone.com/, https://us.orsted.com/news-archive/2021/06/ocean-wind-2#:~:text=%C3%98rsted%20Offshore's%20North%20American%20business,employs%20more%20than%20150%20people

[48] Owned by Orsted (Denmark) and Eversource (Connecticut), https://southforkwind.com/.

Empire Offshore Wind, LLC,[49] Community Offshore Wind,[50] Attentive Energy[51] These projects are all partially or wholly owned by foreign nationals, not U.S. citizens, in contravention of the MMPA.

The APA has been further contravened by way of the NMFS' arbitrary and capricious determination of maximum spatial extent of Level B harassment noise. In turn, this underestimation in outward spatial extent of Level B noise, underestimates the number of Level B and even Level A marine mammal takes (notwithstanding the fact that the existing number of requested takes already easily violate the MMPA). As explicated supra, and in the Complaint (ECF No. 1, p. 24-30), Defendants assume that the Level B harassment noise levels only propagate out to 141 meters at maximum.[52]

Conversely, the available evidence suggests that the 141 meters is unreasonable and contrary to available scientific evidence, in view of other ITAs authorized by NMFS, other studies/reports, and calculations predicated upon scientific norms

---

[49] Owned by British Petroleum (United Kingdom) and Equinor (Norway), https://www.empirewind.com/.
[50] Joint venture between RWE Renewables of Germany and NationalGrid of England: https://www.nationalgridus.com/News/2022/03/National-Grid-and-RWE-consolidate-partnership-and-move-forward-on-offshore-wind-development/; https://en.wikipedia.org/wiki/RWE; https://en.wikipedia.org/wiki/National_Grid_plc.
[51] Owned by TotalEnergies headquartered in France: https://www.globaldata.com/company-profile/total-se/#:~:text=TotalEnergies%20is%20headquartered%20in%20Paris%2C%20Ile%20de%20France%2C%20France.
[52] See, e.g., page 10, Table 4, of Atlantic Shores ITA Application: https://media.fisheries.noaa.gov/2022-09/AtlanticShoresOWF_2022_Application_OPR1.pdf.

attendant spherical and cylindric spreading of noise.[53] Accordingly the Defendants' usage of certain assumptions in the calculations of maximum spatial extent of Level B noise is unreasonable and arbitrary. The NMFS' lack of consideration of more significant numbers Level A takes is arbitrary and unreasonable, as written extensively by Dr. Stern in comment letters.[54]

### B. NEPA AND APA

Finally, Plaintiffs demonstrate that they can prevail on the merits as to their NEPA claim, namely that Defendants abrogated their statutorily imposed procedural duty to undertake a cumulative environmental impact statement ("EIS") of the aggregate total of ITAs in the NY/NJ offshore waters.[55] Pertinent parlance reflecting this requirement is found in the implementing regulations of NEPA at 40 CFR § 1508.[56]

See, e.g., "The National Environmental Policy Act (NEPA) may require a comprehensive environmental impact statement (EIS) when several concurrent proposals have a cumulative or synergistic

---

[53] Exhibit D – Dr. Robert Stern's comments to the Atlantic Shores vessel survey ITA, explains in assiduous detail the deficiencies in NMFS' noise based propagation analysis.

[54] See Exhibit E, Enclosure to Atlantic Shores ITA comments.

[55] 42 USCS § 4332(2)(C).

[56] "Actions are connected if one is an interdependent part of a larger action and depends on the larger action for its justification . . . A single environmental impact statement (EIS) must also be prepared if the actions are "cumulative actions" under 40 C.F.R. § 1508.25(a)(2). An action is cumulative with another if when viewed with the other proposed action they have cumulatively significant impacts. Considering the impacts in a single EIS will prevent an agency from dividing a project into multiple actions, each of which individually has an insignificant environmental impact, but which collectively have a substantial impact."

impact. A single EIS is required if (1) there is a single proposal governing the projects or (2) the projects are connected, cumulative, or similar actions under the NEPA regulations."[57]

Concordant with the cited interpretive case precedent, it is axiomatic that each individual ITA, in the aggregate, forms a synergistic, cumulative picture, which thereby triggers the cumulative EIS requirement for a major federal action significantly affecting the quality of the human environment. Note that BOEM organizes all the individual leases (red color) in the outer-continental shelf region as a category, emblematic of a unified program.[58]

Additionally, the Draft BOEM and NOAA Fisheries North Atlantic Right Whale and Offshore Wind Strategy (2022)[59] concedes throughout that the offshore wind program must be implemented responsibly or face devastating impacts to NARWs:

> The species faces a high risk of extinction,
>
> and the population size is small enough that

---

[57] <u>Greater Yellowstone Coalition v. Reese</u>, 392 F. Supp. 2d 1234 (D. Idaho 2005); <u>Native Ecosys. Council v. Dombeck</u>, 304 F.3d 886,893-94 (9th Cir. 2002); <u>Kleppe v. Sierra Club</u>, 427 U.S. 390 (1976) (finding "when several proposals for coal-related actions that will have cumulative or synergistic environmental impact upon a region are pending concurrently before an agency, their environmental consequences must be considered together"); <u>Earth Island Inst. v. United States Forest Serv.</u>, 351 F.3d 1291 (9th Cir. 2003) (explaining "A single NEPA review document is required for distinct projects when there is a single proposal governing the projects or when the projects are connected, cumulative, or similar actions under the regulations implementing NEPA)."
[58] https://boem.maps.arcgis.com/apps/instant/sidebar/index.html?appid=e2079773d85b43059abf15a16bce7aa7&locale=en.
[59] See Exhibit F, p. 6-7 - Draft BOEM and NOAA Fisheries North Atlantic Right Whale and Offshore Wind Strategy (2022)

the death of even some individuals can have a
measurable effect on its population status,
trend, and population dynamics. Further, the
loss of even one individual a year may reduce
the likelihood of recovery and of the species'
achieving optimum sustainable population.[60]

Figure C-1 (reproduced below) in that document concedes that
there will be major cumulative impact to the NARW as it migrates
along the East Coast, calves in the South and feeds in the north
via the NARW density map overlaid on individual leased areas on
the East Coast. These individual ITAs have and will have a
cumulative impact.



Figure C-1. Density of NARWs in U.S. waters during the month of January (2010–2019) (Roberts et al.
2016; Roberts and Halpin 2022)

---

[60] *Id*. at 6-7.

Accordingly, Plaintiffs have demonstrated likelihood of prevailing on the merits as to all of their claims.

## II. PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT INJUNCTIVE RELIEF
### A. STANDING AND PLAINTIFFS' ATTENDANT HARM

The U.S. Supreme Court has set forth the standing requirement pursuant to Article III of the Constitution. [61] The standing standard for cases brought via the APA elucidate a "zone of interests" test, namely, the Plaintiff must show that the injury suffered is within the "zone of interests intended to be protected by the relevant statute."[62] The relevant statute here is the MMPA. As to the NEPA standing requirement, a plaintiff must "(a) allege a non-pretextual environmental injury; (b) show the claim is more than 'marginally related' to . . . the purposes that underlie NEPA; and (c) . . . [the] interests in the litigation must not be 'more likely to frustrate than to further statutory objectives."[63]

---

[61] Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992) (holding a plaintiff must have "suffered an "injury in fact," an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not "conjectural" or "hypothetical." Second, there must be a causal connection between the injury and the conduct complained of, the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision.").

[62] Kanoa Inc. v. Clinton, 1 F. Supp. 2d 1088, 1094 (D. Haw. 1998); see also, Douglas County v. Babbitt, 48 F.3d 1495, 1499 (9th Cir. 1995)(noting "a plaintiff bringing suit pursuant to the APA must meet additional standing requirements specific to the APA"); Nevada Land Action Assoc. V. U.S. Forest Service, 8 F.3d 713, 715-16 (9th Cir. 1993) (a plaintiff . . .must show that the injury that he suffered falls within the zone of interests that the relevant statute at issue was designed to protect)."

[63] Id. at 1093 (quoting City of Los Angeles v. U.S. Dept. of Agriculture, 950 F. Supp. 1005, 1012 (C.D. Cal. 1996).

U.S. Supreme Court jurisprudence emphasizes that the APA zone of interest tests should be construed generously,[64] and that the court should only deny standing if "plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit."[65]

The organizational/associational standing standard provides that an organization can bring suit when "its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."[66]

Plaintiffs Dr. Robert Stern and Save LBI clearly satisfy the zone of interests test of the APA in connection with the MMPA and the NEPA standing test. Dr. Stern considers it his responsibility to protect the waters of NJ and all the animal life in it, and he has a particular concern regarding the impact of turbine construction and operation on the whales migrating through the area. Dr. Stern has traveled to Nova Scotia many times and taken

---

[64] <u>City of Sausalito v. O'Neill</u>, 386 F.3d 1186, 1200 (9th Cir. 2004) (quoting <u>Clarke v. Secs. Indus. Ass'n</u>, 479 U.S. 388, 399 (1987).
[65] <u>Clarke v. Secs. Indus. Ass'n</u>, 479 U.S. 388, 399 (1987).
[66] <u>Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.</u>, 528 U.S. 167 (2000); <u>see</u> <u>also</u>, <u>United States v. AVX Corp.</u>, 962 F.2d 108, 116 (1st Cir. 1992) (expounding the three prong test that "(1) at least one of the members possesses standing to sue in his or her own right; (2) the interests that the suit seeks to vindicate are pertinent to the objectives for which the organization was formed; and (3) neither the claim asserted nor the relief demanded necessitates the personal participation of affected individuals)."

Zodiac craft excursions in the Bay of Fundy to see NARW and other whales-up close, and he has researched whales and the impact of wind energy industrialization on same, extensively. He has submitted numerous scrupulously analyzed and written letters and comments to political leaders, the President of the U.S., NOAA Fisheries' personnel, and responsive comments to ITA applications. As such, the continued death of whales, causally connected to the offshore wind surveying, will personally injury Dr. Stern, in view of his life's devotion, time, energy and work investment into marine mammals, and his personal plans to observe and enjoy the NJ animal/plant life.

Dr. Stern therefore satisfies standing and will be irreparably harmed by the continued offshore surveying, both directly (as described above) and indirectly, via the environmental injury to the marine mammal life which injuries Dr. Stern. Save LBI satisfies standing as at least one of its members possesses standing.[67] One of Save LBI's purposes involves informing the public on the facts of wind energy and its potentially harmful effects on marine mammal life, and the protection of that marine mammal life off of NJ. The organization, directed by Dr. Stern, has submitted multifarious comments and letters analyzing same. Finally, the claim asserted and relief demanded does not require

---

[67] In addition to Dr. Stern satisfying standing, other Save LBI members also satisfy standing. See Exhibit G.

the personal participation of the affected organization individuals.[68]

Wherefore, both Save LBI and Dr. Stern will be irreparably harmed by the continued offshore surveying which is causally related to the recent exponential increase in cetacean mortality.

## III.  INJUNCTIVE RELIEF WILL NOT POSE SIGNIFICANT RISK OF HARM TO OTHERS INCLUDING DEFENDANTS

The grant of injunctive relief will not irreparably harm any other parties, including Defendants in this case. Plaintiffs' request, in large part, involves the halting of active ITAs and consideration of pending ITAs, and the creation of a committee of sufficient independence, devoid of conflicts, to thoroughly examine the data (some of which is adumbrated in the Complaint and herein) and for Defendant NMFS to submit to the Court a revised vessel survey program that includes measures to achieve the least practicable adverse impact on the marine mammal species.

This request will not inimically affect non-parties to the case; no one will be personally, financially, physically or emotionally harmed. This request does not harm Federal Defendants as it merely sets aside and halts permits and compels a reanalysis performed objectively, correctly, and in furtherance of maximum protection for marine mammals as per the MMPA. Intervenor-defendants have not yet begun construction and operation of wind

---

[68] _United States v. AVX Corp.,_ 962 F.2d 108, 116 (1st Cir. 1992).

turbines, and as such, given the premature stage of the process, the financial commitment has not been fully consummated. And moreover, Plaintiffs do not demand existing turbines to be deactivated or removed (as they are not yet constructed). Notwithstanding Defendants investments in research, development on early-phase surveying, their interests are more than countervailed by the requested taking of an entire endangered species of NARW (and the associated domino and non-specific deleterious effects that would eventuate on the oceanic ecosystem, carbon mitigation, inter alia).

Therefore, in weighing prong three of the preliminary injunction, the harm to Plaintiffs supersedes that of other parties, including harm to Defendants.

### IV.   INJUNCTIVE RELIEF FURTHERS THE PUBLIC INTEREST

The public interest factor is of elevated importance when the federal government is a defendant, as the number of individuals impacted by the grant or denial of the injunction is much greater.[69] Such is the case here. The public interest prong militates strongly in favor of granting the injunction. Irreparable harm to Plaintiffs will not only be obviated, but millions of individuals through the U.S. will now be able to observe the NAWR and attendant marine

---

[69] THE PRELIMINARY INJUNCTION STANDARD: UNDERSTANDING THE PUBLIC INTEREST FACTOR, 117 Mich. L. Rev. 939, "Cases involving the federal government will often raise larger public interest concerns, though, given that a higher number of individuals will be affected."

life absent continued degradation to the various species via the offshore surveying described *supra*. These marine mammal species are integral for ecosystem stability, climate mitigation, inter alia, including preserving the livelihood of commercial fishermen/fisherwomen who depend upon the existence of whales and dolphins to preserve the predator-prey harmony of the oceans. The preservation of great whales has numerous benefits including offsetting CO2 production (Complaint, ECF No. 1). The NARW is an endangered species, and Humpbacks were previously so, but may eventually return to the endangered list is these activities are not halted.

## V.   PLAINTIFFS ARE NOT REQUIRED TO POST SECURITY DUE TO THE PUBLIC INTEREST EXCEPTION TO PRELIMINARY INJUNCTIONS

As has been held in 3rd Circuit and other federal cases, the security stipulation of FRCP 65(c) is inappropriate and thus waived in certain instances where enforcement of important federal rights or public interests, arising out of the comprehensive federal health and welfare statutes is at issue.[70] Courts must consider the hardship a bond requirement would impose on Plaintiffs.[71] Moreover, as the Court explained in an environmental case, "courts have held that security is not necessary where requiring security would have

---

[70] Alexander v. Primerica Holdings, Inc., 811 F. Supp. 1025 (D. N.J. 1993); Temple Univ. v. White, 941 F.2d 201 (3rd Cir. 1991); Crowley v. Furniture & Piano Moving, Furniture Store Drivers, etc., 679 F.2d 978 (1st Cir. 1982)("In the second line [of cases], no bond is required in suits to enforce important federal rights or "public interests."").
[71] *Id.* at 1034.

the effect of denying the plaintiffs their right to judicial review of administrative action . . . To require plaintiffs . . . to post security . . . would have the effect of denying three nonprofit environmental organizations from obtaining judicial review of the defendant's actions under NEPA."[72]

## VI.   CONCLUSION

For the foregoing reasons, this Court should grant the injunctive relief Plaintiffs request, and order such further relief as this Court deems appropriate.


Dated: June 11, 2023

Respectfully submitted,

*/s/ Thomas Stavola, Jr., Esq.*
Thomas Stavola, Jr., Esq.
Attorney for Plaintiffs

---

[72] <u>Natural Resources Defense Council, Inc. v. Morton</u>, 337 F. Supp. 167 (D.D.C. 1971).