## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

SAVE LONG BEACH ISLAND and
ROBERT STERN, Ph.D.,

    Plaintiffs,

    v.

U.S. DEPARTMENT OF COMMERCE;
GINA RAIMONDO, in her official capacity
as Secretary of Commerce; NATIONAL
MARINE FISHERIES SERVICE; and
JANET COIT, in her official capacity as
Director, National Marine Fisheries Service,

    Federal Defendants,

    and

ØRSTED NORTH AMERICA INC., and
ATLANTIC SHORES OFFSHORE WIND,
LLC,

    Intervenor-Defendants.

Civil Action No. 23-1886 (RK) (JBD)

**OPINION**

**KIRSCH, District Judge**

This suit concerns a non-profit organization's objection to several windfarms being developed in the waters of the Atlantic Ocean off the coast of New York and New Jersey and its allegations of potential harm to marine mammals the windfarms will cause. In 2022 and 2023, Defendant National Marine Fisheries Service ("NMFS") issued several Incidental Take Authorizations ("ITAs") pursuant to the Marine Mammal Protection Act, 16 U.S.C. §§ 1361 *et seq.*, which allowed the windfarms' developers to disrupt certain marine species as part of the development projects without running afoul of the federal laws protecting those species.

Plaintiffs—Save Long Beach Island ("Save LBI") and its president Robert Stern, Ph.D. ("Stern") (together, "Plaintiffs")—bring a challenge under the Marine Mammal Protection Act ("MMPA"), the Administrative Procedures Act ("APA"), and the National Environmental Policy Act ("NEPA") to the decision by the United States Department of Commerce, the Secretary of Commerce Gina Raimondo, the NMFS, and the NMFS's Assistant Administrator Janet Coit (together, "Federal Defendants") to issue these ITAs. Two developers of the windfarms have intervened in the suit: Orsted North America Inc. ("Orsted") and Atlantic Shores Offshore Wind, LLC ("Atlantic Shores") (together, "Intervenor-Defendants").

Presently pending before the Court are seven (7) motions,[1] including Federal Defendants' Motion to Dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), (ECF No. 49); Orsted's Motion to Dismiss pursuant to Rules 12(b)(1) and 12(b)(6), (ECF No. 43)[2]; and Atlantic Shores' Motion to Dismiss pursuant to same, (ECF No. 44). The Court has considered the parties' submissions and resolves the matter without oral argument pursuant to Federal Rule of Civil Procedure 78 and Local Civil Rule 78.1. For the reasons set forth below, Defendants' Motions to Dismiss are **GRANTED**.[3]

---

[1] Aside from the three (3) Motions to Dismiss, also pending before the Court are Plaintiffs' Motion for a Preliminary Injunction, (ECF No. 23), Orsted's and Atlantic Shores' Motions to Strike (ECF Nos. 57 and 59), and American Clean Power Association's Motion for Leave to File an *Amicus Curiae* Brief, (ECF No. 53).

[2] Because the Court grants Defendants' Motions to Dismiss pursuant to Rule (12)(b)(1), it need not consider Defendants' alternate avenue of dismissal under Rule 12(b)(6).

[3] Since the Court grants Defendants' Motions to Dismiss, the Court denies Plaintiffs' Motion for a Preliminary Injunction, (ECF No. 23), as moot. The Court also denies Orsted's and Atlantic Shores' Motions to Strike (ECF Nos. 57 and 59), and American Clean Power Association's Motion for Leave to File an *Amicus Curiae* Brief, (ECF No. 53), as moot.

I.    **BACKGROUND**

A.    **PROCEDURAL HISTORY**

On April 4, 2023, Plaintiffs filed suit against Federal Defendants. (*See* ECF No. 1.) On April 21, 2023, Orsted moved to intervene, (ECF No. 9), and Atlantic Shores did same on May 12, 2023, (ECF No. 13). The Honorable J. Brendan Day granted the Intervenor-Defendants' respective motions on May 19, 2023. (ECF Nos. 18, 19.) On June 11, 2023, Plaintiffs filed a Motion for a Preliminary Injunction. (ECF No. 23.) After the Motion for a Preliminary Injunction was filed, the matter was transferred to the Undersigned on July 21, 2023. (ECF No. 32.) Federal Defendants opposed Plaintiffs' preliminary injunction motion, (ECF No. 51), as did Orsted, (ECF Nos. 45, 46), and Atlantic Shores, (ECF No. 47). Plaintiffs filed a reply brief in support of their motion for a preliminary injunction. (ECF No. 55.)

On August 1, 2023, Federal Defendants filed a Motion to Dismiss Plaintiffs' Complaint. ("Fed. Def. Mov. Br.," ECF No. 49.) Federal Defendants moved under Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction, as they contended that Plaintiffs lack standing to assert their claims. (*Id.* at 24–35.) Federal Defendants also argued that Plaintiffs' challenges to expired ITAs are moot, and that any claims to pending ITAs are unripe. (*Id.* at 35–42.) In addition, Federal Defendants claimed that Plaintiffs failed to exhaust their administrative remedies, as they only raised their concerns in the public notice and comment period to three (3) of the challenged ITAs. (*Id.* at 42–44.) Finally, Federal Defendants moved under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim under NEPA or the MMPA. (*Id.* 44–62.)

On the same day, August 1, 2023, Orsted, (ECF No. 43), and Atlantic Shores, (ECF No. 44), each filed their own Motions to Dismiss. Orsted filed a brief in support of its Motion, ("Orsted Mov. Br.," ECF No. 43-1), as did Atlantic Shores, ("Atlantic Shores Mov. Br.," ECF No. 44-1).

These briefs largely mirror Federal Defendants' motion, with the Intervenor-Defendants moving to dismiss under both Rule 12(b)(1) and 12(b)(6). Plaintiffs filed a consolidated brief in opposition. ("Pls. Opp'n," ECF No. 54.) Federal Defendants filed a reply brief, (ECF No. 62), as did Orsted, (ECF No. 56), and Atlantic Shores, (ECF No. 58). In addition, Orsted and Atlantic Shores each filed a Motion to Strike the declarations Plaintiffs attached to their preliminary injunction papers. (ECF Nos. 57, 59.) The Clean Power Association also moved to file an *amicus curiae* brief in support of Defendants' opposition to Plaintiffs' preliminary injunction motion. (ECF No. 53.)

### B.    STATUTORY BACKGROUND

#### 1.    The Marine Mammal Protection Act

In 1972, Congress enacted the Marine Mammal Protection Act ("MMPA"), 16 U.S.C. §§ 1361 *et seq*. The MMPA imposed a "moratorium on the taking and importation of marine mammals." 16 U.S.C. § 1371(a). To "take" under the MMPA means "to harass, hunt, capture, kill, or attempt to harass, hunt, capture, or kill any marine mammal." *Id.* § 1362(13). The MMPA divides marine mammal harassment into two categories: "Level A harassment" and "Level B harassment." *Id.* § 1362(18). Level A harassment is "any act of pursuit, torment, or annoyance which has the potential to injure a marine mammal or marine mammal stock in the wild." *Id.* § 1362(18)(A)(i). Level B harassment is less severe, being met by "any act of pursuit, torment, or annoyance which has the potential to disturb a marine mammal or marine mammal stock in the wild by causing disruption of behavioral patterns, including, but not limited to, migration, breathing, nursing, breeding, feeding, or sheltering." *Id.* § 1362(18)(A)(ii).

The MMPA contains an exception on the moratorium for certain "incidental" takings of marine mammals. *Id.* § 1371(a)(5). A party seeking to qualify for this exception must receive an

Incidental Take Authorization ("ITA") from the NMFS under one of two provisions of the MMPA.

First,

> upon request . . . [for] a specified activity . . . within a specified geographical region, [NMFS] shall allow, during periods of not more than five consecutive years each, the incidental, but not intentional, taking by citizens while engaging in that activity within that region of small numbers of marine mammals of a species . . . [so long as] the total of such taking during each five-year . . . period concerned will have a negligible impact on such species.

*Id.* § 1371(a)(5)(A)(i). Second, the MMPA allows

> [u]pon request . . . [for] a specified activity . . . within a specific geographic region, [NMFS] shall authorize, for periods of not more than 1 year . . . the incidental, but not intentional, taking by harassment of small numbers of marine mammals of a species or population stock . . . while engaging in that activity within that region if the Secretary finds that such harassment during each period concerned . . . will have a negligible impact on such species.

*Id.* § 1371(a)(5)(D)(i).[4]

Prior to receiving an ITA, the applicant must provide a written request to NMFS with information concerning the proposed taking. 50 C.F.R. § 216.104. The request must include detailed information, reproduced in relevant part below, concerning the project and proposed taking:

> (1) A detailed description of the specific activity or class of activities that can be expected to result in incidental taking of marine mammals;
> (2) The date(s) and duration of such activity and the specific geographical region where it will occur;
> (3) The species and numbers of marine mammals likely to be found within the activity area;

---

[4] The five-year ITAs are Incidental Take Regulations, § 1371(a)(5)(A)(i), and the one-year ITAs are known as Incidental Harassment Regulations, § 1371(a)(5)(D)(i). The parties refer to them both as ITAs, and the distinction between the two provisions is not relevant for the purposes of this Opinion. The Court will therefore also refer to both as ITAs.

(4) A description of the status, distribution, and seasonal distribution (when applicable) of the affected species or stocks of marine mammals likely to be affected by such activities;

(5) The type of incidental taking authorization that is being requested (i.e., takes by harassment only; takes by harassment, injury and/or death) and the method of incidental taking;

(6) By age, sex, and reproductive condition (if possible), the number of marine mammals (by species) that may be taken by each type of taking identified in paragraph (a)(5) of this section, and the number of times such takings by each type of taking are likely to occur;

(7) The anticipated impact of the activity upon the species or stock of marine mammal;

(8) The anticipated impact of the activity on the availability of the species or stocks of marine mammals for subsistence uses;

(9) The anticipated impact of the activity upon the habitat of the marine mammal populations, and the likelihood of restoration of the affected habitat;

(10) The anticipated impact of the loss or modification of the habitat on the marine mammal populations involved;

(11) The availability and feasibility (economic and technological) of equipment, methods, and manner of conducting such activity or other means of effecting the least practicable adverse impact upon the affected species or stocks, their habitat, and on their availability for subsistence uses, paying particular attention to rookeries, mating grounds, and areas of similar significance; . . .

(13) The suggested means of accomplishing the necessary monitoring and reporting that will result in increased knowledge of the species, the level of taking or impacts on populations of marine mammals that are expected to be present while conducting activities and suggested means of minimizing burdens by coordinating such reporting requirements with other schemes already applicable to persons conducting such activity. Monitoring plans should include a description of the survey techniques that would be used to determine the movement and activity of marine mammals near the activity site(s) including migration and other habitat uses, such as feeding. Guidelines for developing a site-specific monitoring plan may be obtained by writing to the Director, Office of Protected Resources; and

(14) Suggested means of learning of, encouraging, and coordinating research opportunities, plans, and activities relating to reducing such incidental taking and evaluating its effects.

50 C.F.R. § 216.104(a). Following the receipt of this information, NMFS publishes either a proposed ITA or a notice of the applicant's request for an ITA to begin a 30 (thirty) day public notice and comment period. *Id.* § 216.104(b). NMFS "evaluate[s] each request to determine . . . whether the taking by specified activity within the specified geographic region will have a negligible impact on the species." *Id.* § 216.104(c). If NMFS finds that the activity will have a negligible impact on the species, NMFS publishes these findings, along with a draft authorization form (described below), for public notice and comment. *Id.* NMFS may also "find[] that . . . mitigating measures" may be taken that would allow the activity to occur with only a negligible impact on the species, "when it would not otherwise satisfy [the negligible impact] requirement." *Id.* If NMFS determines that an activity will have a greater than a negligible impact, NMFS publishes this finding along with its reasoning for denying the applicant's request. *Id.* § 216.104(d).

Once the request is approved, NMFS sets forth "specific regulations" outlining the "[p]ermissible methods of taking," the "[m]eans of effecting the least practicable adverse impact on the species and its habitat," and "[r]equirements for monitoring and reporting" of the activity and its impact on the species. 50 C.F.R. § 216.105.

Once NMFS signs off on a project, it must issue a "Letter of Authorization" ("LOA") to the applicant that sets out the conduct and activities approved by the ITA. 50 C.F.R. § 216.106. The LOAs "specify the period of validity and any additional terms and conditions for the specific request," and are published within thirty (30) days of issuance. *Id.* NMFS may withdraw an LOA following the notice and comment period if it determines that the applicant has failed to comply with the regulations, or the takings have a greater than negligible impact on the animal species at issue. *Id.* If a party requests a modification to the activity requested in an LOA, NMFS may publish the proposed LOA for public notice and comment. 50 C.F.R. § 217.47. A party may request an

extension without the public notice and comment component if the activity and the "anticipated impacts" are identical to those in the previously issued LOA, and NMFS concludes the required monitoring and reporting measures were implemented by the applicant. *Id.*[5]

### 2.       National Environmental Policy Act

In 1970, Congress passed the National Environmental Policy Act ("NEPA") to "establish[] a 'national policy [to] encourage productive and enjoyable harmony between man and his environment,' and . . . to reduce or eliminate environmental damage and to promote 'the understanding of the ecological systems and natural resources important to' the United States." *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 756 (2004) (quoting 42 U.S.C. § 4321). NEPA requires federal agencies to adhere to certain "procedural requirements to ensure that the government gives 'appropriate consideration' to environmental impacts before undertaking major actions." *Gulf Restoration Network v. Haaland*, 47 F.4th 795, 798 (D.C. Cir. 2022) (quoting 42 U.S.C. § 4332(2)(B)–(C)). One way NEPA effectuates this goal is by requiring agencies to prepare an Environmental Impact Statement ("EIS") that contains "a detailed statement" on, *inter alia*, "the environmental impact of the proposed action"; "any adverse environmental effects which cannot be avoided"; and "alternatives to the proposed action." 42 U.S.C. § 4332(C).

### 3.       The Outer Continental Shelf Lands Act

Pursuant to the Outer Continental Shelf Lands Act ("OSCLA"), 43 U.S.C. § 1337, the Bureau of Ocean Energy Management ("BOEM") may issue "leases, easements, and rights-of-way for activities that produce or support the production, transportation, or transmission of energy," including "renewable energy." 30 C.F.R. § 585.100. The Secretary of the Interior

---

[5] The ITAs at issue in this case, such as one issued to Atlantic Shores, note, however, that "one-time, one-year" renewals may be issued "[o]n a case-by-case basis"; however, these renewals are subject to a fifteen (15) day notice and comment period so long as the renewal request is for "identical, or nearly identical, activities." (*See e.g.*, ECF No. 49-2 at *14.)

delegated to BOEM, an agency within the Department of the Interior ("Interior"), "the authority to manage the development of energy on the Outer Continental Shelf (OCS)." (*Id.*) As the D.C. Circuit has explained:

> The OCSLA establishes a four-stage process for development. First, Interior evaluates national energy needs to formulate a five-year plan of proposed lease sales. Next, Interior sells the leases to the highest responsible qualified bidders. . . . [A]t the third and fourth stages, . . . Interior reviews lessees' plans for exploration and then for development and production. During this process, Interior must prepare environmental impact statements (EISs) as necessary.

*Gulf Restoration*, 47 F.4th at 798 (cleaned up).

### C. FACTUAL BACKGROUND

Plaintiff Save LBI is a New Jersey 501(c)(3) non-profit organization "created to guard human and natural resources." ("Compl.," ECF No. 1 ¶ 13.) The non-profit organization's goals include, *inter alia*, protecting the "marine mammals," including the North Atlantic Right Whale ("Right Whale") that "inhabit, use, or migrate off the New Jersey and New York coasts" and conserving the "aesthetic elements" of the beaches of the coasts of New Jersey and New York. (*Id.*) Plaintiff Stern, Save LBI's current President, was previously employed in the Office of Environmental Compliance in the Department of Energy. (*Id.* ¶ 14.)

The gravamen of Plaintiffs' Complaint concerns numerous ITAs issued pursuant to planned wind energy projects (the "Projects") that BOEM approved for development off the shores of New Jersey and New York. (*Id.* ¶ 28.) The Complaint does not directly challenge BOEM's decision pursuant to the OSCLA, but rather challenges Federal Defendants' decisions to issue ITAs to various companies involved in developing the Projects.[6]

---

[6] As noted above, there are four Federal Defendants who Plaintiffs contend were involved in promulgating the challenged ITAs. Two are entities: the Department of Commerce and NMFS, an agency housed within the Department of Commerce's National Oceanic and Atmospheric Administration. (*Id.* ¶ 15.) Janet Coit is the director of NMFS, and Gina Raimondo is the Secretary of the Department of Commerce. (*Id.*)

Plaintiffs in total challenge eleven (11) issued ITAs. The "specified activity" permitted by one of the challenged ITAs, issued to South Fork Wind, LLC and effective November 15, 2022 through November 14, 2023, involves actual construction of a wind project. (*Id.* ¶ 29.) The remaining ten ITAs, covering year-long periods in 2022 and 2023, were all issued for "marine site characterization surveys." (*Id.* ¶¶ 30–39.) The Intervenor Defendants were two of the recipients of ITAs and involved in the development of the offshore wind energy projects. (*See id.* ¶¶ 28–39.) Plaintiffs also allege there are five pending applications for ITAs, which Federal Defendants had not yet decided at the time Plaintiffs filed suit. (*Id.* ¶ 40.)

Each ITA corresponds to a unique request for a proposed taking, and thus, each ITA differs. *See* 50 C.F.R. § 216.104. The ITA issued to Atlantic Shores specified that only Level B harassment could occur, and it set out the specific number of takes to which Atlantic Shores was authorized. (*See* ECF No. 49-2 at *16.)[7] For example, Atlantic Shores was allowed twenty-four (24) Level B Harassment Takes of Right Whales, but only two (2) Level B Harassment Takes of Sei Whales. (*Id.*) The ITA also specified the "minimum separation distance" in which Atlantic Shores' vessels were to remain from each animal, and "shutdown zones" where no "acoustic source" could emit if the vessels were too close to the animals. (*Id.* at *3, 7, 18) The ITA listed the relevant monitoring requirements, including mandating constant three-hundred-and-sixty (360) degree surveillance by a trained "lead protected species observers." (*Id.* at *8) The ITA also set forth various reporting requirements, including that Atlantic Shores "submit a draft comprehensive report on all activities

---

[7] Plaintiffs' Complaint is based on challenges to the ITAs issued by Federal Defendants. Although Plaintiffs did not append the challenged ITAs to their Complaint, Federal Defendants attached the ITAs as exhibits to their Motion to Dismiss. The Court may consider certain exhibits submitted by Defendants in their respective Motion to Dismiss. *See Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.,* 998 F.2d 1192, 1196 (3d Cir. 1993) (a court may also review "exhibits attached to the complaint and matters of public record," as well as "undisputedly authentic document[s] that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document").

and monitoring results within 90 days of the completion of the survey or expiration of the IHA."

(*Id.* at *9–10.) Another challenged ITA, issued to Orsted, contained different taking allowances, permitting Level B Harassment of seventeen (17) Right Whales, and three (3) Sei Whales. (*See* ECF No. 49-5 at *16.)

Plaintiffs' Complaint alleges three counts: violation of the MMPA (Count One); violation of the Administrative Procedures Act ("APA") (Count Two); and violation of NEPA (Count III).[8] With respect to Count One, Plaintiffs contend that Federal Defendants' decision to issue the ITAs was arbitrary and capricious in violation of the MMPA and APA because the ITAs had more than a "negligible" impact on "small numbers of marine mammals." (Compl. ¶¶ 10, 125–28.)

Plaintiffs Complaint asserts numerous contentions regarding the science underlying Federal Defendants' actions. Plaintiffs allege that the challenged ITAs "underestimate the potential for Level A harassment takes from the noise exposure and cumulative noise exposure" to which the marine animals will be subject based on the marine site characterization surveys. (*Id.* ¶ 5.) Plaintiffs contend "that the anthropogenic acoustic source utilized in the wind turbine characterization surveys can result in takings." (*Id.* ¶ 43.) By issuing the series of ITAs, Plaintiffs allege that Federal Defendants subject the majority of the populations of Right Whales and Humpback Whales to takings through "elevated noise exposure." (*Id.* ¶ 47.) In addition, the Complaint asserts that an increase in marine mammal deaths has occurred during the period of late

---

[8] As neither statute contains a private right of action, Plaintiffs bring their claims under the MMPA and NEPA pursuant to the APA. (*See* Compl. ¶¶ 10, 160.) The Intervenor Defendants contend that Plaintiff's MMPA claim should be dismissed because the statute does not contain a private right of action. (*See* Atlantic Shores Mov. Br. at 3; Orsted Mov. Br. at 2.) While there is merit to this argument, judicial review under the MMPA and NEPA may be sought pursuant to the APA. *See City of Sausalito v. O'Neill*, 386 F.3d 1186, 1205–06 (9th Cir. 2004) (collecting cases for the proposition that even though neither the MMPA nor NEPA contain private rights of action, judicial review of agency action under these statutes is permitted pursuant to the APA). The Court agrees with Plaintiffs that they made clear that the basis for their suit under the MMPA was through the APA. (*See* Compl. ¶ 10; Pls. Opp'n at 38.)

2022 through 2023, which Plaintiffs contend was caused by the "numerous ITAs issued in 2022." (*Id.* ¶¶ 48–68.)

Plaintiffs contend that the number of takings authorized by the challenged ITAs cause greater harm to marine mammals than NFMS believes. Plaintiffs argue that the ITAs allow for considerably greater noise than NFMS approximates, as, for example, "noise levels over 140 decibels [can extend outward] up to 34 miles away from the vessels," and the ITAs allow for up to 120 and 160 decibels of noise. (*Id.* ¶¶ 73–75.) Plaintiffs also reference studies which "found that Humpback whales try to avoid the noise down to a level of 140 decibels." (*Id.* ¶ 84.) The noise allowed by the ITAs, allege Plaintiffs, "[d]isturb[s] the whale's behavior" and may cause whales to change swimming patterns, increasing the risk that they will collide with vessels. (*Id.* ¶¶ 87–88.) The noise may also separate mothers from calves, as well as cause "stress and distress reactions," such as increased "heart rate [and] blood pressure." (*Id.* ¶¶ 89–93.) Moreover, Plaintiffs argue that the noise may cause whale strandings, otherwise known as beaching. (*Id.* ¶¶ 104–14.) Plaintiffs contend that Defendants ignored numerous scientific studies outlining the harm from sonar noises, which are created during the marine site surveys and development of the wind farms, to whales and other marine mammals. (*Id.* ¶ 145.) In addition, Plaintiffs claim that Defendants issued IPAs to non-United States citizens, further flouting the prescriptions of the law. (*Id.* ¶ 150.)

In Count Two, Plaintiffs allege that Federal Defendants acted "arbitrarily, capriciously, and without substantial evidence," in violation of the APA, by issuing the ITAs based upon "incorrect noise loss factors" and a faulty assumption that "no Level A harassment takes would occur." (*Id.* ¶¶ 151–54.) Finally, in Count Three, Plaintiffs contend that Federal Defendants violated NEPA by failing to submit a cumulative EIS ascertaining the potential harm of all issued ITAs.

(*Id.* ¶¶ 155–60.) Plaintiffs seek the Court to issue an order "reversing and setting aside" the ITAs; enjoining Federal Defendants from issuing any pending and prospective ITAs; directing NMFS to create "an Advisory Board of acoustic and marine mammal specialists"; directing NMFS to prepare a cumulative EIS; and awarding Plaintiffs fees. (*Id.*, Prayer for Relief.)

## II.   **LEGAL STANDARD**

Under Federal Rule of Civil Procedure 12(b)(1), a defendant may move to dismiss a complaint based on lack of subject matter jurisdiction. In deciding a Rule 12(b)(1) motion to dismiss, a court must first determine whether the party presents a facial or factual attack to the jurisdiction, because that distinction determines how the pleading is reviewed. *See Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977). "A facial attack concerns an alleged pleading deficiency whereas a factual attack concerns the actual failure of a plaintiff's claims to comport factually with the jurisdictional prerequisites." *Young v. United States*, 152 F. Supp. 3d 337, 345 (D.N.J. 2015). In reviewing a facial attack, "the court must only consider the allegations of the complaint and documents referenced therein . . . in the light most favorable to the plaintiff." *Gould Elecs. Inc. v. United States*, 220 F.3d 169, 176 (3d Cir. 2000). On this posture, a court presumes that it lacks subject matter jurisdiction, and "the burden of establishing the contrary rests upon the party asserting jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) (citations omitted). By contrast, in reviewing a factual attack, the court may weigh and consider evidence outside of the pleadings. *Const. Party of Pennsylvania v. Aichele*, 757 F.3d 347, 358 (3d Cir. 2014). Facial attacks typically occur prior to the defendant answering the complaint and the parties engaging in discovery. *See Askew v. Trustees of Gen. Assembly of Church of the Lord Jesus Christ of the Apostolic Faith Inc.*, 684 F.3d 413, 417 (3d Cir. 2012) ("As the defendants had not answered and the parties had not engaged in discovery, the

first motion to dismiss was facial."). As Defendants contest whether the facts as pled in the Complaint establish standing, the Court construes Defendants' challenge as a facial challenge. *See Aichele*, 757 F.3d at 358 (holding that a facial attack "contests the sufficiency of the pleading") (quoting *In re Schering Plough Corp. Intron*, 678 F.3d 235, 243 (3d Cir. 2012)). The Court applies the same analysis "when considering a facial attack under Rule 12(b)(1) or a motion to dismiss for failure to state a claim under Rule 12(b)(6)." *Petruska v. Gannon Univ.*, 462 F.3d 294, 299 n.1 (3d Cir. 2006).

## III.   <u>DISCUSSION</u>

All Defendants move to dismiss Plaintiffs' Complaint for a lack of standing. As this is the threshold issue in this case, the Court will consider Plaintiffs' standing, and thus, the Court's subject matter jurisdiction over Plaintiffs' claims.

### A.   STANDING

"Standing is a question of subject matter jurisdiction." *Petroleos Mexicanos Refinancion v. M/T KING, A (Ex–Tbilisi)*, 377 F.3d 329, 224 (3d Cir. 2004). Federal courts are courts of limited, not general jurisdiction. *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541–42 (1986). A district court must have subject matter jurisdiction through "power authorized by Constitution and statute." *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 552 (2005). "Article III [of the United States Constitution] confines the federal judicial power to the resolution of "Cases" and "Controversies." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021). "Absent Article III standing, a federal court does not have subject matter jurisdiction to address a plaintiff's claims." *Taliaferro v. Darby Twp. Zoning Bd.*, 458 F.3d 181, 188 (3d Cir. 2006). A district court must presume that it lacks jurisdiction over a matter unless jurisdiction is shown to be proper. *Kokkonen*, 511 U.S. at 377.

To establish Article III standing, "the plaintiff must have a 'personal stake' in the case . . . ." *TransUnion*, 141 S. Ct. at 2203 (quoting *Raines v. Byrd*, 521 U.S. 811, 820 (1997)). The "'irreducible constitutional minimum' of standing" requires three elements be demonstrated by the plaintiff at the pleading stage. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). A plaintiff must demonstrate that they: "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.* As the Supreme Court has explained, "when . . . a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of *someone else*, much more is needed" and "standing is not precluded, it is ordinarily 'substantially more difficult' to establish." *Lujan*, 504 U.S. at 562 (emphasis in original) (quoting *Allen v. Wright*, 468 U.S. 737, 758 (1984)).

Defendants contend that both Stern and Save LBI fail to demonstrate standing. Federal Defendants first argue that Stern fails to demonstrate any harm personal to himself. (*See* Fed. Def. Mov. Br. at 25–28.) They also contend that Save LBI lacks organizational standing because the Complaint fails to show that its members have standing on their own or that Save LBI seeks to advance the purposes of its organization's mission. (*Id.* at 29–32.) The Intervenor-Defendants also claim that Plaintiffs lack injury-in-fact, as well as that Plaintiffs fail to demonstrate traceability and redressability, as Plaintiffs fail to show that the ITAs have caused injury to the marine mammal populations they seek to protect and that Plaintiffs' requested relief would address their harm. (*See* Atlantic Shores Mov. Br. at 10–17; Orsted Mov. Br. at 9–14.)

An injury in fact, the first element of standing, is "an invasion of a legally protected interest that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Reilly v. Ceridian Corp.*, 664 F.3d 38, 41 (3d Cir. 2011) (quoting *Danvers Motor Co. v. Ford*

*Motor Co.*, 432 F.3d 286, 290–91 (3d Cir. 2005)). A concrete injury is one that is "real, or distinct and palpable, as opposed to merely abstract." *Finkelman v. Nat'l Football League*, 810 F.3d 187, 193 (3d Cir. 2016); *see TransUnion*, 141 S. Ct. at 2204 (noting concrete harms include "tangible harms" such as "physical and or monetary harm to the plaintiff" and "intangible harms" including "reputational harms, disclosure of private information, and intrusion upon seclusion"). An injury is particularized when it "affect[s] the plaintiff in a personal and individual way." *In re Am. Med. Collection Agency, Inc. Customer Data Sec. Breach Litig.*, No. 19-MD-2904, 2021 WL 5937742, at *6 (D.N.J. Dec. 16, 2021) (quoting *Lujan*, 504 U.S. at 561 n.1); *see also In re Horizon Healthcare Servs. Inc. Data Breach Litig.*, 846 F.3d 625, 640 n.22 (3d Cir. 2017) (noting that the "particularization requirement" of standing requires more than a plaintiff pleading "generalized grievances"). Second, "[a]llegations of possible future injury are not sufficient to satisfy Article III." *Reilly*, 664 F.3d at 42 (citations and quotation marks omitted); *see id.* (noting that a "plaintiff lacks standing if his 'injury' stems from an indefinite risk of future harms inflicted by unknown third parties"). "Article III standing requires a concrete injury even in the context of a statutory violation." *Spokeo*, 578 U.S. at 330. As such, a plaintiff cannot satisfy the injury in fact requirement by "alleg[ing] a bare procedural violation, divorced from any concrete harm." *Id.*; *see In re Horizon Healthcare*, 846 F.3d at 638.[9]

In *Lujan*, environmental organizations "dedicated to wildlife conservation and other environmental causes" brought suit against the Department of the Interior seeking an injunction that would require the Secretary of the Interior to promulgate a new rule that would impose obligations of the Endangered Species Act in foreign nations. 504 U.S. at 558–59. The Supreme

---

[9] Plaintiffs contend that they suffered a procedural injury and are subject to a less stringent standard to establish standing. (Pl. Opp'n at 15.) However, even if a plaintiff asserts a procedural right, they must still demonstrate injury-in-fact. *See Summers v. Earth Island Inst.*, 555 U.S. 488, 496–97 (2009) (describing the injury-in-fact inquiry as a "hard floor . . . that cannot be removed by statute").

Court was tasked with deciding whether these environmental plaintiffs had standing to challenge the government's action. *Id.* at 561. The Supreme Court explained that "the desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purposes of standing." *Id.* at 562–63. However, The Court continued, to demonstrate an injury in fact, a plaintiff must demonstrate "more than a cognizable interest"; rather, the plaintiff must show "not only that listed species were in fact being threatened . . . but also that one or more of [plaintiffs'] members would thereby be directly affected apart from their special interest in the subject." *Id.* at 563 (citations and quotation marks omitted). To establish an "imminent" injury, a plaintiff must show more than "an intent to return to the places they had visited before," as "'some day' intentions . . . do not support a finding of the 'actual or imminent injury'" required under the law. *Id.* at 564 (citations omitted); *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009) ("This vague desire to return is insufficient to satisfy the requirement of imminent injury."). Moreover, the plaintiff must establish "use the area affected by the challenged activity." *Lujan*, 504 U.S. at 566.

Plaintiffs allege that Stern "believes it to be his responsibility to guard the national resources of Long Beach Island and the waters adjacent to it, including the land animals, plants, and marine life." (Compl. ¶ 14.) Stern "is concerned with all aspects of the wind turbine development process" which includes the "the harmful preparatory activities" that might "threaten[] the unique marine life . . . [of] the place Dr. Stern has chosen to call home." (*Id.*) Moreover, both Plaintiffs contend that they "have legally protected interests in preserving marine mammals in the waters off of New Jersey/New York, marine mammals which have been increasingly dying as a primary result of [Federal] Defendant[s'] actions." (*Id.* ¶ 10.) Save LBI was "created to guard human and natural resources" including the marine mammals off the coast

of New Jersey and New York, "the aesthetic elements of Long Beach Island and the New York Bight," and the "economic interests" associated with the shores. (*Id.* ¶ 13.) The Complaint alleges that the organization has "a legally protected interest in preserving the marine mammals." (*Id.* ¶¶ 13.)

However, Plaintiffs' allegations with respect to their interest in marine mammals fail to demonstrate an imminent and concrete injury. *See Reilly*, 664 F.3d at 41. Applying *Lujan*, the Court finds a dearth of allegations in the Complaint that demonstrate a direct injury to Plaintiffs apart from their alleged "special interest" in marine mammals. *Lujan*, 504 U.S. at 563. Plaintiffs believe that they are to "guard the national resources of Long Beach Island and the waters adjacent to it" and are "concerned" with activities of the wind projects that may "threaten[] the unique marine life" in the waters of New York and New Jersey. (Compl. ¶ 13.) While Plaintiffs have a noble interest in believing it their duty and responsibility to protect these mammals, they have not demonstrated a legally-protected one. Plaintiffs fail to allege harm to themselves resulting from any harm to marine mammals. Therefore, Plaintiffs' concerns do not demonstrate that they are harmed in "a personal and individual way." *Id.* at 560. Without allegations alleging concrete injury, finding standing based on Plaintiffs' worry about the harm that may befall marine mammals would "transform[] [the Court] into no more than a vehicle for the vindication of the value interests of concerned bystanders." *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 156 (4th Cir. 2000) (citations and quotation marks omitted); *see Summers*, 555 U.S. at 494 ("generalized harm to the forest or the environment will not alone support standing").

Plaintiffs fail to demonstrate a "'threatened concrete interest of' [their] own." *Friends of the Earth*, 204 F.3d at 159 (quoting *Lujan,* 504 U.S. at 573 n.8). Environmental plaintiffs, like the ones in the case at bar, must show how their interests "in a particular place, animal, or plant species

. . . [are] impaired by a defendant's conduct." *Ocean Advocs. v. U.S. Army Corps. of Engineers*, 402 F.3d 846, 860 (9th Cir. 2005) (determining plaintiffs alleged injury-in-fact where they contended oil spills caused by defendants affected their ability to "study the ecological area, observe wildlife" and use the waters "for recreation"); *Friends of the Earth*, 204 F.3d at 156 (finding injury-in-fact where plaintiff and his family alleged harm from their inability to fish or swim in lake because of defendant's pollution); *Sierra Club, Lone Star Chapter v. Cedar Point Oil Co. Inc.*, 73 F.3d 546, 556 (5th Cir. 1996) (plaintiffs' affidavits that explained their recreational use of the water and harm to these activities by defendant's pollution established injury-in-fact). Stern fails to allege any use of the waters in which the ITAs had or will occur or even in the Atlantic Ocean in general, apart from living on Long Beach Island, thus failing to demonstrate a concrete injury. *Lujan*, 504 U.S. at 563–64; *cf. Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 182 (2000) (finding that "plaintiffs adequately allege[d] injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity" (quoting *Sierra Club v. Morton*, 405 U.S. 727, 735 (1972)).

The Complaint describes Stern's research on marine mammal fatalities and his concern about the harm sonar may have on the whales. (Compl. ¶ 14.) Moreover, vast portions of the Complaint discuss scientific studies describing sonar and its effects on whales. (*See e.g.*, *id.* ¶¶ 101, 104.) These allegations of harm amount only to a "mere academic or philosophical interest" in marine mammals, falling short of establishing injury-in-fact. *Friends of the Earth*, 204 F.3d at 159. Nor do Plaintiffs allege a financial injury from Defendants' conduct. Plaintiffs contend that Save LBI was created to "guard the human and natural resources" off the coasts of New Jersey and New York, including the "economic interests strongly tied to the maintenance of the

environmental features." (Compl. ¶¶ 13–14.) However, Plaintiffs' Complaint is devoid of any allegations of economic harm aside from this conclusory reference. Plaintiffs do not contend that Stern or their other members have been forced to close down their businesses or the value of their properties has decreased due to potential harm to marine mammals. *See Friends of the Earth*, 204 F.3d at 156 (4th Cir. 2000) (determining that plaintiff had pled injury-in-fact where plaintiff claimed nearby pollution decreased the value of his property); *Kanoa Inc. v. Clinton*, 1 F. Supp. 2d 1088, 1092 (D. Haw. 1998) (concluding that plaintiff alleged injury-in-fact where plaintiff was forced to close whale watching tour business due sonar tests by defendants).

In opposing Federal Defendants' and Intervenor Defendants' Motions seeking dismissal for lack of standing, Plaintiffs offer additional allegations in their brief to support their standing. "[I]t is 'axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss.'" *Olson v. Ako*, 724 F. App'x 160, 166 (3d Cir. 2018) (quoting *Commonwealth of Pa. ex rel. Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 181 (3d Cir. 1988)). As the Third Circuit has explained, "it is one thing to set forth theories in a brief; it is quite another to make proper allegations in a complaint." *Hughes v. United Parcel Serv., Inc.*, 639 F. App'x 99, 104 (3d Cir. 2016) (quoting *PepsiCo, Inc.,* 836 F.2d at 181 (affirming district court's decision to not consider allegations not pled in the complaint)).

In the case at bar, Plaintiffs allege new facts in response to Defendants' Motions to Dismiss the Complaint. In their opposition brief, Plaintiffs attach a declaration from Stern, in which, for the first time, Stern states that he has "personally observed whales off the NJ shore here, and up close in Nova Scotia in Zodiac craft on at least fifteen excursions there. . . . I have an excursion planned in the NJ/N[Y] area . . . leaving from Belmar, NJ, and plan to return to Nova Scotia for additional excursions this fall and in the future." (ECF No. 54-1 ¶ 3.) Plaintiffs' attempt to amend

their Complaint to allege injury-in-fact in their opposition brief runs afoul of Federal Rule of Civil Procedure 15, and, under clear Third Circuit instruction, such new facts are inappropriately considered at this juncture. *See Frederico v. Home Depot*, 507 F.3d 188, 201–22 (3d Cir. 2007) ("we do not consider after-the-fact allegations"); *Lawshe v. Squeri*, No. 03-3506, 2010 WL 276232, at *7 (D.N.J. Jan. 19, 2010) (noting that "[t]he proper procedure is for a plaintiff to amend his pleadings pursuant to Rule 15 of the Federal Rules of Civil Procedure"); *AccuCredit Assocs., LLC v. Diversified Glob. Sys., LLC*, No. 18-16537, 2019 WL 11276332, at *2 (D.N.J. Sept. 30, 2019) (explaining that in "a facial attack to subject matter jurisdiction, . . . 'the court must only consider the allegations of the complaint and documents referenced therein and attached thereto, and affidavits and briefs do not fall in this category'" (quoting *Lincoln Ben. Life Co. v. AEI Life, LLC*, 800 F.3d 99, 105 (3d Cir. 2015)); *Berrol ex rel. Est. of Berrol v. AIG*, No. 07-1565, 2007 WL 3349763, at *4 (D.N.J. Nov. 7, 2007) (declining to "consider facts alleged in Plaintiff's opposition brief" on a facial jurisdictional challenge).

Save LBI's standing arguments fail for an additional reason that it cannot demonstrate associational standing. "[A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *N.J. Coal. of Auto. Retailers, Inc. v. Mazda Motor of Am., Inc.*, 957 F.3d 390, 392 (3d Cir. 2020) (quoting *Hunt v. Wash. State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977)); *see also Franco v. Conn. Gen. Life Ins. Co.*, 647 F. App'x 76, 82 (3d Cir. 2016). As discussed above, the Complaint fails to show that Stern, the only member of Save LBI referenced in the Complaint, has suffered an injury-in-fact. Moreover, the Complaint lacks any additional discussion of other members of the

organization. As such, Plaintiffs fails to satisfy the first prong of the test, and Save LBI does not have standing on behalf of its members.

Therefore, the Court finds that Plaintiffs fail to allege injury-in-fact and need not consider whether Plaintiffs have alleged facts establishing the remaining two prongs of Article III standing. See *Toll Bros. v. Twp. of Readington*, 555 F.3d 131, 142 (3d Cir. 2009) (""[T]the injury-in-fact element [of standing] is often determinative."); *Katz v. Six Flags Great Adventure, LLC*, No. 18-116, 2018 WL 3831337, at *8 (D.N.J. Aug. 13, 2018) (ending standing inquiry after finding that the plaintiff failed to allege injury-in-fact); *Okten v. ARS Nat'l Servs., Inc.*, No. 22-443, 2023 WL 3249828, at *4 (D.N.J. May 4, 2023) (same).[10]

## B. RIPENESS AND MOOTNESS

Defendants also contend that Plaintiffs' claims against several ITAs that have not yet been issued are unripe and that the claims against the expired ITAs are moot. (*See* Fed. Defs. Mov. Br. at 36–42; Orsted Mov. Br. at 17–21; Atlantic Shores Mov. Br. at 17–22.)

The doctrine of ripeness "serves to 'determine whether a party has brought an action prematurely and counsels abstention until such time as a dispute is sufficiently concrete to satisfy the constitutional and prudential requirements of the doctrine.'" *Khodara Env't, Inc. v. Blakey*, 376 F.3d 187, 196 (3d Cir. 2004) (quoting *Peachlum v. City of York*, 333 F.3d 429, 433 (3d Cir. 2003)). A court lacks subject matter jurisdiction over a dispute that is not ripe. *See Thompson v. Borough of Munhall*, No. 01-4120, 2002 WL 1840802, at *1 (3d Cir. Aug.13, 2002) ("There must be a true and ripe case or controversy for a federal court to have jurisdiction over an action.");

---

[10] Because the court finds that Plaintiffs do not satisfy constitutional standing, the court need not address the additional standing inquiry under the APA whether Plaintiffs fall within the "zone of interests to be protected or regulated by the statute." *Match–E–Be–Nash–She–Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 132 (2012) (quoting *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153 (1970)).

*Philadelphia Fed'n of Tchrs., Am. Fed'n of Tchrs. v. Ridge*, 150 F.3d 319, 323 (3d Cir. 1998) ("One aspect of justiciability is ripeness.").

Federal Defendants argue that Plaintiffs' challenges to the pending ITAs are not ripe, and thus, the Court should dismiss these claims. (Fed. Defs. Mov. Br. at 36–38.) They argue that because the ITAs are still pending, there has not been "final action" and thus "no legal or practical effects on any party." (*Id.* at 38.) The Intervenor Defendants echo this argument. (*See* Atlantic Shores Mov. Br. at 17–20; Orstead Mov. Br. at 17–19.) Besides the cursory references to the pending ITAs and an argument that these ITAs are "statements of intention that will invariably become reality," (Pls. Opp'n at 34), Plaintiffs do not independently address whether their claims are ripe. *See Dreibelbis v. Scholton*, 274 F. App'x 183, 185 (3d Cir. 2008) (affirming district court's grant of a motion to dismiss on grounds raised in defendants' motion but not addressed in plaintiff's opposition despite "ample opportunity" to contest it (citing *Confer v. Custom Eng'g Co.*, 952 F.2d 41, 44 (3d Cir. 1991) and *Laborers' Intern. Union of N. Am., AFL–CIO v. Foster Wheeler Energy*, 26 F.3d 375, 398 (3d Cir. 1994))); *Woodell v. Coach,* No. 22-2222, 2022 WL 17486262, at *3 (D.N.J. Dec. 7, 2022) ("As Woodell does not address these arguments in his opposition brief, any arguments in opposition are deemed waived." (citing *Leisure Pass N. Am., LLC v. Leisure Pass Grp., Ltd.*, No. 12-3375, 2013 WL 4517841, at *4 (D.N.J. Aug. 26, 2013))); *see also DeShields v. Int'l Resort Props. ILtd.*, 463 F. App'x 117, 120 (3d Cir. 2012) (noting that "judges are not like pigs, hunting for truffles buried in briefs" (quoting *United States v. Starnes,* 583 F.3d 196, 216 (3d Cir. 2009)). As such, Plaintiffs have waived contesting that these ITAs are unripe, and thus, the Court dismisses the challenges to the pending ITAS as same.

Even had Plaintiff not waived opposition to Defendants' ripeness argument, the Court would nonetheless find that challenges to pending ITAs are unripe. The ripeness inquiry looks to

"whether the parties are in a sufficiently adversarial posture to be able to present their positions vigorously, whether the facts of the case are sufficiently developed to provide the court with enough information on which to decide the matter conclusively, and whether a party is genuinely aggrieved so as to avoid expenditure of judicial resources on matters which have caused harm to no one." *Khodara*, 376 F.3d at 196 (cleaned up). Courts evaluating ripeness consider "(1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." *Al Ummah Cmty. Ctr. v. Teaneck*, No. 20-14181, 2022 WL 16948812, at *4 (D.N.J. Nov. 15, 2022) (citing *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967)).

When asked to review an administrative action, "courts are instructed to consider whether review is being sought of final agency action." *Wedgewood Vill. Pharmacy, LLC v. U.S. Food & Drug Admin.*, No. 22-2649, 2022 WL 1591787, at *4 (D.N.J. May 19, 2022) (quotation marks omitted). A final agency action "must mark the consummation of the agency's decisionmaking process, must not be of a merely tentative or interlocutory nature, and must be one by which rights or obligations have been determined, or from which legal consequences will flow." *T Mobile Ne. LLC v. City of Wilmington*, 913 F.3d 311, 318–19 (3d Cir. 2019) (quoting *Riverkeeper Network v. Sec'y of Pa. Dep't of Envtl. Prot.*, 870 F.3d 171, 178 (3d Cir. 2017)).

Here, the pending ITAs are not final agency actions. As described above, prior to approving an ITA, NMFS allows for a public notice and comment prior to finalizing the LOA and final rule. 50 C.F.R. § 216.104. Only after this public comment period does NMFS fully examine the request and decide whether to approve it. *Id.* Moreover, NMFS must then promulgate "specific regulations" for each ITA. 50 C.F.R. § 216.105. The regulations "set forth . . . [p]ermissible mthods of taking" and other requirements, including monitoring and reporting. *Id.* While the ITAs are still pending and before the regulations have been issued, NMFS may still withdraw or otherwise

24

modify the ITA. The pending ITA does not allow the requestor to take any action until the rule is finalized. Thus, any challenge to pending ITAs are unripe. *See Health Sci. Funding LLC v. FDA & Stephen Ostroff*, No. 15-5635, 2016 WL 3078748, at *5 (D.N.J. May 31, 2016) (holding claim unripe where no final agency action); *Ass'n of Cmty. Orgs. for Reform Now (ACORN) v. Se. Pennsylvania Transp. Auth. (SEPTA)*, 462 F. Supp. 879, 885 (E.D. Pa. 1978), *aff'd sub nom.,* 605 F.2d 1194 (3d Cir. 1979) ("The matter is not ripe for adjudication since there has not been final agency action.").

Plaintiffs point the Court to a discussion of the pending ITAs in a letter attached to their Complaint. (ECF No. 1-2 at *9). Yet, as this exhibit shows, the five (5) pending ITAs contain no date of issue or effective dates, illustrating the still hypothetical and tentative, as opposed to final, nature of the agency action. *T Mobile Ne.*, 913 F.3d at 318–19. Prior to finalizing the taking, NMFS must issue regulations and a letter of authorization "specify[ing] the period of validity and any additional terms and conditions appropriate for the specific request." 50 C.F.R. § 216.106. The lack of finality is evidenced by the incomplete nature of the pending ITAs. Any action by the Court to enjoin or set aside these pending ITAs would fail to respect the ongoing decisionmaking process of the agency and would amount to counseling the agency how to make its decisions. *See Doris Behr 2012 Irrevocable Tr. v. Johnson & Johnson*, No. 19-8828, 2022 WL 798334, at *5 (D.N.J. Mar. 15, 2022), aff'd, No. 22-1657, 2023 WL 3316329 (3d Cir. May 9, 2023) ("[J]udgments 'that would be based upon a hypothetical set of facts stray towards the realm of advisory opinions and thus favor a finding of unripeness.'" (quoting *AXIS Ins. Co. v. PNC Fin. Servs. Grp., Inc.*, 135 F. Supp. 3d 321, 327 (W.D. Pa. 2015))).

Defendants further contend that Plaintiffs' challenges to the expired ITAs are moot. The mootness doctrine "requires that 'an actual controversy must be extant at all stages of review, not

merely at the time the complaint is filed.'" *8 Erie St. JC LLC v. City of Jersey City*, No. 19-9351, 2020 WL 2611540, at *2 (D.N.J. May 21, 2020) (quoting *Brown v. Phila. Hous. Auth.*, 350 F.3d 338, 343 (3d Cir. 2003)). Cases are moot when "developments occur during the course of adjudication that eliminate a plaintiff's personal stake in the outcome of a suit or prevent a court from being able to grant the requested relief." *Hamilton v. Bromley*, 862 F.3d 329, 335 (3d Cir. 2017) (quoting *Blanciak v. Allegheny Ludlum Corp.*, 77 F.3d 690, 698–99 (3d Cir. 1996)); *Providence Pediatric Med. Daycare, Inc. v. Alaigh*, No. 10-2799, 2016 WL 901078, at *4 (D.N.J. Mar. 9, 2016), *aff'd sub nom.*, 672 F. App'x 172 (3d Cir. 2016) ("Even if a plaintiff has standing at the time suit is instituted, the case may be dismissed if it becomes moot."). Once a claim has become moot, a court lacks jurisdiction to hear it. *8 Erie St.*, 2020 WL 2611540, at *2.

In the case at bar, with respect to the expired ITAs, Plaintiffs seek the Court to declare that Federal Defendants' issuance of these ITAs was "arbitrary, capricious, and contrary to law." (*See* Compl., Prayer for Relief.) However, the expired ITAs are no longer in effect. (*See id.* ¶¶ 28–39.) According to Plaintiffs' Complaint, the then active ITAs referenced therein were as follows: (1) South Fork Wind, LLC to construct the South Fork Offshore Wind Project effective November 15, 2022 through November 14, 2023; (2) Atlantic Shores for marine site characterization surveys effective April 20, 2022 through April 19, 2023; (3) Ocean Wind, LLC for marine site characterization surveys effective May 10, 2022 through May 9, 2023; (4) Orsted Wind Power North America, LLC for marine site characterization surveys effective May 10, 2022 through May 9, 2023; (5) Ocean Wind II, LLC for marine site characterization surveys effective May 10, 2022 through May 9, 2023; (6) NextEra Energy Transmission Mid-Atlantic Holdings, LLC for marine site characterization surveys effective July 1, 2022 through June 30, 2023; (7) Park City Wind, LLC for marine characterization surveys effective September 1, 2022 through August 31, 2023;

(8) Atlantic Shores for marine site characterization surveys effective August 10, 2022 through August 9, 2023; (9) Attentive Energy, LLC for marine site characterization surveys effective September 15, 2022 through September 14, 2023; (10) Vineyard Northeast, LLC for marine site characterization surveys effective July 27, 2022 through July 26, 2023; (11) Orsted for marine site characterization surveys effective October 6, 2022 through October 5, 2023. (*Id.*) Clearly, according to Plaintiffs' own Complaint, all ITAs have expired and, thus, are no longer active. Plaintiff has not submitted an amended pleading with any information concerning renewals of the above ITAs or information concerning other active ITAs. Plaintiffs' proposed relief would have the Court enter a judgment that would have no meaningful effect, as the ITAs no longer apply to the Defendants. The proposed relief would amount to an "advisory opinion on abstract propositions of law," which the Court is not empowered to do. *See ConocoPhillips Alaska, Inc. v. Nat'l Marine Fisheries*, No. 06-0198, 2007 WL 9718215, at *2 (D. Alaska Apr. 17, 2007) (quoting *Neighbors of Cuddy Mountain v. Alexander*, 303 F.3d 1059, 1065 (9th Cir. 2002)).

Another district court faced a similar scenario to the one at issue in the case at bar. In *ConocoPhillips*, the plaintiff sought declaratory relief from the court, asking the court to hold that NMFS had violated the MMPA and APA by issuing one-year taking authorizations that were arbitrary and capricious. *ConocoPhillips*, 2007 WL 9718215, at *2. The defendant argued that the plaintiff's claim was moot, and the court agreed. *Id.* The court explained that "when the 2006 [taking authorization] expired, [the plaintiff's] claim for injunctive relief expired with it," as "2006 is gone and past" and "[o]ne cannot presume that the conditions that existed then exist now or will exist in the future." *Id.* The court examined whether, if it found for the plaintiff on the merits, it would be able to afford relief, and concluded that the case was moot because "no effective relief for the alleged violation can be given." *Id.*

Notwithstanding the expiration of the relevant ITAs, Plaintiffs contend that their claims regarding these ITAs fall within the "capable of repetition, yet evading review" exception to the mootness doctrine. (Pls. Opp'n at 28.) This is a "narrow exception" to the mootness doctrine "that 'applies only in exceptional situations.'" *Hamilton*, 862 F.3d at 335 (quoting *Spencer v. Kemna*, 523 U.S. 1, 17 (1998)). Plaintiffs bear the burden to demonstrate that this exception applies. *Cnty. of Butler v. Governor of Pennsylvania*, 8 F.4th 226, 231 (3d Cir. 2021). This exception applies where "(1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again." *Hamilton*, 862 F.3d at 335 (quoting *Spencer*, 523 U.S. at 17).

The Court rejects this exception based on failure of the second prong. To meet the exception, a plaintiff must show "more than a theoretical possibility of the action occurring against the complaining party again; it must be a reasonable expectation or a demonstrated probability." *Cnty. of Butler*, 8 F.4th at 231. "The 'same action' generally refers to 'particular agency policies, regulations, guidelines, or recurrent identical agency actions.'" *Theodore Roosevelt Conservation P'ship v. Salazar*, 661 F.3d 66, 79 (D.C. Cir. 2011) (quoting *Pub. Utilities Comm'n v. FERC*, 236 F.3d 708, 715 (D.C. Cir. 2001)); *Am. Littoral Soc. v. U.S. E.P.A. Region*, 199 F. Supp. 2d 217, 249 (D.N.J. 2002) (finding claim did not satisfy mootness exception where it was "contingent on a host of occurrences" (quoting *Blanciak*, 77 F.3d at 699–700); *Lone Rock Timber Co. v. U.S. Dep't of Interior*, 842 F. Supp. 433, 439 (D. Or. 1994) (finding exception did not apply where "plaintiffs' entitlement to relief and the precise nature of that relief may vary depending upon the particular circumstances of the case" which included each "particular" scientific opinion issued by the federal agency).

In the case at bar, Plaintiffs complain of expired ITAs that governed a specific activity for a particular period of time and place—"specific condition[s] necessarily predicated on the *unique* features of this particular" ITA. *New Jersey Tpk. Auth. v. Jersey Cent. Power & Light*, 772 F.2d 25, 33 (3d Cir. 1985) (emphasis in original). As discussed above, for each ITA, the requesting party must submit a host of information for the "specific activity," including the "date," "duration," and "specific geographical region." *See* 50 C.F.R. § 216.104. In support of their argument, Plaintiffs cite to a since-vacated decision finding the exception applied where the plaintiffs "criticism . . . [was] directed at the agencies broader approach." (*See* Pl. Opp'n at 30–31 (citing *Or. Natural Desert Ass'n v. Lohn*, 485 F. Supp. 2d 1190 (D. Or. 2007)).) However, there are no facts alleged in the Complaint that NMFS will issue ITAs or that Federal Defendants will approve an ITA for the same specific activity. As the case law makes clear, the "same action" refers to "recurrent identical agency actions," and it is not clear the same ITAs governing the same area and activities will occur in the future. *See Theodore Roosevelt Conservation P'ship*, 661 F.3d at 79. Moreover, these ITAs will be subject to additional notice and comment periods, which may encompass new information for NFMS to weigh. Plaintiffs' allegations that ITAs may be issued in the future fails to show that these will cover equivalent ITAs previously issued by NFMS. Therefore, the Court finds that no exception to mootness applies, and any challenge to expired ITAs is moot.[11]

---

[11] Because the Court dismisses Plaintiffs' claims based on the aforementioned grounds, the Court need not address Defendants' additional arguments concerning issue exhaustion. *Perez v. New Jersey*, No. 14-4610, 2015 WL 4394229, at *5 n.6 (D.N.J. July 15, 2015). As the Court find that it lacks jurisdiction to hear Plaintiffs' claim, the Court denies Plaintiffs' Motion for a Preliminary Injunction, (ECF No. 23), as moot. *Aemer v. Brewer*, No. 18-1402, 2019 WL 13260173, at *1 (D.N.J. Apr. 1, 2019), *aff'd sub nom.*, 808 F. App'x 73 (3d Cir. 2020) (holding motion for preliminary injunction moot because the Court dismissed Plaintiff's complaint); *KDDI Glob. LLC v. Fisk Telecom LLC*, No. 17-5445, 2017 WL 5479512, at *7 (D.N.J. Nov. 15, 2017) (same). Relatedly, since the preliminary injunction is moot, so too are Orsted's and Atlantic Shore's Motions to Strike (ECF Nos. 57 and 59), as well as American Clean Power Association's Motion for Leave to File an Amicus Curiae Brief, (ECF No. 53).

IV.     **CONCLUSION**

For the foregoing reasons, Defendants' Motions to Dismiss are **GRANTED**. Plaintiffs' claims are **DISMISSED** without prejudice. Plaintiffs may file an amended complaint that cures the deficiencies identified in this Opinion within forty-five (45) of the date of this Opinion. An appropriate Order will accompany this Opinion.

ROBERT KIRSCH
UNITED STATES DISTRICT JUDGE

Dated: February 29, 2024

30