# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

SAVE LONG BEACH ISLAND and
ROBERT STERN, Ph.D.,

     Plaintiffs,

     v.

U.S. DEPARTMENT OF COMMERCE;
HOWARD LUTNICK, in his official capacity
as Secretary of Commerce; NATIONAL
MARINE FISHERIES SERVICE; and
EUGENIO PIÑEIRO SOLER, in his official
capacity as Acting Assistant Administrator,
National Marine Fisheries Service,

     Federal Defendants,

ATLANTIC SHORES OFFSHORE WIND,
LLC; and EMPIRE OFFSHORE WIND LLC,

     Defendant-Intervenors.

Civil Action No. 23-1886 (RK) (JBD)

**OPINION**

**KIRSCH, District Judge**

     **THIS MATTER** comes before the Court upon eight motions: (1) Plaintiffs Save Long

Beach Island ("Save LBI") and Robert Stern, Ph.D.'s ("Dr. Stern") Motion for Summary

Judgment, (ECF No. 117); (2) Defendants United States Department of Commerce, National

Marine Fisheries Service ("NMFS"), Howard Lutnick, and Eugenio Piñeiro Soler's (collectively,

"Federal Defendants")[1] Cross Motion for Summary Judgment, (ECF No. 118); (3) Intervenor-

Defendant Atlantic Shores Offshore Wind, LLC's ("Atlantic Shores") Cross Motion for Summary

---

[1] Under Rule 25(d) of the Federal Rules of Civil Procedure, Secretary of Commerce Howard Lutnick and
Acting Assistant Administrator Eugenio Piñeiro Soler are substituted for Gina Raimondo and Janet Coit.
The Court directs the Clerk to update the docket sheet and case caption to reflect this change.

Judgment, (ECF No. 120); (4) Intervenor-Defendant Empire Offshore Wind LLC's ("Empire Wind") Cross Motion for Summary Judgment, (ECF No. 121); (5) Federal Defendants' Motion to Exclude Plaintiffs' Extra-Record Materials, (ECF No. 122); (6 & 7) Atlantic Shores and Empire Wind's Motions to Join in Federal Defendants' Motion to Exclude Plaintiffs' Extra-Record Materials, (ECF Nos. 125, 126); and (8) Atlantic Shores's Motion to Join in Federal Defendants' Reply in Further Support of Their Motion to Exclude Plaintiffs' Extra-Record Materials, (ECF No. 129). Federal Defendants and Intervenor-Defendants (collectively, "Defendants") opposed Plaintiffs' Motion for Summary Judgment. (ECF Nos. 118, 120, 121.) Plaintiffs opposed Defendants' Motions for Summary Judgment, and Defendants replied. (ECF Nos. 123, 124, 127, 130, 131.) Plaintiffs opposed Federal Defendants' Motion to Exclude Plaintiffs' Extra-Record Materials, and Federal Defendants replied. (ECF Nos. 124, 128.)

The Court has carefully considered the parties' submissions and resolves the matter without oral argument pursuant to Federal Rule of Civil Procedure 78 and Local Civil Rule 78.1. For the reasons set forth below, Federal Defendants' Motion to Exclude Plaintiffs' Extra-Record Materials and Atlantic Shores and Empire Wind's Motions to Join in Federal Defendants' Motion to Exclude are **GRANTED**.[2] Atlantic Shores's Motion for Summary Judgment is **DENIED as moot**. Plaintiffs' Motion for Summary Judgment is **DENIED**. Federal Defendants' Motion for Summary Judgment is **GRANTED in part and DENIED in part**. Empire Wind's Motion for Summary Judgment is **GRANTED**.

---

[2] As discussed further below, the Court agrees with Federal Defendants that documents introduced by Plaintiffs outside of the Administrative Record should be excluded for purposes of the Court's merits analysis. The Court, however, will consider some of these records when assessing Plaintiffs' standing.

## I.    **BACKGROUND**

Plaintiffs Save LBI and Dr. Stern[3] bring this action against Federal Defendants pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.*, the Marine Mammal Protection Act ("MMPA"), 16 U.S.C. § 1361 *et seq.*, and the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4331 *et seq.* They seek to challenge six Incidental Harassment Authorizations ("IHA") and one Letter of Authorization ("LOA") issued by Defendant NMFS to various windfarm developers off the coast of New York and New Jersey. (ECF No. 81 ("Am. Compl.") ¶ 1.)

As discussed at length below, this Court will grant summary judgment in favor of Defendants on jurisdictional grounds. It finds that Plaintiffs' claims regarding the expired IHAs issued to Atlantic Shores and Bluepoint Wind, LLC ("Bluepoint Wind") are moot. The Court will apply the "capable of repetition, yet evading review" exception to save from mootness Plaintiffs' challenges to all other expired IHAs (Vineyard Northeast, LLC ("Vineyard Northeast"); Attentive Energy, LLC ("Attentive Energy"); Invenergy Wind Offshore, LLC ("Invenergy Wind Offshore"); and Community Offshore Wind, LLC ("Community Offshore Wind")). With regard to the surviving IHA challenges and the challenge to Empire Wind's LOA, the Court concludes that Plaintiffs lack standing to pursue their claims.

---

[3] Plaintiff Save LBI, a New Jersey 501(c)(3) non-profit corporation with over 10,000 supporters, was organized to "guard human and natural resources," including "marine mammals, fish, and other species that inhabit, use, or migrate off the New Jersey and New York coasts"; "the aesthetic elements of Long Beach Island and the New York Bight"; and "economic interests strongly tied to the maintenance of the environmental features comprising Long Beach Island and the New York Bight." (Am. Compl. ¶ 15.) Plaintiff Dr. Stern, the current president of Save LBI, holds a doctorate in Applied Mathematics and Aeronautical Engineering. (*Id.* ¶ 16.) He previously "managed" the United States Department of Energy's Office of Environmental Compliance, which was responsible for reviewing all environmental impact assessments and statements. (*Id.*) Dr. Stern believes that it is his "responsibility to guard the natural resources of Long Beach Island and the waters adjacent to it, including the land animals, plants, and marine life." (*Id.*)

In the alternative, assuming *arguendo* that jurisdiction exists over this matter, the Court finds that Plaintiffs have failed to meet their high burden to prove that NMFS's take estimates of North Atlantic Right Whales and Humpback Whales were arbitrary and capricious under the MMPA's "small numbers" and "negligible impact" requirements and that NMFS's decision not to conduct a cumulative Environmental Impact Statement ("EIS") or Environmental Assessment ("EA") under NEPA before issuing the IHAs and LOA at issue was arbitrary and capricious. Indeed, the Administrative Record underlying these authorizations contains approximately 72,000 pages. (ECF Nos. 106-1, 109-1.) Upon review, this exhaustive record consists of, among other things, decision memoranda, proposed and final authorizations, public comments, categorical exclusion memoranda, a biological opinion, an EIS, and almost 50,000 pages of scientific and legal references. The sheer volume of documentary support bespeaks the comprehensive and transparent nature of NMFS's administrative process and lends substantial support for that process's thoroughness and reasonableness.[4]

### A. Federal Regulation of Wind Energy Development

The Secretary of the Interior has authority under the Outer Continental Shelf Lands Act ("OCSLA") to issue renewable energy leases on the Outer Continental Shelf through the U.S. Bureau of Ocean Energy Management ("BOEM"). 30 C.F.R. § 585.100. Wind energy lessees must seek approval for various site and construction plans from BOEM. 30 C.F.R. §§ 585.600, 585.605–585.613, 585.20–585.628. Once BOEM approves these plans, the lessee may conduct the activities specified in those plans.

---

[4] The administrative process for each one-year IHA from its application to its finalization took approximately four months. (*See* ECF Nos. 106-1.) The process to investigate and approve Empire Wind's five-year LOA took over two years. (*Id.*)

### 1. **The Marine Mammal Protection Act**

In addition to the approvals from BOEM, if the wind energy lessee's activities may incidentally "take" a marine mammal, the lessee must obtain a separate authorization from NMFS for that take under the MMPA. The MMPA prohibits the "taking and importation of marine mammals." 16 U.S.C. § 1371. The MMPA defines "take" as "to harass, hunt, capture, or kill, or attempt to harass, hunt, capture, or kill any marine mammal." 16 U.S.C. § 1362(13). The MMPA divides marine mammal harassment into two grades. "Level A" harassment is "any act of pursuit, torment, or annoyance which [] has the potential to injure a marine mammal or marine mammal stock in the wild." 16 U.S.C. § 1362(18)(A)(i). "Level B" harassment is "any act of pursuit, torment, or annoyance which . . . has the potential to disturb a marine mammal or marine mammal stock in the wild by causing disruption of behavioral patterns, including, but not limited to, migration, breathing, nursing, breeding, feeding, or sheltering." 16 U.S.C. § 1362(18)(A)(ii).The MMPA, however, permits "incidental" takings of "small numbers of marine mammals of a species" with a "negligible impact on such species." 16 U.S.C. § 1371(a)(5)(A), (D). To qualify for this exception, an applicant must submit a written request[5] to NMFS with detailed information regarding the proposed taking. 50 C.F.R. § 216.104(a); 50 C.F.R. § 216.106(a). Once submitted, NMFS publishes either the proposed authorization or notice of the request for authorization for public comment. 50 C.F.R. § 216.104(b); 50 C.F.R. § 216.106(c)–(d). The public comment period is 30 days. *Id*. Once all public comments have been submitted, NMFS responds to them and then

---

[5] If an applicant's activities will result in "harassment" only (rather than serious injury or death) of marine mammals, then the applicant can apply for an IHA, which is effective for up to one year. *Incidental Take Authorizations Under the Marine Mammal Protection Act*, NOAA Fisheries, https://www.fisheries.noaa.gov/permit/incidental-take-authorizations-under-marine-mammal-protection-act (May 29, 2025). If the applicant's activities will result in "harassment" only and is planned for multiple years, then the applicant may apply for an LOA, which is effective for up to five years. *Id*.

determines whether to issue a final authorization.[6]

## 2.  **The National Environmental Policy Act**

NEPA requires federal agencies to adhere to certain "procedural requirements to ensure that the government gives 'appropriate consideration' to environmental impacts before undertaking major actions." *Gulf Restoration Network v. Haaland*, 47 F.4th 795, 798 (D.C. Cir. 2022) (quoting 42 U.S.C. § 4332(2)(B)–(C)). One way that NEPA effectuates this goal is by requiring agencies to prepare an EIS when "major Federal actions . . . significantly affect[] the quality of the human environment." 42 U.S.C. § 4332(C). The EIS must be "a detailed statement" on, *inter alia*, "reasonably foreseeable environmental effects of the proposed agency action"; "any reasonably foreseeable adverse environmental effects which cannot be avoided"; and "a reasonable range of alternatives to the proposed agency action." *Id*. If the federal action on its face does not require an EIS, the agency may conduct an EA to determine whether an EIS is necessary. *Allegheny Def. Project, Inc. v. U.S. Forest Serv.*, 423 F.3d 215, 223 n.14 (3d Cir. 2005).

An agency is not required to prepare an EIS or EA if it determines that the proposed action falls within established "categorical exclusions." 40 C.F.R. § 1508.1(e) (repealed Apr. 11, 2025)[7]; *N. J. Dep't of Env't Prot. & Energy v. Long Island Power Auth.*, 30 F.3d 403, 409 (3d Cir. 1994).

---

[6] *Incidental Take Authorizations Under the Marine Mammal Protection Act*, National Oceanic and Atmospheric Administration ("NOAA") Fisheries, https://www.fisheries.noaa.gov/permit/incidental-take-authorizations-under-marine-mammal-protection-act (May 29, 2025).

[7] Plaintiffs' claims arise under the Council of Environmental Quality ("CEQ") NEPA regulations, as amended on September 14, 2020. *See, e.g.*, NMFS_2022. On April 11, 2025, CEQ issued an "interim rule" removing the CEQ regulations implementing NEPA, including those regulations governing categorical exclusions. 90 Fed. Reg. 10610, 10610. However, the removal of those regulations post-dates the authorizations at issue. The Court must rely on the regulations in effect at the time of the authorizations issued in this case. *Ctr. for Biological Diversity v. Fed. Energy Regul. Comm'n*, 67 F.4th 1176, 1182 n.2 (D.C. Cir. 2023). NMFS has also issued agency-specific policies and procedures for compliance with NEPA, which appear to remain in effect. *See NAO 216-6A: Compliance with the National Environmental Policy Act*, NOAA, https://www.noaa.gov/organization/administration/nao-216-6a (last visited May 31, 2025).

A "categorical exclusion" is "a category of actions that an agency has determined, in its agency NEPA procedures (§ 1507.3 of this subchapter) or pursuant to § 1501.4(c) of this subchapter, normally does not have a significant effect on the human environment." 40 C.F.R. § 1508.1(e) (repealed Apr. 11, 2025). Before relying on a categorical exclusion, however, an agency must evaluate the action for "extraordinary circumstances" in which a normally excluded action might have a "significant environmental effect." *Ctr. for Biological Diversity v. Salazar*, 706 F.3d 1085, 1097 (9th Cir. 2013).

### B. THE CHALLENGED IHAS AND LOA[8]

Plaintiffs challenge six IHAs and one LOA issued by NMFS, focusing on the take of two specific whale species: the North Atlantic Right Whale ("Right Whale") and the Humpback Whale. (Am. Compl. ¶¶ 30–37.) Those authorizations are:

- "Bluepoint Wind, LLC's Marine Site Characterization Surveys off of New York and New Jersey in the New York Bight, 3/1/2024-2/28/2025. Total Level B harassment takes: Humpback whales (36), North Atlantic Right Whales (14)." (*Id.* ¶ 31; *see also* NMFS_572[9].)

- "Empire Offshore Wind, LLC Construction of the Empire Wind Project (EWI and EW2) LOA off of New York, 2/22/2024 – 2/21/2029. Total Level B harassment takes: Humpback whales (97), North Atlantic Right Whales (29)." (*Id.* ¶ 32; *see also* NMFS_917.)

- "Atlantic Shores Offshore Wind Bight, LLC's Marine Site Characterization Surveys off New Jersey and New York, 4/1/2024-3/31/2025. Total Level B harassment takes: Humpback whales (3), North Atlantic Right Whales (2)." (*Id.* ¶ 33; *see also* NMFS_14.)

- "Vineyard Northeast, LLC's Marine Site Characterization Survey from Massachusetts to New Jersey, 7/27/2023-7/26/2024. Total Level B harassment takes: Humpback whales (12), North Atlantic Right Whales (12)." (*Id.* ¶ 34; *see also* NMFS_8358.)

---

[8] The Administrative Record in this case is approximately 72,000 pages. (ECF Nos. 106-1, 109-1.) The Court focuses its factual summary on the agency findings most relevant to the claims before it.

[9] The Court refers to the Administrative Record by the Bates number assigned to each page ("NMFS_##"). (*See* ECF No. 107-1 (Administrative Record Index); ECF No. 109-1 (Supplemental Administrative Record Index); ECF No. 113-1 (Errata to Administrative Record Index).)

- "Invenergy Wind Offshore, LLC's site characterization surveys off New Jersey and New York, 7/31/2023-7/30/2024. Total Level B harassment takes: Humpback whales (13), North Atlantic Right Whales (6)." (*Id.* ¶ 35; *see also* NMFS_8008.)

- "Community Offshore Wind, LLC Marine Site Characterization Surveys12 off New Jersey and New York, 7/1/2023-6/30/2024. Total Level B harassment takes: Humpback whales (46), North Atlantic Right Whales (24)." (*Id.* ¶ 36; *see also* NMFS_650.)

- "Attentive Energy, LLC Marine Site Characterization Surveys off New Jersey and New York (2023), 6/20/2023-6/19/2024. Total Level B harassment takes: Humpback whales (24), North Atlantic Right Whales (12)." (*Id.* ¶ 37.)

Each of the one-year IHAs at issue authorized under the MMPA the take of Right Whales and Humpback Whales incidental to "marine site characterization surveys," including "high-resolution geophysical [] surveys," which map the seafloor. (NMFS_02; NMFS_278, NMFS_571; NMFS_639; NMFS_7998; NMFS_8350.) The objective of these surveys is to "support the site characterization, siting, and engineering design of offshore wind project facilities including wind turbine generators, offshore substations, and submarine cables within the Survey Area." (*Id.*) NMFS determined that these survey activities have "the potential to result in incidental take of marine mammals in the form of Level B harassment." (*Id.*) That is, NMFS authorized only activities with the potential to disturb marine mammal behavioral patterns—less serious, obviously, than "the potential to injure" threshold of Level A harassment and serious injury or mortality. *See* 16 U.S.C. § 1362(18)(A)(i)–(ii).

The five-year LOA issued to Empire Wind authorized the take of marine mammals incidental to construction activities associated with implementation of Empire Wind's windfarm project. (NMFS_930; *see also* NMFS_883–884 ("The specified activities are impact pile driving of wind turbine generator (WTG; monopiles) and offshore substation (OSS) foundations (pin piles for jacket foundations); impact and vibratory pile driving associated with cable landfall construction and marina construction; site characterization surveys using high-resolution

geophysical (HRG) acoustic sources; vessel transit within the specified geographical region to transport crew, supplies, and materials; WTG operation; fishery and ecological monitoring surveys; placement of scour protection; and trenching, laying, and burial activities associated with the installation of the export cable route from OSSs to shore-based converter stations and inter-array cables between turbines.").) Like the IHAs at issue, the LOA authorized only Level B harassment of Right Whales and Humpback Whales in connection with these activities. (NMFS_917–919.) The LOA as well as the IHAs each expressly prohibited the take by "serious injury" or "death" of any of the species listed in the authorizations, including Right Whales and Humpback Whales. (NMFS_35; NMFS_298; NMFS_574; NMFS_671; NMFS_884; NMFS_8017; NMFS_8363.)

In each authorization, NMFS provided a detailed description of the marine mammals (including Right Whales and Humpback Whales) present in the area of the activities specified by each windfarm developer and any risk to those species from the specified activities. (NMFS_156–161; NMFS_435–440; NMFS 746–751; NMFS_8124–8128; NMFS_3636–3657); *see also* 88 Fed. Reg. 2325, 2329–2334 (Bluepoint Wind initial proposed IHA); 87 Fed. Reg. 30872, 30876–30879 (Vineyard Northeast initial proposed IHA). In the late fall months, Right Whales are "generally thought to depart from the feeding grounds in the North Atlantic and move south to their calving grounds off Georgia and Florida." (NMFS_157; *see also* NMFS_435–436; NMFS 746–747; NMFS_8124; NMFS_3636); 88 Fed. Reg. 2325, 2329–2330 (Bluepoint Wind initial proposed IHA); 87 Fed. Reg. 30872, 30876–30877 (Vineyard Northeast initial proposed IHA). NMFS determined that the majority of Right Whales in the vicinity of the various project areas at issue were "likely to be transient, migrating through the area." (*Id*.) NMFS provided that "[e]levated [Right Whale] mortalities have occurred since June 7, 2017, along the U.S. and Canadian coast,"

which has been declared "an unusual mortality event [], with human interactions, including entanglement in fixed fishing gear and vessel strikes, implicated in at least 60 of the mortalities or serious injuries thus far." (*Id.*) Regarding Humpback Whales, NMFS explained that they "utilize the mid-Atlantic as a migration pathway between calving/mating grounds to the south and feeding grounds in the north." (NMFS_158; *see also* NMFS_436–437; NMFS_747–748; NMFS_8125; NMFS_3637–3638); *see also* 88 Fed. Reg. 2325, 2330–2331 (Bluepoint Wind initial proposed IHA); 87 Fed. Reg. 30872, 30877 (Vineyard Northeast initial proposed IHA). NMFS found that only the West Indies "distinct population segment" of Humpback Whales was expected to be present in the project areas at issue. (*Id.*) "Since January 2016, elevated humpback whale mortalities have occurred along the Atlantic coast from Maine to Florida." (*Id.*) "[A]bout 40 percent" of the whales examined had "evidence of human interaction, either vessel strike or entanglement." (*Id.*)

NMFS determined that the "acoustic sound sources" associated with the site surveys proposed in each IHA were likely to have a lesser impact on the marine mammals in the vicinity. (NMFS_160–161; NMFS_439–440; NMFS_750–751; NMFS_8127–8128); *see also* 88 Fed. Reg. 2325, 2333–2334 (Bluepoint Wind initial proposed IHA); 87 Fed. Reg. 30878, 30879 (Vineyard Northeast initial proposed IHA). For example, NMFS explained that the animals in the vicinity of these project areas were "unlikely" to incur even temporary shifts in their hearing thresholds because "the characteristics of the sound source" include "generally very short pulses and potential duration of exposure." (*Id.*) NMFS determined that "[s]urveys using active acoustic sound sources move through an area, limiting exposure to multiple pulses[,]" and sound levels return to "ambient" when a survey ends and the noise source is shut down. (*Id.*) "[W]hen exposure to sound ends, behavioral and/or physiological responses are expected to end relatively quickly." (*Id.*)

NMFS also found that "[m]ost marine mammals would more likely avoid a loud sound source rather than swim in such close proximity" to it. (*Id*.) Regarding vessel strikes, NMFS concluded that "[a]t average transit speed for geophysical survey vessels, the *probability* of serious injury or mortality resulting from a strike is less than 50 percent." (*Id*. (emphasis added).) NMFS determined, however, that the "likelihood of a strike *actually* happening" is "low given the smaller size of these vessels proposed for use and generally slower speeds." (*Id*. (emphasis added).) Furthermore, as discussed below, NMFS has also ordered each windfarm developer to employ various prophylactic, protective measures to minimize the impact of activities on marine mammals, including, for example, work delays or shutdowns if certain species are observed in designated areas. (*See* NMFS_35–50; NMFS_298–313; NMFS_574–586; NMFS_671–686; NMFS_883–928; NMFS_8017–8032; NMFS_8363–8379.)

In connection with the construction activities authorized in the Empire Wind LOA, NMFS provided a detailed assessment of the potential effects on marine mammals and their habitat. (NMFS_3639–3657.) For example, NMFS determined that

> any behavioral disturbance that would occur due to animals being exposed to construction activity would be of a relatively short duration, with behavior returning to a baseline state shortly after the acoustic stimuli ceases or the animal moves far enough away from the source. Given this, and NMFS' evaluation of the available [Potential Consequences of Disturbance] studies, and the required mitigation discussed later, any such behavioral disturbance resulting from Empire Wind's activities is not expected to impact individual animals' health or have effects on individual animals' survival or reproduction, thus no detrimental impacts at the population level are anticipated. Marine mammals may temporarily avoid the immediate area but are not expected to permanently abandon the area or their migratory or foraging behavior. Impacts to breeding, feeding, sheltering, resting, or migration are not expected nor are shifts in habitat use, distribution, or foraging success.

(NMFS_3651.) Regarding vessel strikes, NMFS found that "[g]iven the extensive mitigation and monitoring measures . . . that would be required of Empire Wind, NMFS believes that a vessel strike is not likely to occur." (NMFS_3652.)

In addition, Right Whales are listed as an endangered species under the Endangered Species Act ("ESA"), 73 Fed. Reg. 12024 (Mar. 6, 2008),[10] which requires federal agencies to consult with the appropriate expert wildlife agency to ensure "that any action authorized, funded, or carried out by such agency is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species." 16 U.S.C. § 1536(a)(2). In compliance with the ESA, BOEM consulted with NMFS on the effects of marine site assessment activities off the Atlantic Coast on ESA-listed species (including the Right Whale) and their habitat. (*See* NMFS_37949–8015.) That consultation analyzed the impacts of high frequency acoustic sources on marine mammals. (NMFS_37953, 37962–37966.) As a result, NMFS concluded that, as long as the plans for any offshore wind project meet certain, specified requirements, including various project design criteria and best management practices, (NMFS_38002–38014), the marine site assessment activities are "not likely to adversely affect" the Right Whale. (NMFS_37986.)

In each authorization, NMFS also required the various windfarm developers to employ protective measures to minimize the impact of their activities on the marine mammal population, including (1) the use of "Protected Species Observers" to visually look out for certain mammal species, such as Right Whales, that when detected within designated zones trigger delay of work or a shutdown; (2) work shutdown requirements and shutdown zones; (3) pre-start clearance and

---

[10] The population segment of Humpback Whales that are present in the vicinity of the project areas at issue are not listed as threatened or endangered under the ESA. 81 Fed. Reg. 62260, 62281 (Sept. 8, 2016).

ramp up procedures, such as gradual soft-start requirements; (4) vessel speed restrictions; and (5) reporting requirements. (*See* NMFS_35–50; NMFS_298–313; NMFS_574–586; NMFS_671–686; NMFS_883–928; NMFS_8017–8032; NMFS_8363–8379.)

Finally, under NEPA, NMFS determined that the IHAs authorizing site surveys were subject to NEPA categorical exclusion "B4" in the National Oceanic and Atmospheric Administration's ("NOAA") Companion Manual.[11] This categorical exclusion applies to the issuance of IHAs under the MMPA "for the incidental, but not intentional, take by harassment of marine mammals during specified activities and for which no serious injury or mortality is anticipated."[12] NMFS also evaluated each proposed IHA for extraordinary circumstances under which the excluded survey activities might have a significant environmental effect and determined that no extraordinary circumstances existed. (*See* NMFS_52–56; NMFS_326–29; NMFS_634–38; NMFS_660–64; NMFS_8040–44; NMFS_8391–8395.) Because NMFS applied a categorical exclusion to each IHA, NMFS did not conduct an EIS or EA.

In contrast, as part of the issuance of various authorizations to Empire Wind, including its LOA, NMFS participated as a cooperating agency with BOEM on an EIS. (NMFS_1984.) The EIS examined potential impacts from the associated LOA to 17 species of marine mammal species under NMFS jurisdiction, such as the Right Whale and Humpback Whale. (NMFS_1776; NMFS_1998–99; NMFS_2354–431.) NMFS independently reviewed, evaluated, and adopted this EIS in support of its LOA. NMFS_1761–1778; NMFS_1824–1826.

---

[11] Appendix E, *Policy and Procedures for Compliance with the National Environmental Policy Act and Related Authorities*, Companion Manual for NOAA Administrative Order 216-6A, https://www.noaa.gov/sites/default/files/2021-10/NOAA-NAO-216-6A-Companion-Manual-03012018%20(1).pdf (last visited June 4, 2025).

[12] *Id.*

### C. Renewed IHAs

The six IHAs at issue in this action have all expired. (Am. Compl. ¶¶ 31–37.) NMFS issued the following four windfarm developers renewed IHAs: (1) Vineyard Northeast,[13] (2) Invenergy Wind Offshore,[14] (3) Attentive Energy,[15] and (4) Community Offshore Wind.[16] To date, Atlantic Shores and Bluepoint Wind have not been issued renewed IHAs. To receive a renewed IHA, these developers had to meet the following conditions:

The request for Renewal must include the following:

An explanation that the activities to be conducted under the proposed Renewal IHA are identical to the activities analyzed under the initial IHA, are a subset of the activities, or include changes so minor (e.g., reduction in pile size) that the changes do not affect the previous analyses, mitigation and monitoring requirements, or take estimates (with the exception of reducing the type or amount of take).

A preliminary monitoring report showing the results of the required monitoring to date and an explanation showing that the monitoring results do not indicate impacts of a scale or nature not previously analyzed or authorized.

Upon review of the request for Renewal, the status of the affected species or stocks, the preliminary monitoring report, and any other pertinent information, NOAA Fisheries determines that there are no more than minor changes in the activities, the mitigation and monitoring measures will remain the same and appropriate, and the

---

[13] 89 Fed. Reg. 61088 (July 30, 2024); *see also Incidental Take Authorization: Vineyard Northeast, LLC's Marine Site Characterization Survey from Massachusetts to New Jersey*, NOAA Fisheries, https://www.fisheries.noaa.gov/action/incidental-take-authorization-vineyard-northeast-llcs-marine-site-characterization-survey (last visited May 27, 2025).

[14] 89 Fed. Reg. 68595 (Aug. 27, 2024); *see also Incidental Take Authorization: Invenergy Wind Offshore, LLC's Site Characterization surveys off New Jersey and New York*, NOAA Fisheries, https://www.fisheries.noaa.gov/action/incidental-take-authorization-invenergy-wind-offshore-llcs-site-characterization-surveys-new (last visited May 27, 2025).

[15] 89 Fed. Reg. 77479 (Sept. 23, 2024); *see also Incidental Take Authorization: Attentive Energy LLC Marine Site Characterization Surveys off New Jersey and New York*, NOAA Fisheries, https://www.fisheries.noaa.gov/action/incidental-take-authorization-attentive-energy-llc-marine-site-characterization-surveys-0 (last visited May 27, 2025).

[16] 89 Fed. Reg. 83655 (Oct. 17, 2024); *see also Incidental Take Authorization: Community Offshore Wind, LLC Marine Site Characterization Surveys off New Jersey and New York*, NOAA Fisheries, https://www.fisheries.noaa.gov/action/incidental-take-authorization-community-offshore-wind-llc-marine-site-characterization (last visited May 27, 2025).

findings in the initial IHA remain valid.[17]

Renewed IHAs are also subject to a 15-day public comment period.[18]

Vineyard Northeast sought a renewal of its 2023 IHA for "a subset of the identical activities associated with [its] 2023 IHA." 89 Fed. Reg. 61088, 61089. It also submitted a preliminary monitoring report, demonstrating that it "implemented the required marine mammal mitigation and monitoring and did not exceed the levels of take authorized under the 2023 IHA." *Id*. NMFS determined that the "potential impacts" of Vineyard Northeast's activities on marine mammals involved "potential acoustic stressors and are unchanged from the impacts" described in the notice for its proposed 2023 IHA. *Id*. NMFS found that "the anticipated effects on marine mammals and the affected stocks also remain[ed] the same." *Id.* NMFS explained that its "methods of estimating take [were] identical to those used in the 2022 IHA and 2023 IHA" issued to Vineyard Northeast. 89 Fed. Reg. 61088, 61092. "Specifically, the source levels, stocks taken, methods of take, and types of take remain unchanged from the 2022 IHA and 2023 IHA." *Id*. In addition, "the marine mammal density/occurrence data applicable to this renewal authorization remain[ed] unchanged from the 2023 IHA." 89 Fed. Reg. 61088, 61093. NMFS authorized a subset of the number of takes authorized in 2023 to "better represent the amount of remaining activity Vineyard Northeast ha[d] left to complete." *Id*. Specifically, NMFS authorized 12 takes of Right Whales and 12 takes of Humpback Whales. *Id*. During the comment period for Vineyard Northeast's renewal, NMFS received four public comment letters. 89 Fed. Reg. 61088, 61089. NMFS reviewed and responded to each comment. 89 Fed. Reg. 61088, 61089–61092. Ultimately, "[n]o changes were made from

---

[17]    *Incidental    Harassment    Authorization    Renewals*,    NOAA    Fisheries, https://www.fisheries.noaa.gov/national/marine-mammal-protection/incidental-harassment-authorization-renewals (last visited May 27, 2025).

[18] *Id*.

the proposed renewal IHA to the final renewal IHA." 89 Fed. Reg. 61088, 61092. NMFS issued Vineyard Northeast a final renewal IHA for the period July 27, 2024, through July 26, 2025. 89 Fed. Reg. 61088, 61096.

Invenergy Wind Offshore sought a renewal of its 2023 IHA for specified activities "identical to those included in [its] initial authorization." 89 Fed. Reg. 68595, 68596. It provided a preliminary monitoring report, showing that it "implemented the required mitigation and monitoring measures and no impacts of a scale or nature not previously analyzed or authorized have occurred as a result of the activities conducted." *Id*. NMFS determined that "[t]he specified activities that may result in take of marine mammals [we]re identical in scope, effort, potential harassment to marine mammals, and mitigation measures as the Initial IHA." *Id*. In addition, "the location, duration, and nature of the activities, including the types of equipment planned for use, [were] identical to those described in the notice referenced above." *Id*. NMFS concluded that there was "no new information that affect[ed] which species or stocks ha[d] the potential to be affected or the pertinent information in the Description of the Marine Mammals in the Area of Specified Activities contained in the supporting documents for the initial IHA." 89 Fed. Reg. 68595, 68598. NMFS found that "the source levels, days of operation, and marine mammal density/occurrence data applicable to this authorization remain unchanged from the initial IHA." *Id*. "Similarly, the stocks taken, methods of take, and type of take remain[ed] unchanged from the initial IHA, as d[id] the number of takes." *Id*. Specifically, NMFS authorized six takes of Right Whales and 13 takes of Humpback Whales. 89 Fed. Reg. 68595, 68599. During the comment period for Invenergy Wind Offshore's renewal, NMFS received five public comment letters. 89 Fed. Reg. 68595, 68596. NMFS reviewed and responded to each comment. 89 Fed. Reg. 68595, 68596–68598. NMFS made no changes to the final renewal IHA based on the public comments submitted. *Id*. NMFS issued

Invenergy Wind Offshore a final renewal IHA for the period August 21, 2024, through July 30, 2025. 89 Fed. Reg. 68595, 68600.

Attentive Energy sought a renewal of its 2023 IHA for activities that were analyzed under its initial authorization, "but were not able to be completed prior to its expiration." 89 Fed. Reg. 77479, 77479. Attentive Energy also provided a "final monitoring report," confirming that it had "implemented the required mitigation and monitoring, and also showed that no impacts of a scale or nature not previously analyzed or authorized have occurred as a result of the activities conducted." 89 Fed. Reg. 77479, 77480. NMFS noted that Attentive Energy's survey area was "minimally expanded (primarily to the south) in the current survey plan as compared with the survey plan associated with the initial IHA; however, this expansion of the survey area will not result in any increase to the amount of planned survey trackline distance." 89 Fed. Reg. 77479, 77480. NMFS determined that "this slight change to the survey area constitute[d] a minor change that d[id] not affect the previous analyses, mitigation and monitoring requirements, or take estimates." *Id*. NMFS also found that "[t]he potential impacts of Attentive Energy's planned activities on marine mammals involve[d] potential acoustic stressors and [we]re unchanged from the impacts described" in the initial IHA. *Id*. In addition, "[t]he specific geographic region and specified activities, including the types of survey equipment and number of survey vessels planned for use, [we]re identical to those described in the previous notices, with the exception of a minor increase in the size of the survey area to the south." *Id*. NMFS reviewed "the monitoring data from the initial IHA, recent Stock Assessment Reports, information on relevant Unusual Mortality Events, other scientific literature, and the public comments, and determined that there [wa]s no new information that affect[ed] our initial analysis of impacts on marine mammals and their habitat." 89 Fed. Reg. 77479, 77481. "Specifically, the source levels, days of operation, and marine

mammal density/occurrence data applicable to this authorization remain[ed] unchanged from the previously issued IHA." *Id*. NMFS also found that "the stocks taken, methods of take, and types of take remain[ed] unchanged from the previously issued IHA." *Id*. NMFS authorized a subset of the number of takes authorized in 2023 to "better represent the amount of remaining activity Attentive Energy has left to complete." *Id*. Ultimately, NMFS authorized four takes of Right Whales and eight takes of Humpback Whales. *Id*. During the comment period for Attentive Energy's renewal, NMFS received two public comment letters. 89 Fed. Reg. 77479, 77482. NMFS reviewed and responded to each comment. 89 Fed. Reg. 77479, 77482–77485. "No changes were made from the proposed renewal IHA to the final renewal IHA." 89 Fed. Reg. 77479, 77485. NMFS issued Attentive Energy a final renewal IHA for the period September 18, 2024, through June 19, 2025. 89 Fed. Reg. 77479, 77479, 77485.

Community Offshore Wind sought a renewal of its 2023 IHA for activities that were analyzed under its initial authorization, but were not completed prior to its expiration. 89 Fed. Reg. 83655, 83656. Community Offshore Wind also provided a preliminary monitoring report, confirming that it had "implemented the required mitigation and monitoring, and also showed that no impacts of a scale or nature not previously analyzed or authorized have occurred as a result of the activities conducted." *Id*. NMFS noted that it had inadvertently omitted from the initial IHA issued to Community Offshore Wind 400 km of trackline in connection with Community Offshore Wind's survey activities. 89 Fed. Reg. 83655, 83656–83657. NMFS determined that this correction to the remaining survey area constituted "a minor change that d[id] not affect the previous analyses, mitigation and monitoring requirements, or take estimates." 89 Fed. Reg. 83655, 83657. NMFS also found that "[t]he potential impacts of [Community Offshore Wind]'s planned activities on marine mammals involve[d] potential acoustic stressors and [we]re

unchanged from the impacts described" in the initial IHA. *Id*. In addition, "[t]he specific geographic region and specified activities, including the types of survey equipment and number of survey vessels planned for use, [we]re identical to those described in the previous notices, with the exception of the reduction in the survey area" for activities already completed from the initial IHA. *Id*. NMFS reviewed "the monitoring data from the initial IHA, recent draft stock assessment reports, information on relevant [Unusual Mortality Events], other scientific literature, and determined that there [wa]s no new information that affect[ed] our initial analysis of impacts on marine mammals and their habitat." 89 Fed. Reg. 83655, 83663. "Specifically, the source levels, days of operation, and marine mammal density/occurrence data applicable to this authorization remain[ed] unchanged from the previously issued IHA." *Id*. NMFS also found that "the stocks taken, methods of take, and types of take remain[ed] unchanged from the initial IHA." *Id*. NMFS authorized a subset of the number of takes authorized in 2023 to "better represent the amount of remaining activity [Community Offshore Wind] has left to complete." *Id*. Ultimately, NMFS authorized 15 takes of Right Whales and 29 takes of Humpback Whales. *Id*. During the comment period for Community Offshore Wind's renewal, NMFS received two public comment letters. 89 Fed. Reg. 83655, 83657. NMFS reviewed and responded to each comment. 89 Fed. Reg. 83655, 83657–83662. There were no changes from the proposed renewal IHA to the final renewal IHA. 89 Fed. Reg. 83655, 83656. NMFS issued Community Offshore Wind a final renewal IHA for the period October 9, 2024, through June 30, 2025. 89 Fed. Reg. 83655, 83655.[19]

---

[19] The Court takes judicial notice of these renewed ITAs as they are matters of public record. *See Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010). The Court considers this extra-record information for purposes of its mootness analysis only.

### D. PLAINTIFFS' CLAIMS

Plaintiffs bring two claims in connection with the authorizations at issue. First, they seek to "reverse and set aside" the six IHAs and one LOA. (Am. Compl. ¶¶ 30–37.) Plaintiffs claim that these authorizations "cumulatively take more than a small number of the North Atlantic Right Whale and Humpback Whale species, and will have more than a 'negligible' impact" on these species, in violation of the MMPA. (*Id.* ¶¶ 3, 103–131.) Under the APA, Plaintiffs assert that Federal Defendants "arbitrarily, capriciously, and without substantial evidence" (1) "significantly underestimat[ed] the maximum spatial extent of Level B Harassment noise emanating from survey vessels" and (2) "assumed that the authorized high-intensity noise activities would result in almost exclusively Level B harassment takes, and virtually no Level A harassment takes." (*Id.* ¶¶ 5, 132–134.)

Second, Plaintiffs claim that Federal Defendants were required to prepare an environmental impact statement "assessing the cumulative effects" of the six IHAs and one LOA on "the quality of the human environment" under NEPA but failed to do so. (*Id.* ¶¶ 6, 135–140.) Plaintiffs also seek an order to "cease all vessel survey activity" in connection with the six IHAs and one LOA until "the agency issues a record of decision on the project based on the relevant [environmental impact statement]." (*Id.* ¶¶ 6, 141.)

### E. DR. STERN'S STANDING ALLEGATIONS

Dr. Stern alleges that he has been and is continually harmed by Defendants' activities in connection with these six IHAs and one LOA. He avers that he has "personally observed whales in the NY/NJ Bight, from the shore, over the span of many years since [he] originally moved to LBI." (ECF No. 117-3 ("Stern MSJ Decl.") ¶ 3.) He states that he has "seen whales offshore from the beach at Beach Haven, NJ, where I live and often go, especially in the summer." (*Id.*) Dr. Stern asserts that these past whale sightings "make[] [him] think how we humans have slaughtered

thousands of them and brought them to the brink of extinction, but yet cannot seem to stop killing them." (*Id.*) Dr. Stern also avers that he has observed whales "up close" in Nova Scotia in Zodiac craft on "at least fifteen excursions there in the Bay of Fundy" and that he "personally observed North Atlantic right whales up close in the Bay of Fundy, Nova Scotia, so close he could reach out and touch them." (*Id.* ¶ 4.)

In addition, Dr. Stern states that he "sought to observe whales on an excursion in the NJ/NY Bight region, which departed from the coast on September 6, 2023, leaving from Belmar, NJ." (*Id.* ¶ 4.) On this excursion, Dr. Stern asserts that he traveled "through the waters to the south of Long Island, along and east of the New Jersey coastline, and otherwise within the NY/NJ Bight waters . . . [a]nd so, ha[s] utilized the area affected by the ongoing and future incidental harassment authorizations and Letters of Authorization." (*Id.*) He avers that his "ability to see, observe, and otherwise experience aesthetic and recreational value from the whales will be negatively affected by the ongoing IHAs/LOA in this same region" because they "disturb the behavior of whales, and can often lead to injury and death outcomes." (*Id.*) He states that he "ha[s] plans for future excursions there[20] and/or into the NJ/NY Bight for further whale watching." (*Id.*)[21]

### F. RECENT PROCEDURAL HISTORY

On February 9, 2024, the Court granted motions to dismiss filed by Federal Defendants,

---

[20] It is not entirely clear from Dr. Stern's declaration what is meant by "there" in this statement based on the sentence immediately preceding it. It is possible that Dr. Stern is referring to plans for future excursions in Nova Scotia or the location of his September 2023 trip—"the waters south of Long Island, along and east of the New Jersey coastline, and otherwise within the NY/NJ Bight waters." (Stern MSJ Decl. ¶ 4.)

[21] Dr. Stern does not include in his declaration attached to the Amended Complaint information regarding his past observations of whales in LBI, but he does make many of the same statements in both of his declarations regarding his whale-watching excursions in Nova Scotia and his September 2023 excursion in New York and New Jersey. (ECF No. 81-2 ("Stern Am. Compl. Decl." ¶ 3.)) Additionally, he states verbatim in both declarations, filed eight months apart, that he "ha[s] plans for future excursions there and/or into the NJ/NY Bight for further whale watching." (*Compare* Stern MSJ Decl. ¶ 4, *with* Stern Am. Compl. Decl. ¶ 3.)

Atlantic Shores, and another since-withdrawn intervenor-defendant, Orsted North America Inc. ("Orsted") (ECF No. 79.) The Court determined that Plaintiffs lacked standing based on Dr. Stern's failure to show injury in fact. (*Id*. at 14–22.) In addition, because several of the IHAs challenged by Plaintiffs in the original Complaint were not yet issued, the Court concluded that any challenges to these yet-to-be-issued IHAs were unripe. (*Id*. at 22–25.) Finally, the Court found that Plaintiffs' challenges to all expired IHAs were moot. (*Id*. at 25–29.)

On March 29, 2024, Plaintiffs filed the Amended Complaint, which sought to challenge six new IHAs and one LOA. (Am. Compl. ¶¶ 31–37.) Orsted withdrew as an intervenor-defendant, and Empire Wind intervened. (ECF Nos. 85, 89, 90, 95.) Federal Defendants, Atlantic Shores, and Empire Wind answered. (ECF No. 97–98, 105.)

On July 9, 2024, the Honorable J. Brendan Day issued an order scheduling summary judgment briefing. (ECF No. 106 at 3–4.) In that order, Judge Day also provided Plaintiffs with the opportunity to notify Federal Defendants whether they believed that the administrative record was complete or if it would require supplementation. (ECF No. 106 at 2.) Judge Day required the parties to submit a status report by September 12, 2024, informing the Court whether they agreed that the administrative record was complete or whether there were any outstanding disputes regarding completeness of the administrative record. (*Id*. ¶ 3.) On September 12, 2024, the parties filed a joint status report, stating that "Federal Defendants have agreed to supplement the Administrative Record with certain documents" and that, subject to that supplementation, the parties agree to the following:

> the administrative records are complete and do not require supplementation with additional materials; no exceptions to record review are applicable; and there is no need for judicial review of extra-record materials.

(ECF No. 108.) On September 25, 2024, Federal Defendants filed the supplemental administrative records to which they had agreed. (ECF No. 109.) Neither the administrative record nor its

supplement includes the following documents relied on by Plaintiffs in their Motion for Summary Judgment: the Declarations of Plaintiff Dr. Stern—one filed in support of Plaintiffs' Motion for Summary Judgment (ECF No. 117-4); and one filed in opposition to Defendants' Motions to Dismiss (ECF No. 54-1); the Preliminary Report on a Beaked Whale Mass Stranding in Cyprus (ECF No. 117-5); and the Declaration of Michael Stocker, filed in support of Plaintiffs' Motion for Preliminary Injunction (ECF No. 55-1).

The parties have since filed Cross Motions for Summary Judgment (ECF Nos. 117, 118, 120, 121). They are ripe for this Court's review.

## II.    <u>LEGAL STANDARD</u>

The parties' cross motions for summary judgment seek judicial review under the APA. "Summary judgment is the proper mechanism for deciding, as a matter of law, whether an agency action is supported by the administrative record and consistent with the APA standard of review." *Neto v. Thompson*, 506 F. Supp. 3d 239, 244 (D.N.J. 2020) (quoting *Tomasi v. Township of Long Beach*, 364 F. Supp. 3d 376, 389 (D.N.J. 2019), *aff'd*, 796 F. App'x 766 (3d Cir. 2020)). However, "[w]hile summary judgment is the proper mechanism' for APA cases like this one, 'the usual summary judgment standard does not apply'" *Neto*, 506 F. Supp. 3d at 244 (quoting *Soccer Ctrs., LLC v. Zuchowski*, No. 17-1024, 2017 WL 4570290, at *4 (D.N.J. Oct. 13, 2017)). "'[T]he district court does not need to determine whether there are disputed facts to resolve at trial' since 'the administrative agency is the finder of fact.'" *Id*. Instead, "[w]hen a party seeks review of agency action under the APA, the district judge sits as an appellate tribunal. The entire case on review is a question of law." *Neto*, 506 F. Supp. 3d at 243–44 (quoting *Am. Biosci., Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001)).

Under § 706 of the APA, a reviewing court must "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

law." 5 U.S.C. § 706; *see also Chao v. Roy's Const., Inc.*, 517 F.3d 180, 186 (3d Cir. 2008). "The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained." *Fed. Commc'ns Comm'n v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). "[A] court may not substitute its own policy judgment for that of the agency." *Id*. Rather, it "simply ensures that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision." *Id*. Thus, a court must "review an administrative record" to determine whether "the agency has made a reasoned decision based on reasonable extrapolations from some reliable evidence" and "to ensure that the agency has examined the relevant data and articulated a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Trenton Threatened Skies, Inc v. Fed. Aviation Admin.*, 90 F.4th 122, 130–31 (3d Cir. 2024) (internal quotation marks and citation omitted).[22]

## III.    DISCUSSION

### A.  MOTION TO EXCLUDE PLAINTIFFS' EXTRA-RECORD MATERIALS

Defendants seek to exclude materials outside of the administrative record (as supplemented) that Plaintiffs have cited and relied on to support the merits of their claims. (ECF No. 122 ("Fed. Defs. Extra-Record Br.") at 14–17.) Those materials include the Declarations of Plaintiff Dr. Stern—one filed in support of Plaintiffs' Motion for Summary Judgment (ECF No. 117-4), and one filed in opposition to Defendants' Motions to Dismiss (ECF No. 54-1), the Preliminary Report on a Beaked Whale Mass Stranding in Cyprus (ECF No. 117-5), and the

---

[22] Because this is an APA matter, in which the Court sits as an appellate tribunal over the final agency decisions at issue, the Court must rely on the facts provided in the administrative record, (ECF No. 107), and its supplement, (ECF No. 109). The Court does not determine whether there are disputed facts to resolve at trial; it reviews the entire case as a question of law. *See Neto*, 506 F. Supp. 3d at 243–44. Accordingly, the Court need not rely on Plaintiffs' Statement of Undisputed Material Facts or any of Defendants' responses to those facts.

Declaration of Michael Stocker, filed in support of Plaintiffs' Motion for Preliminary Injunction (ECF No. 55-1). Defendants argue that the Court provided Plaintiffs with an opportunity to seek supplementation of the administrative record, but Plaintiffs failed to do so regarding these four additional materials before filing their Motion for Summary Judgment. (Fed. Defs. Extra-Record Br. at 7–8.)

Plaintiffs respond that the "time-sensitiv[e]" nature of the authorizations at issue and the additional time built into Judge Day's order regarding supplementation of the administrative record "played a determinative role in Plaintiffs' calculus to avoid seeking supplementation of the existing record." (ECF No. 124 ("Pls. Opp. to Extra-Record Mot." at 6–7).) Plaintiffs also contend that Dr. Stern's Motion to Dismiss Declaration is "necessary to explain a technical subject matter unconsidered by the NMFS." (*Id*. at 8.) They argue that the report from Cyprus is "relevant because it demonstrates a recent example of a whale stranding event spatiotemporally correlated to the usage of sound devices" like those used in the surveys at issue here. (*Id*. at 9.) Plaintiffs also assert that Stocker's Declaration "further corroborate[s] the assertions of Plaintiffs and Dr. Stern's Expert Declaration." (*Id*. at 10.)

Under the APA, "judicial review must be based on 'the whole record or those parts of it cited by a party.'" *Trenton Threatened Skies, Inc.*, 90 F.4th at 130–131 n.6 (citing 5 U.S.C. § 706(2)). "[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973). A court must confine its review "to the full administrative record that was before the [agency] at the time it took the action under review." *SIH Partners LLLP v. Comm'r of Internal Revenue*, 923 F.3d 296, 302 (3d Cir. 2019) (internal quotation marks omitted). "[A]lthough certain materials may be relevant to an agency decision, if those materials were not considered by the

agency when the challenged decision was made the materials should not be included in the administrative record." *New Jersey v. U.S. Army Corps of Eng'rs*, No. 09-5591, 2010 WL 2771771, at *3 (D.N.J. July 13, 2010). Accordingly, the administrative record usually cannot be supplemented in a challenge to agency action under the APA. *NVE, Inc. v. Dep't of Health and Human Servs.*, 436 F.3d 182, 189 (3d Cir. 2006).

Courts will allow supplementation of an administrative record under two circumstances—(1) "where the administrative record 'does not disclose the factors considered by an agency or the agency's construction of the evidence,'" and (2) "in cases where there is agency bias." *New Jersey*, 2010 WL 2771771, at *4 (quoting *NVE, Inc.*, 436 F.3d at 189). Neither circumstance is present here.

Judge Day's scheduling order provided Plaintiffs with the opportunity to seek supplementation of the administrative record. (ECF No. 106 ¶ 2.) Although an administrative record in an APA case normally cannot be supplemented, the parties here agreed to do so as it pertains to certain documents. (ECF No. 108.) Subject to that agreement, the parties expressly represented the following to the Court:

> the administrative records are complete and do not require supplementation with additional materials; no exceptions to record review are applicable; and there is no need for judicial review of extra-record materials.

(ECF No. 108.) Federal Defendants filed the supplemental administrative records to which all parties had agreed. (ECF No. 109.) None of those records included the four extra-record documents relied on by Plaintiffs in their Motion for Summary Judgment. (*See generally id*.)

As an initial matter, Plaintiffs argue that they offer Dr. Stern's Motion for Summary Judgment Declaration to further clarify Dr. Stern's standing. (Pls. Opp. Extra-Record Mot. at 5–6.) Federal Defendants have not objected to Plaintiffs' reliance on this declaration to establish

26

standing. (Fed. Defs. Extra-Record Br. at 11 n.3.) Accordingly, the Court will consider Dr. Stern's Motion for Summary Judgment Declaration for this limited, jurisdictional purpose.

However, the Court will exclude all four documents submitted by Plaintiffs to the extent that they are offered to support Plaintiffs' merits arguments.[23] There is no dispute that Plaintiffs did not seek to supplement the administrative record with these four documents when they had the opportunity to do so. Instead, Plaintiffs argue that, based on the time-sensitive nature of this case and the potential summary judgment delays built into Judge Day's scheduling order, the "most prudent" decision was to ignore the Court's order and proceed to summary judgment. The Court finds this unilateral, self-serving strategic decision unavailing.

There is no record of Plaintiffs raising these timing issues with Judge Day before the summary judgment stage. Furthermore, Plaintiffs make no attempt to argue that any of the exceptions to record supplementation under the APA apply here. Before this Court, instead, is a representation—three months before any summary judgment filing—of Plaintiffs' explicit agreement that the "administrative records are complete and do not require supplementation with additional materials"; "no exceptions to record review are applicable"; and "there is no need for judicial review of extra-record materials." (ECF No. 108.) Plaintiffs *post-hoc* justifications for failing to follow Judge Day's Order appear contrived and ring hollow. Accordingly, Federal Defendants' Motion to Exclude Extra-Record Materials is granted, with the exception, as stated, of Dr. Stern's Motion for Summary Judgment Declaration for the limited purpose of assessing Plaintiffs' standing.

---

[23] The Court grants Atlantic Shores and Empire Wind's three unopposed Motions to Join in Federal Defendants' Motion to Exclude Extra-Record Materials. (ECF Nos. 125, 126, and 129.)

### B. Cross Motions for Summary Judgment

Plaintiffs, Federal Defendants, Atlantic Shores, and Empire Wind each seek summary judgment on various grounds. At the outset, this Court's summary judgment decision rests on issues of subject matter jurisdiction—in particular, whether Plaintiffs' challenges to the expired authorizations at issue are moot and whether Plaintiffs have standing to pursue their claims. Alternatively, assuming *arguendo* that this Court has subject matter jurisdiction over the case, the Court will assess whether Plaintiffs have met the high burden required to prove that NMFS's decisions were arbitrary and capricious.

#### 1. <u>Mootness</u>

As was the case at the motion to dismiss stage, Plaintiffs, again, seek to challenge expired IHAs, (Am. Compl. ¶¶ 31–37), and Federal Defendants, again, argue that these challenges are moot. (ECF No. 118 ("Fed. Defs. MSJ") at 37–39.) The expired IHAs include authorizations issued to Bluepoint Wind (expired February 28, 2025), Atlantic Shores (expired March 31, 2025), Vineyard Northeast (expired July 26, 2024), Invenergy Wind Offshore (expired July 30, 2024), Community Offshore Wind (expired June 30, 2024), and Attentive Energy (expired June 19, 2024). (Am. Compl. ¶¶ 31–37.)

Mootness is a question of subject matter jurisdiction. *Fensterer v. Cap. One Bank (USA), N.A.*, No. 20-5558, 2021 WL 838333, at *3 (D.N.J. Mar. 5, 2021). Although Federal Defendants argue mootness, the Court may raise it *sua sponte*. *Harper v. N'Diaye*, No. 21-10192, 2022 WL 17742422, at *1 (D.N.J. Dec. 9, 2022) (citing *Chong v. Dist. Dir., Immigration and Naturalization Serv.*, 264 F.3d 378, 383 (3d Cir. 2001)) ("Although the parties did not raise the case or controversy issue in their original briefs, we must resolve the issue because it implicates our jurisdiction."). "The mootness doctrine 'requires that an actual controversy exist at all stages of review, not merely

at the time the complaint is filed.'" *Smith v. President United States*, No. 21-19457, 2024 WL 4315257, at *3 (D.N.J. Sept. 26, 2024) (quoting *Doe v. Delie*, 257 F.3d 309, 313 (3d Cir. 2001)).

Mootness exists in two circumstances: "(1) the issues presented are no longer live, or (2) the parties lack a cognizable interest in the outcome." *Brown v. Phila. Hous. Auth.*, 350 F.3d 338, 343 (3d Cir. 2003). Cases are moot when "developments occur during the course of adjudication that eliminate a plaintiff's personal stake in the outcome of a suit or prevent a court from being able to grant the requested relief." *Hamilton*, 862 F.3d at 335 (quoting *Blanciak v. Allegheny Ludlum Corp.*, 77 F.3d 690, 698–99 (3d Cir. 1996)). The party asserting mootness "bears the burden to establish that a once-live case has become moot. *W. Virginia v. Env't Protection Agency*, 597 U.S. 697, 719 (2022).

A "narrow" exception to mootness exists where the conduct at issue is "capable of repetition, yet evading review." *Cnty. of Butler v. Governor of Pa.*, 8 F.4th 226, 231 (3d Cir. 2021) (quoting *Hamilton v. Bromley*, 862 F.3d 329, 335 (3d Cir. 2017)). This exception "applies only in exceptional situations" where "(1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again." *Id*. Indeed, "[t]here must be more than a theoretical possibility of the action occurring against the complaining party again; it must be a reasonable expectation or a demonstrated probability." *Id*. "The 'same action' generally refers to 'particular agency policies, regulations, guidelines, or recurrent identical agency actions.'" *Theodore Roosevelt Conservation P'ship v. Salazar*, 661 F.3d 66, 79 (D.C. Cir. 2011) (quoting *Pub. Utilities Comm'n v. FERC*, 236 F.3d 708, 715 (D.C. Cir. 2001)). The plaintiff bears the burden of showing that the "capable of repetition, yet evading review" exception applies. *Cnty. of Butler*, 8 F.4th at 231.

The Court finds that all of the expired IHAs satisfy the "evading review" element of this exception. "For a controversy to be 'too short to be fully litigated prior to cessation or expiration,' it must be of [an] inherently limited duration" that is "clear at the action's inception." *Hamamoto v. Ige*, 881 F.3d 719, 722 (9th Cir. 2018) (internal quotation marks omitted). In other words, "the controversy will only ever present a live action until a particular date, after which the alleged injury will either cease or no longer be redressible." *Id*.; *see also Associated Energy Grp., LLC v. United States*, 131 F.4th 1312, 1318 (Fed. Cir. 2025) (quoting *Alcoa, Inc. v. Bonneville Power Admin.*, 698 F.3d 774, 787 (9th Cir. 2012)) ("'[E]vading review' means that the underlying action is almost certain to run its course before either this court or the Supreme Court can give the case full consideration."). "Though there is no bright-line rule, when assessing the classes of cases inherently limited in duration, actions lasting more than two years are frequently considered long enough to be fully litigated prior to cessation, while actions lasting less than two years are considered too short." *Wallingford v. Bonta*, 82 F.4th 797, 801 (9th Cir. 2023); *see also Karuk Tribe of California v. U.S. Forest Serv.*, 681 F.3d 1006, 1018 (9th Cir. 2012) (en banc) (finding that actions lasting "only one or two years" evade review). IHAs are effective for up to one year.[24] 16 U.S.C § 1371(a)(5)(D)(i). For a few of the windfarm developers—Atlantic Shores, Vineyard Northeast, Attentive Energy—two rounds of IHAs have already expired during the pendency of this litigation. (ECF No. 1 ("Compl.") ¶¶ 36, 37, 38, Am. Compl. ¶¶ 33, 34, 37.) In fact, NMFS has renewed four of the expired IHAs while this litigation has been ongoing, and all four of those renewals are approaching expiration in June and July 2025. 89 Fed. Reg. 61088, 61088; 89 Fed. Reg. 68595, 68595; 89 Fed. Reg. 77479, 77479; 89 Fed. Reg. 83655, 83655. Accordingly, it has

---

[24] *Incidental Take Authorizations Under the Marine Mammal Protection Act*, NOAA Fisheries, https://www.fisheries.noaa.gov/permit/incidental-take-authorizations-under-marine-mammal-protection-act (last visited May 27, 2025.)

been clear from this action's inception that these IHAs are of an inherently limited duration.

Thus, the Court concludes that the one-year IHAs at issue evade review. *Cf. Nat. Res. Def. Council, Inc. v. Evans*, 316 F.3d 904, 910 (9th Cir. 2003) (one-year timespan for NMFS's annual groundfish specifications management plan evaded review); *Fish Nw. v. Rumsey*, No. 21-570, 2022 WL 2916627, at *6 (W.D. Wash. July 25, 2022), *aff'd*, No. 22-35641, 2023 WL 4071941 (9th Cir. June 20, 2023) (NMFS's one-year biological opinion regarding the effects of salmon fisheries on Puget Sound salmon evaded review); *see also Associated Energy Grp., LLC*, 131 F.4th at 318 (one year is too short to complete judicial review of lawfulness of Defense Logistics Agency procurement); *In re Flint Water Cases*, 53 F.4th 176, 189 (6th Cir. 2022) ("As to what time frame is 'too short' to obtain full review, the Supreme Court has held that periods of twelve months, *Turner v. Rogers*, [564 U.S. 431, 440 (2011)], eighteen months, *First Nat'l Bank* [*of Boston v. Bellotti*, 435 U.S. 765, 774 (1978)], and even two years, *Kingdomware Techs., Inc. v. United States*, [579 U.S. 162, 170 (2016)], are too short to obtain complete review."); *Del Monte Fresh Produce Co. v. United States*, 570 F.3d 316, 323 (D.C. Cir. 2009) (one-year export license for food shipments was too short to be fully litigated); *Schreibman v. Holmes*, 203 F.3d 53 (D.C. Cir. 1999) (press credentials only valid for one year evaded review); *Greenpeace Action v. Franklin*, 14 F.3d 1324, 1329–30 (9th Cir. 1992) (fishing quota specifications that expire in less than one year evaded review); *ANR Pipeline Co. v. Federal Energy Regulatory Commission*, 876 F.2d 124, 129 (D.C. Cir. 1989) (one-year term conditions in individual certificates of public convenience and necessity issued to pipeline companies evaded review); *Walsh v. Louisiana High Sch. Athletic Ass'n*, 616 F.2d 152, 157 (5th Cir. 1980) (one-year period of athletic ineligibility suffered by an individual student in Lutheran high school was too short in duration to be fully litigated); *H.R. v. District of Columbia*, No. 21-01856, 2024 WL 1344444, at *13 (D.D.C. Mar. 29, 2024), *report and*

*recommendation adopted*, No. 21-1856, 2024 WL 3580663 (D.D.C. July 30, 2024) (one-year placement order under the Individuals with Disabilities Act evaded review).

The Court turns now to the "capable of repetition" prong—a reasonable expectation that the same complaining party will be subject to the same action again. In its February 29, 2024 Motion to Dismiss Opinion, the Court rejected the exception based on Plaintiffs' failure to prove this prong. (ECF No. 79 at 28.) The Court reasoned that Plaintiffs had failed to allege facts that "NMFS will issue ITAs[25] or that Federal Defendants will approve an ITA for the same specific activity." (*Id.*) The Court further explained that "it is not clear the same ITAs governing the same area and activities will occur in the future" or that future IHAs "will cover equivalent ITAs previously issued by NFMS." (*Id.*)

Now, before this Court on summary judgment is evidence of renewed IHAs issued to certain windfarm developers that are equivalent to IHAs previously issued by NMFS to those same windfarm developers. As Federal Defendants acknowledge, (Fed. Defs. MSJ at 37–38), NMFS has since renewed four of the following expired IHAs challenged in the Amended Complaint: (1) Vineyard Northeast,[26] (2) Invenergy Wind Offshore,[27] (3) Attentive Energy,[28] and (4) Community

---

[25] An Incidental Take Authorization ("ITA") can either be an LOA or an IHA under the MMPA. *See Incidental Take Authorizations Under the Marine Mammal Protection Act*, NOAA Fisheries, https://www.fisheries.noaa.gov/permit/incidental-take-authorizations-under-marine-mammal-protection-act (last visited May 28, 2025).

[26] 89 Fed. Reg. 61088 (July 30, 2024); *see also Incidental Take Authorization: Vineyard Northeast, LLC's Marine Site Characterization Survey from Massachusetts to New Jersey*, NOAA Fisheries, https://www.fisheries.noaa.gov/action/incidental-take-authorization-vineyard-northeast-llcs-marine-site-characterization-survey (last visited May 27, 2025).

[27] 89 Fed. Reg. 68595 (Aug. 27, 2024); *see also Incidental Take Authorization: Invenergy Wind Offshore, LLC's Site Characterization surveys off New Jersey and New York*, NOAA Fisheries, https://www.fisheries.noaa.gov/action/incidental-take-authorization-invenergy-wind-offshore-llcs-site-characterization-surveys-new (last visited May 27, 2025).

[28] 89 Fed. Reg. 77479 (Sept. 23, 2024); *see also Incidental Take Authorization: Attentive Energy LLC Marine Site Characterization Surveys off New Jersey and New York*, NOAA Fisheries, https://www.fisheries.noaa.gov/action/incidental-take-authorization-attentive-energy-llc-marine-site-characterization-surveys-0 (last visited May 27, 2025).

Offshore Wind.[29] Each of these renewed IHAs govern the same activities as a prior IHA, a subset thereof, or a minor expansion of prior-approved activities that did not alter NMFS's analyses, mitigation and monitoring requirements, or take estimates. *See* 89 Fed. Reg. 61088, 61089; 89 Fed. Reg. 68595, 68596; 89 Fed. Reg. 77479, 77480; 89 Fed. Reg. 83655, 83657. NMFS also determined that each of the renewed IHAs was based on the same "source levels, stocks taken, methods of take, and types of take" as prior IHAs issued to these windfarm developers. 89 Fed. Reg. 61088, 61092; 89 Fed. Reg. 68595, 68598; 89 Fed. Reg. 77479, 77481; 89 Fed. Reg. 83655, 83663. In addition, NMFS found that the applicable "marine mammal density/occurrence data" was the same in these renewals as in prior-issued IHAs. 89 Fed. Reg. 61088, 61093; 89 Fed. Reg. 68595, 68598; 89 Fed. Reg. 77479, 77481; 89 Fed. Reg. 83655, 83663. The potential impacts of the activities on marine mammals, *i.e.*, potential acoustic stressors, were also unchanged from prior IHAs. 89 Fed. Reg. 61088, 61089; 89 Fed. Reg. 68595, 68596; 89 Fed. Reg. 77479, 77480; 89 Fed. Reg. 83655, 83657. Although each renewal request was subject to an additional 15-day public comment period, none of the public comments submitted on any one renewal resulted in a change to the proposed IHA. 89 Fed. Reg. 61088, 61092; 89 Fed. Reg. 68595, 68596–68598; 89 Fed. Reg. 77479, 77485; 89 Fed. Reg. 83655, 83655.

Furthermore, for NMFS to issue a renewed IHA in general, it must find that "there are no more than minor changes in the activities, the mitigation and monitoring measures will remain the same and appropriate, and the findings in the initial IHA remain valid."[30] In other words, the nature

---

[29] 89 Fed. Reg. 83655 (Oct. 17, 2024); *see also Incidental Take Authorization: Community Offshore Wind, LLC Marine Site Characterization Surveys off New Jersey and New York*, NOAA Fisheries, https://www.fisheries.noaa.gov/action/incidental-take-authorization-community-offshore-wind-llc-marine-site-characterization (last visited May 27, 2025).

[30]   *Incidental    Harassment    Authorization    Renewals*,    NOAA    Fisheries, https://www.fisheries.noaa.gov/national/marine-mammal-protection/incidental-harassment-authorization-renewals (last visited May 27, 2025).

of a renewal itself requires a finding that the renewal requested is either identical to the initial IHA or otherwise based on identical findings such that NMFS's analysis regarding the initial IHA remains applicable.

The Court finds that the four renewed IHAs are recurrent identical agency actions sufficient to justify the application of the "capable of repetition, yet evading review" exception to mootness for the four expired IHAs issued to the same windfarm developers. *ConocoPhillips Alaska, Inc. v. Nat'l Marine Fisheries*, No. 06-0198, 2006 WL 8438534, at *2 (D. Alaska Dec. 29, 2006) (applying the "capable of repetition, yet evading review" exception to an IHA authorizing seismic activities because there was "a reasonable expectation that the agency could continue to rely on the studies it referenced and/or utilized in issuing the 2006 I[H]A that is the subject of this litigation");[31] *Alaska Wilderness League v. Jewell*, 637 F. App'x 976, 980 (9th Cir. 2015) ("Our decisions recognize that where a regulatory framework like the MMPA allows an agency to authorize activities, and the agency has done so and is likely to continue to do so, strictly requiring a plaintiff to limit her facial case to harms associated with some discrete and transitory authorization would be neither expeditious nor constitutionally compelled.").

The Ninth Circuit's decision in *Greenpeace Action v. Franklin* supports this finding. 14 F.3d 1324 (9th Cir. 1992). In that case, Greenpeace filed a complaint against the Secretary of Commerce alleging violations of NEPA and the Endangered Species Act. *Id*. at 1326. Through its suit, Greenpeace sought to stop "continued pollock fishing in the Gulf of Alaska" out of fear for the fate of the Steller sea lion. *Id*. In 1991, the Secretary of Commerce set the total allowable catch ("TAC") of pollock fish at 103,400 metric tons. *Id*. at 1328. The TAC is the "total tonnage of fish

---

[31] After this decision, the plaintiff withdrew its application for a 2007 IHA, and the court determined that the "capable of repetition, yet evading review" exception no longer applied. *ConocoPhillips Alaska, Inc. v. Nat'l Marine Fisheries*, No. 06-0198, 2007 WL 9718215, at *1 (D. Alaska Apr. 17, 2007).

that fishermen may retain in a particular year." *Id*. at 1327. At the time of the appeal, the 1991 fishing season had ended and the 1991 TAC had expired. *Id*. at 1329. The Secretary of Commerce argued that the appeal was moot and that the "capable of repetition, yet evading review" exception did not apply because the 1992 TAC had been determined based on "an entirely new administrative record." *Id*. The Ninth Circuit determined that the case was "one of those extraordinary cases in which the complained of activity may be repeated and yet evade review." *Id*. (quoting *Alaska Fish & Wildlife Fed'n v. Dunkle*, 829 F.2d 933, 939 (9th Cir. 1987)). The court reasoned that "[t]he major issue—whether the Secretary has adequately examined the effects of pollock fishing on the Steller sea lions—is likely to recur in future years." *Id*. The court based its finding on the fact that the Secretary of Commerce relied on the "same biological opinion in support of the 1992 TAC" as he did in setting the 1991 TAC and "declined to prepare an [Environmental Impact Statement]" as he did before regarding the 1991 TAC. *Id.* at 1330. As a result, the Ninth Circuit determined that the appeal was not moot. *Id*. Similarly, here, the four renewed IHAs are based on the same scientific data as the prior IHAs issued to these windfarm developers, such that NMFS was able to rely on its prior analyses when issuing the renewed IHAs.

Federal Defendants contend that, although NMFS has renewed four of the IHAs at issue, they are "new agency actions based on new administrative records (not before the Court)." (Fed. Defs. MSJ Br. at 38–39.) What Federal Defendants fail to acknowledge, however, is that the renewed IHAs are essentially identical to the prior IHAs issued to these windfarm developers in both the activities authorized and the basis for NMFS's findings. In other words, while it is technically true that the renewed IHAs generated new administrative records, it is clear that NMFS has authorized the same activities based on the same data for the same (or a lesser) number of takes as the prior IHAs.

Indeed, the preliminary monitoring reporting submitted to NMFS along with each renewal request serves as confirmation that NMFS's findings on prior IHAs remain valid and that it could authorize either the same number of takes or a subset of the takes initially authorized. Federal Defendants also argue that the renewed IHAs were subject to notice periods that produced new comments for NMFS's consideration. However, for each of the renewed IHAs, none of the comments received resulted in a change from the proposed renewed IHA to the final version. In sum, the Court finds that these four renewed IHAs demonstrate that there is at least a reasonable expectation that Plaintiffs will be subject to the same action again. Thus, Plaintiffs' claims regarding the four IHAs issued to Vineyard Northeast, Invenergy Wind Offshore, Attentive Energy, and Community Offshore Wind are not moot.

Regarding the two expired IHAs issued to Bluepoint Wind and Atlantic Shores, the Court declines to apply the "capable of repetition, yet evading review" exception to these IHAs. Neither Bluepoint Wind nor Atlantic Shores has been issued a renewed IHA. In the parties' May 6, 2025 joint status report, Atlantic Shores states that they have requested a new ITA "based on the same findings and take" as its recently-expired ITA. (ECF No. 142 at 2–3.) According to counsel, that request remains outstanding. (*Id*. at 3.) NMFS has also advised Atlantic Shores that any action on that request will be delayed "pending completion of the review mandated by the January 20, 2025 Presidential Memorandum concerning 'Temporary Withdrawal of All Areas on the Outer Continental Shelf from Offshore Wind Leasing and Review of the Federal Government's Leasing and Permitting Practices for Wind Projects.'" (*Id*. at 3 n.2.)

In that Memorandum, which was directed to the Secretary of the Treasury, the Attorney General, the Secretary of the Interior, the Secretary of Agriculture, the Secretary of Energy, and

the Administrator of the Environmental Protection Agency,[32][33] the President "withdr[e]w from disposition for wind energy leasing all areas within the Offshore Continental Shelf" and directed agencies to "conduct a comprehensive review of the ecological, economic, and environmental necessity of terminating or amending any existing wind energy leases, identifying any legal bases for such removal, and submit a report with recommendations to the President." *Id*. The President also prohibited agencies from issuing "new or renewed approvals" for offshore wind projects, "pending the completion of a comprehensive assessment and review of Federal wind leasing and permitting practices." *Id*. In support of this decision, the President relied on "the need to foster an energy economy capable of meeting the country's growing demand for reliable energy," "the importance of marine life," "impacts on ocean currents and wind patterns," "effects on energy costs for Americans . . . and to ensure that the United States is able to maintain a robust fishing industry for future generations and provide low cost energy to its citizens." *Id*. The President's directives in this Memorandum will remain in effect until the Memorandum is revoked. *Id*. In response to the Memorandum, the Environmental Protection Agency has already sought and obtained a remand of its Clean Air Act permit issued to Atlantic Shores in connection with Atlantic Shores's offshore wind energy project in New Jersey. Order Granting Motion for Voluntary Remand, *In re Atlantic Shores Offshore Wind, LLC*, Permit No. OCS-EPA-R2 NJ 02, OCS Appeal No. 24-01 (EAB Mar. 14, 2025).[34] In light of the President's Memorandum, the future of approvals

---

[32] Memorandum on Temporary Withdrawal of All Areas on the Outer Continental Shelf from Offshore Wind Leasing and Review of the Federal Government's Leasing and Permitting Practices for Wind Projects (Jan. 20, 2025), https://www.whitehouse.gov/presidential-actions/2025/01/temporary-withdrawal-of-all-areas-on-the-outer-continental-shelf-from-offshore-wind-leasing-and-review-of-the-federal-governments-leasing-and-permitting-practices-for-wind-projects/.

[33] The Court takes judicial notice of the President's Memorandum as a matter of public record. *See Mayer*, 605 F.3d at 230.

[34] The Court takes judicial notice of the Environmental Protection Agency's remand order as a matter of public record. *See Mayer*, 605 F.3d at 230.

for windfarm projects, including new and renewed IHAs associated with those projects, is more uncertain.

That is, based on the President's Memorandum, there is no longer a reasonable expectation or demonstrated probability that Plaintiffs will be subject to the same action when it comes to Atlantic Shores and Bluepoint Wind, whose IHAs have both expired and not yet been renewed. *Cf.*, *Alaska Wilderness League*, 637 F. App'x at 980 (finding that, when analyzing the "capable of repetition requirement," various factors, including that "[o]ffshore oil exploration in the Arctic is a daunting, costly activity that is not economically feasible when, as now, the price of oil has plummeted to new lows," rendered "too remote and speculative" NMFS's issuance of an IHA for Pacific walruses in connection with offshore oil exploration in the Artic before regulation under the MMPA expired).

Furthermore, on April 11, 2025, in response to the President's January 20, 2025 Executive Order, "Unleashing American Energy,"[35] CEQ issued an "interim rule" removing the CEQ regulations implementing NEPA, including those regulations governing categorical exclusions. 90 Fed. Reg. 10610, 10610. NMFS previously determined that IHAs authorizing site surveys, like those issued to Atlantic Shores and Bluepoint Wind, were subject to NEPA categorical exclusion "B4" in the NOAA Companion Manual.[36] As a result, for such IHAs, NMFS was not required to conduct an EIS or EA under NEPA. Now that the CEQ NEPA regulations no longer exist, it appears unlikely that NMFS will apply categorical exclusions to authorizations going forward.

---

[35]  https://www.whitehouse.gov/presidential-actions/2025/01/unleashing-american-energy/ (last visited June 4, 2025).

[36] Appendix E, *Policy and Procedures for Compliance with the National Environmental Policy Act and Related Authorities*, Companion Manual for NOAA Administrative Order 216-6A, https://www.noaa.gov/sites/default/files/2021-10/NOAA-NAO-216-6A-Companion-Manual-03012018%20(1).pdf (last visited June 4, 2025).

Therefore, for any subsequent IHA potentially issued to Atlantic Shores or Bluepoint Wind, NMFS would be required to conduct an EIS or EA under NEPA. Because these authorizations would be based on "different criteria or factors" (an EIS or EA) in the future, Plaintiffs cannot meet the "capable of repetition" prong, and the Atlantic Shores and Bluepoint Wind IHAs are moot. *Ramsey v. Kantor*, 96 F.3d 434, 446 (9th Cir. 1996).

As to Bluepoint Wind's windfarm project, the Court also has before it scant information with which to assess whether there is a reasonable expectation that Plaintiffs will be subject to the same action again. As far as the Court is aware, Bluepoint Wind has not sought to renew its IHA, and the Court does not know whether it intends to do so. Thus, the future of such an action is too speculative to qualify for the narrow "capable of repetition, yet evading review" exception. *See ConocoPhillips Alaska, Inc.*, 2007 WL 9718215, at *1 (finding that the "capable of repetition, yet evading review" exception did not apply without a pending IHA request).

Regarding Atlantic Shores, the Court has no information as to whether it has complied with NMFS's criteria to seek renewal, what activities Atlantic Shores seeks to authorize, whether any of the underlying data affecting Atlantic Shores's request has changed since its prior IHA, how NMFS will respond to any public comments, and whether those comments will result in any changes to the proposed renewed IHA. Indeed, if Atlantic Shores's does not meet the criteria for renewal or if NMFS determines that it must rely on different information in assessing the request, then Atlantic Shores's renewal request will either be rejected or converted to a regular IHA. *See* 89 Fed. Reg. 61088, 61088–61089 (issuing a new IHA instead of a renewal because, although Vineyard Northeast had satisfied the renewal requirements, NMFS determined that "updated marine mammal density data . . . upon which the take estimates were based, for all species in the Project Area" was available). In that case, the "capable of repetition, yet evading review" exception

would not apply. *See Ramsey*, 96 F.3d at 446 (reasoning that the "capable of repetition, yet evading review" exception is inapplicable "where an agency will be basing its rulings on different criteria or factors in the future"). Plaintiffs' assertion that all of the expired IHAs are "technically similar," (ECF No. 123 ("Pls. MSJ Opp.") at 12), does not address these informational gaps. Indeed, the "presumed" similarities among the already-expired IHAs does not address the likelihood of whether Plaintiffs will be subject to the same action again as to Atlantic Shores. Such a presumption is not sufficient to meet the high threshold of "reasonable expectation" or "demonstrated probability" required under the "capable of repetition, yet evading review" exception to Article III's case or controversy mandate.[37]

In sum, the Court finds that Plaintiffs' challenges to IHAs issued to Vineyard Northeast, Invenergy Wind Offshore, Community Offshore Wind, and Attentive Energy are not moot and that challenges to IHAs issued to Bluepoint Wind and Atlantic Shores[38] are moot. The Court will now assess Plaintiffs' standing regarding Empire Wind's LOA, which has not yet expired, and the IHAs issued to Vineyard Northeast, Invenergy Wind Offshore, Community Offshore Wind, and Attentive Energy.[39]

---

[37] It also appears that Atlantic Shores is seeking to cancel their windfarm project off the coast of New Jersey. Atlantic Shores has submitted a petition to the State of New Jersey to terminate the renewable energy certificates awarded to the project. Josh Saul, *NJ Wind Project That Trump Dubbed a Disaster Is Canceled*, Bloomberg (June 9, 2025), https://www.bloomberg.com/news/articles/2025-06-09/nj-wind-project-that-trump-dubbed-a-disaster-is-canceled. This latest development is noteworthy in that, at the least, it evidences Atlantic Shores's desire to withdraw from the project.

[38] Atlantic Shores does not move for summary judgment on mootness grounds as Atlantic Shores filed its Motion before the expiration of its IHA. Because that IHA has since expired and the Court concludes that any challenge to Atlantic Shores's IHA is moot, the Court likewise denies Atlantic Shores's Motion for Summary Judgment as moot.

[39] Even if this Court were to find that the narrow "capable of repetition, yet evading review" mootness exception applied to all six expired IHAs, the Court still grants summary judgment in Defendants' favor based on Plaintiffs' lack of standing as set forth below. *See infra* Section III.B.2.

### 2. **Standing**

Once again before this Court is the question of Plaintiffs' Article III standing. To establish Article III standing, Plaintiffs must satisfy three elements—they "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). When, like here, a plaintiff has asserted an injury arising from "the government's allegedly unlawful regulation (or lack of regulation) of *someone else*, much more is needed." *Lujan*, 504 U.S. at 562 (emphasis in original). "[O]ne or more of the essential elements of standing" will depend on "the unfettered choices made by independent actors . . . whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict . . . ." *Id*. (internal quotation marks and citation omitted). While "standing is not precluded" in this circumstance, "it is ordinarily 'substantially more difficult' to establish." *Id*. (quoting *Allen v. Wright*, 468 U.S. 737, 758 (1984)). Furthermore, although a court may credit allegations of standing at the pleading stage, a plaintiff's "burden to demonstrate standing grows heavier at each stage of the litigation." *Osborn v. Visa Inc.*, 797 F.3d 1057, 1063 (D.C. Cir. 2015); *see also Scenic Am., Inc. v. United States Dep't of Transportation*, 836 F.3d 42, 48–49 (D.C. Cir. 2016) ("[T]he plaintiff must meet this burden at the outset of each phase."). At summary judgment, the plaintiff "can no longer rest on such mere allegations, but must set forth by affidavit or other evidence specific facts." *Lujan*, 504 U.S. at 561; *Scenic Am., Inc.*, 836 F.3d at 48–49 ("If . . . the court determines that the plaintiff has not introduced sufficient evidence into the record to at least raise a disputed issue of fact as to each element of standing, the court has no power to proceed and must dismiss the case.").

i.  Injury In Fact

An injury in fact, the first element of standing, is "an invasion of a legally protected interest that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Reilly v. Ceridian Corp.*, 664 F.3d 38, 41 (3d Cir. 2011) (quoting *Danvers Motor Co. v. Ford Motor Co.*, 432 F.3d 286, 290–91 (3d Cir. 2005)). A concrete injury is one that is "real, or distinct and palpable, as opposed to merely abstract." *Finkelman v. Nat'l Football League*, 810 F.3d 187, 193 (3d Cir. 2016). "Allegations of possible future injury are not sufficient to satisfy Article III." *Reilly*, 664 F.3d at 42 (internal quotation marks omitted). "Article III standing requires a concrete injury even in the context of a statutory violation." *Spokeo*, 578 U.S. at 341. Accordingly, a plaintiff cannot satisfy the injury in fact requirement by "alleg[ing] a bare procedural violation, divorced from any concrete harm." *Id*. An injury is particularized when it "affect[s] the plaintiff in a personal and individual way." *In re Am. Med. Collection Agency*, 2021 WL 5937742, at *6 (quoting *Lujan*, 504 U.S. at 561 n.1).

In the context of cases brought by environmental organizations, the Supreme Court of the United States has held that "the desire to use or observe an animal species, even for purely [a]esthetic purposes, is undeniably a cognizable interest for purpose of standing." *Lujan*, 504 U.S. at 562–63. However, to demonstrate an injury in fact, a plaintiff must prove "more than a cognizable interest." *Id*. at 563. A plaintiff must show "not only that listed species were in fact being threatened . . . but also that one or more of [plaintiffs'] members would thereby be directly affected apart from their special interest in the subject." *Id*. at 563 (internal quotation marks and citation omitted). To establish "imminent" injury in this context, a plaintiff must show more than "an intent to return to the places [he] ha[s] visited before," as "'some day intentions—without any description of concrete plans, or indeed even any specification of *when* the some day will be—do not support a finding of the 'actual or imminent injury'" required under the law. *Id*. at 564 (citations

42

omitted) (emphasis in original). Moreover, a plaintiff must show that he "use[s] the area affected by the challenged activity and not an area roughly in the vicinity of it." *Id*. at 566 (internal quotation marks and citation omitted).

Dr. Stern offers several statements in his summary judgment declaration as purported evidence of his and Save LBI's standing. He asserts that (1) he has observed whales offshore in the past from the beach where he lives in LBI; (2) he has observed Right Whales in the Bay of Fundy, Nova Scotia during fifteen excursions; (3) he attempted to observe whales in New York and New Jersey during an excursion in September 2023; and (4) he has plans for future whale-watching excursions. (Stern MSJ Decl. ¶¶ 3–4.)

Dr. Stern's excursions in Nova Scotia and in the New York and New Jersey bight are insufficient evidence of standing. First, regarding his Nova Scotia whale-watching trips, Dr. Stern must show use of the area affected by the activities that he challenges. *See Lujan*, 504 U.S. at 565. Therefore, his observations of Right Whales in Canada cannot establish a legally protected interest in the Right Whales and Humpback Whales that have allegedly been threatened in the waters of LBI. Regarding Dr. Stern's whale-watching excursion in New York and New Jersey on September 6, 2023, this trip occurred five months after Plaintiffs filed the original Complaint. (*See* ECF No. 1.) "[S]tanding must exist at the time a complaint was filed." *Freedom from Religion Found. Inc v. New Kensington Arnold Sch. Dist.*, 832 F.3d 469, 475 (3d Cir. 2016). A plaintiff that lacks standing at the time an action is filed cannot cure such a deficiency "retroactively." *Minden Pictures Inc. v. Ammoland, Inc.*, No. 20-2276, 2023 WL 4288332, at *7 (D.N.J. June 30, 2023). Thus, Dr. Stern's September 2023 whale-watching trip cannot establish that he had standing when he filed this action in May 2023.

The Court then turns its assessment to Dr. Stern's statements as to his past observation of whales from the shore where he lives in LBI and his unspecified plans for future whale-watching excursions. In terms of his shore-line observations, Dr. Stern states that he has seen whales "in the NY/NJ Bight" from the shore and "offshore from the beach at Beach Haven." (Stern MSJ Decl. ¶¶ 3–4.) At the motion to dismiss stage, this Court held that Dr. Stern failed to allege "any use of the waters in which the IHAs had or will occur or in the Atlantic Ocean in general." (ECF No. 79 at 19.) At the summary judgment phase, Dr. Stern's declaration has not cured this deficiency. Dr. Stern's vague statement that he saw whales in the New York and New Jersey bight from the shore and offshore from the Beach Haven beach where he lives does not adequately show at this later stage—when Dr. Stern's standing burden is heavier—that he used the area specifically affected by the IHAs and LOA at issue. *See Sierra Club v. Morton*, 405 U.S. 727, 735 (1972) (finding that plaintiff failed to allege that "it or its members would be affected in any of their activities or pastimes" by the challenged activity and did not assert "that its members use [the area] for any purpose, much less that they use it in any way that would be significantly affected by the proposed actions").

Dr. Stern links his use of the affected area to the vaguely described "New York and New Jersey bight," generally, (Stern MSJ Decl. ¶¶ 3–4), but blind generalized reference to a geographic region as expansive as the New York and New Jersey bight cannot support Article III standing. *See Ctr. for Biological Diversity v. United States Env't Prot. Agency*, 937 F.3d 533, 539 (5th Cir. 2019) (reasoning that petitioners could not satisfy Article III standing when challenging EPA's permit based on the release of pollutants in a geographic area as big as the "Western and Central Portions of the Gulf"). The New York and New Jersey bight is approximately 15,000 square

miles.[40] Plaintiffs have failed to show with any degree of certainty or precision that Dr. Stern's observations of whales will geographically overlap with the activity areas approved by NMFS. *See Ctr. for Biological Diversity*, 937 F.3d at 538.

The below three diagrams depict the areas relevant to the Empire Wind LOA and the Attentive Energy and Vineyard Northeast IHAs.[41] The red circle in each diagram, added by the Court, roughly estimates the location of LBI. Dr. Stern lives in Beach Haven, New Jersey, which is close to the southern tip of LBI. The legends in each of these diagrams show the location of the activities approved by NMFS. Using the scale bars on each diagram, the Court concludes that (1) the activities relevant to the Empire Wind LOA are approximately 200 miles northeast of Beach Haven, (2) the activities relevant to the Attentive Energy IHA are approximately 65 miles northeast of Beach Haven, and (3) the activities relevant to the Vineyard Northeast IHA are approximately 60 miles northeast of Beach Haven.

Dr. Stern does not specify how far from the shore in Beach Haven he saw the whales that he observed. Indeed, it is Plaintiffs' burden to establish Dr. Stern's standing. Yet, conspicuously absent from his declarations is any statement that he was able to observe whales anywhere remotely close to the locations of these project areas, one of which was as far as 200 miles away. As a point of reference, a person with eyes about 1.5 meters (approximately five feet) above the ground gazing across the ocean at the horizon is seeing only as far as 4.4 kilometers (approximately three miles) away.[42] For these reasons and based on the location of the Empire Wind, Attentive Energy, and Vineyard Northeast projects as compared to Beach Haven beach, the Court finds that

---

[40]    NOAA, *Mesa New York Bight Atlas Monograph 6* (1976), https://repository.library.noaa.gov/view/noaa/9945/noaa_9945_DS1.pdf.

[41] (Am. Compl. ¶¶ 32 n.8, 34 n.10, 37 n.13.)

[42]    Phil Plait, *How Far Away Is the Horizon?*, Scientific American (Jan. 26, 2024), https://www.scientificamerican.com/article/how-far-away-is-the-horizon/.

Dr. Stern has failed to present sufficient evidence that he could observe whales in these waters from the shore in Beach Haven. Even if Dr. Stern has seen whales from the shore in Beach Haven, that area is, at best, "roughly in the vicinity" of the one affected by the Empire Wind LOA and the Attentive Energy and Vineyard Northeast IHAs,[43] which is insufficient to establish his use of that area. *See Lujan*, 504 U.S. at 565; *see also Ctr. for Biological Diversity*, 937 F.3d at 538 ("[P]etitioners cannot simply assert some interest somewhere within a large geographic area. The Court . . . must 'assure itself that' members of the plaintiff associations 'plan to make use of the specific sites' where environmental effects would allegedly be felt." (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009))).

---

[43] It appears from Invenergy Wind Offshore and Community Offshore Wind's IHAs that the approved survey areas include waters along the shore of LBI. (Am. Compl. ¶¶ 35 n.11, 36 n.112.) Although Plaintiffs make no such argument, the Court recognizes that Dr. Stern's observation of whales from the shore in Beach Haven could potentially encompass the area affected by these two IHAs. Nevertheless, the Court finds that Plaintiffs lack standing regarding these two IHAs for the other reasons discussed in this Section.







Furthermore, Dr. Stern links his use of the affected area solely to the September 2023 excursion, which occurred after he initiated this action and cannot be relied on to prove standing. (Stern MSJ Decl. ¶ 4 ("This excursion traveled through the waters to the south of Long Island, along and east of the New Jersey coastline, and otherwise within the NY/NJ Bight waters. And so, I have utilized the area affected by the ongoing and future incidental harassment authorizations and Letters of Authorization.").)

However, even setting aside problems with Dr. Stern's proof of use, there are additional deficiencies with Dr. Stern's remaining standing evidence. It is clear from the Amended Complaint that the activity challenged by Plaintiffs arise from the IHAs and LOA that authorize Level B takings of Humpback Whales and Right Whales. (ECF No. 81 ("Am. Compl.") ¶¶ 30–37.) However, Dr. Stern provides no evidence that he has observed Right Whales or Humpback Whales

from the shore of LBI or that he has concrete future plans to observe those two specific species. He states only that he has seen "whales" from the shore and plans for future "whale watching" excursions. (Stern MSJ Decl. ¶¶ 3–4.) Although observing whales is a cognizable interest, Dr. Stern must show more to demonstrate injury in fact. *See Lujan*, 504 U.S. at 563 ("It goes beyond the limit, however, and into pure speculation and fantasy, to say that anyone who observes or works with an endangered species, anywhere in the world, is appreciably harmed by a single project affecting some portion of that species with which he has no more specific connection."). He must show that Empire Wind's LOA would directly affect his use or observation of these two specific whale species. *See Lujan*, 504 U.S. at 563 (finding that the plaintiff must show "not only that listed species were in fact being threatened . . . but also that one or more of [plaintiffs'] members would thereby be directly affected apart from their special interest in the subject" (internal quotation marks and citation omitted)). Without evidence of his past or future observations of Right Whales and Humpback Whales, or any evidence that he would be directly harmed by the takings of these two species, Dr. Stern lacks standing.

Regarding Dr. Stern's "plans for future excursions," this statement does not support a finding of "imminent" injury. As *Lujan* instructs, "'some day' intentions—without any description of concrete plans, or indeed even any specification of *when* the some day will be" are insufficient to demonstrate imminent injury. *Lujan*, 504 U.S. at 564 (emphasis in original) (citation omitted) (finding that the concept of imminence is "concededly a somewhat elastic concept" but is absent when a plaintiff "alleges only an injury at some indefinite future time."). In that case, the plaintiffs represented their intent to return to Sri Lanka to observe the Nile crocodile with one plaintiff confessing that, despite this intent, she had no current plans to return. *Id*. at 563–64.

While Dr. Stern's statement that he "ha[s] plans for future excursions" is arguably more concrete than the plaintiffs' plans in *Lujan*, Dr. Stern's representation lacks other markers of concreteness and, thus, imminence. Although he describes the general location of these future excursions, "there and/or into the NY/NJ Bight," he provides no other concrete description of those plans. (Stern MSJ Decl. ¶ 4.) Indeed, based on Dr. Stern's imprecise use of "there" and "and/or," it is not even clear that those excursions will be in New Jersey. Moreover, he provides no specification of when these excursions will occur; he merely states that at some undefined future time he plans to participate in whale-watching excursions. *See Animal Legal Def. Fund, Inc. v. Espy*, 23 F.3d 496, 500 (D.C. Cir. 1994) (reasoning that plaintiff's injury was not "certainly impending" as she merely stated that "at some undefined future time she will be required to engage in further research" (internal quotation marks omitted)). Dr. Stern relies on the same vague statement about "future excursions" in both his Amended Complaint declaration and his summary judgment declaration, which were filed eight months apart. During that eight-month period, his "plans for future excursions" became no more concrete.[44] Accordingly, the Court concludes that Dr. Stern has failed to establish Article III's "actual or imminent" injury requirement.

---

[44] "The Supreme Court has declined to find standing in contrived circumstances." *Ctr. for Powell Crossing, LLC v. Ebersole*, 696 F. App'x 702, 705 (6th Cir. 2017) (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013) (holding that plaintiffs, who incurred costs to protect the confidentiality of their communications in order to challenge a government surveillance policy to which they were not likely subjected, lacked standing)); *Mancuso v. Consol. Edison Co. of N.Y., Inc.*, 324 F. Supp. 2d 469, 471 (S.D.N.Y. 2004) (finding that plaintiff lacked standing to bring Clean Water Act challenge because he did not reside, own property, or recreate in, on, or near the affected area and, instead, had visited the area in question solely to obtain evidence for litigation and, as such, any aesthetic injury suffered by the plaintiff was nothing more than a byproduct of the lawsuit); *see also Goldberg v. Stein Saks, PLLC*, No. 23-3089, 2024 WL 816518, at *3 (S.D.N.Y. Feb. 26, 2024) (reasoning that a plaintiff who challenged a law firm's website for failing to be accessible to the blind had manufactured standing by claiming that he would revisit that website in the future for contact information because of his pending lawsuit); *Castro v. Fontes*, No. 23-01865, 2023 WL 8436435, at *3 (D. Ariz. Dec. 5, 2023), *aff'd*, No. 23-3960, 2024 WL 2806969 (9th Cir. Mar. 29, 2024) ("[A] plaintiff cannot establish competitive standing merely by self-declaring as a write-in candidate. If a cognizable injury could be manufactured so easily, then any citizen could obtain standing (in violation of Article III of the U.S. Constitution) by merely self-declaring[.]" (cleaned up)); *Omni Innovations, LLC v. BMG Columbia House, Inc.*, No. 06-1350, 2009 WL 10677406, at *1 (W.D. Wash. Dec. 18, 2009) (finding

Plaintiffs argue, again, as they did at the motion to dismiss stage, that they have demonstrated a procedural injury, and therefore standing, by showing that Defendants' "procedural derelictions . . . le[d] to the increased risk of environmental harm, that in turn eventuate[d] in an increased risk to the Plaintiff[s'] concrete interests." (ECF No 117-1 ("Pls. MSJ Br.") at 16.) Plaintiffs define "concrete interests" as "interests within the zone of interests of the MMPA and NEPA." (*Id*.) As the Court has already held, and as is the law of this case, "even if a plaintiff asserts a procedural right, they must still demonstrate injury-in-fact." (ECF No. 79 at 16 n.9 (citing *Summers v. Earth Island Inst.*, 555 U.S. 488, 496-97 (2009) (describing the injury-in-fact inquiry as a "hard floor . . . that cannot be removed by statute.")).) Thus, Plaintiffs are not excused from Article III's standing requirements by alleging a procedural injury.

Plaintiffs' reliance on the "zone of interest" is similarly unavailing. The "zone of interest" is a test for "prudential standing" which is in addition to Article III's standing requirements. *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012). As the Supreme Court has made clear, "a person suing under the APA must satisfy not only Article III's standing requirements, but an additional test: The interest he asserts must be arguably within the zone of interests to be protected or regulated by the statute that he says was violated." *Id*. (internal quotation marks and citation omitted). Therefore, Plaintiffs' allegation that Dr. Stern's injuries fall within the zone of interest of the MMPA and NEPA is not a substitute for proof of Dr. Stern's injury in fact.

---

that plaintiff's late-stage motion to amend after the court had found that he lacked standing was "contrived"). While the Court does not go so far as to find standing to be contrived or manufactured in this case, the Court takes note of the barebones nature of Dr. Stern's standing allegations, especially in light of the other matters that Save LBI has filed before this Court in connection with windfarm development. *See Save Long Beach Island v. U.S. Dep't Commerce*, No. 25-4155 (D.N.J. May 12, 2025); *Save Long Beach Island v. U.S. Dep't Commerce*, No. 25-240 (D.N.J. Jan. 10, 2025).

Plaintiffs also seek to satisfy their burden to demonstrate Dr. Stern's standing through reliance on the District of Massachusetts' decision in *Nantucket Residents Against Turbines v. United States Bureau of Ocean Energy Mgmt.*, 675 F. Supp. 3d 28 (D. Mass. May 17, 2023). This non-binding decision is also distinguishable. In that case, the founder and president of Nantucket Residents Against Turbines, Vallorie Oliver, submitted a declaration in support of her standing, stating the following:

> I currently reside on Nantucket Island in the state of Massachusetts, where I was born and have lived my entire 60 years of life. Since I was a child, everything about one's life is centered around the whales. I have enjoyed the natural environment that Nantucket offers, especially the rich marine life that defines what Nantucket is and what we want it to be in the future, as well. I am awe inspired that so many marine animals, including some that are threatened or endangered, still choose to visit and live in the waters around Nantucket. I love that I have had, and continue to have, opportunities to observe them in their natural habitat. Many of these sea animals, including and especially the North Atlantic right whale, are truly magnificent to behold. Seeing them, whether from a boat or from the air, is a sacred and metaphysical experience that most people never get the chance to encounter. It is a sublime connection you have with them, once you have been near them and seen how majestic these animals truly are. It comforts me to know that they are still there, just under the surface, sharing the water with me, even when I am not near them.

*Nantucket Residents Against Turbines et al v. U.S. Bureau of Ocean Energy Management* et al, No. 21-11390, ECF No. 88-2 ¶ 3 (D. Mass. Aug 25, 2021).[45] Based on her representations, the court determined that Ms. Oliver had demonstrated "marginally sufficient" standing. *Nantucket Residents Against Turbines*, 675 F. Supp. 3d at 49. The court reasoned that Ms. Oliver had demonstrated that "she has seen right whales in the past and has 'concrete plans' to observe them in the future." *Id*. In contrast, as discussed above, Dr. Stern has not presented evidence that he personally observed Right Whales or Humpback Whales in New Jersey. Indeed, his only

---

[45] The Court takes judicial notice of Ms. Oliver's declaration as a matter of public record. *See Mayer*, 605 F.3d at 230.

observation of Right Whales was out of the country in Nova Scotia. Furthermore, Ms. Oliver's observations of whales were not only of the specific species at issue in *Nantucket Residents Against Turbines* but was also in the area affected by the agency action being challenged.

Dr. Stern's reference to his observation of whales is quite scant in comparison to Ms. Oliver's declaration in *Nantucket Residents Against Turbines*. Ms. Oliver averred to her lifelong observation of marine animals, especially Right Whales, in her hometown, and its impact on and import in her life. It is clear from her declaration that this pastime provides her with much personal, even spiritual, enrichment and fulfillment. In contrast, Dr. Stern blandly states that he has observed unspecified whale species from the shore in LBI. It is not clear how often he has observed whales from the shore, but, regardless of the frequency, he makes no mention of the impact that these observations had on him.[46] *C.f. Animal Legal Def. Fund, Inc. v. Glickman*, 154 F.3d 426, 431 (D.C. Cir. 1998) ("Mr. Jurnove's allegations solidly establish injury in fact. As his affidavit indicates, Mr. Jurnove 'enjoy[s] seeing [animals] in various zoos and other parks near [his] home' '[b]ecause of [his] familiarity with and love of exotic animals, as well as for recreational and educational purposes and because [he] appreciate[s] these animals' beauty.' He decided to tour the primate cages at the Game Farm 'in furtherance of [his] appreciation for exotic animals and [his] desire to observe and enjoy them.'"); *Gescheidt v. Haaland*, No. 21-04734, 2023 WL 2250268, at *8 (N.D. Cal. Feb. 27, 2023) (finding that plaintiff has sufficiently demonstrated aesthetic and recreational

---

[46] *See Ecological Rts. Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1150 (9th Cir. 2000) ("An individual who visits Yosemite National Park once a year to hike or rock climb and regards that visit as the highlight of his year" may litigate "to protect the environmental quality of Yosemite Valley . . . ."); *see also Sierra Club v. Jewell*, 764 F.3d 1, 5 (D.C. Cir. 2014) (reasoning that a court may confer standing on an individual who "derive[s] great pleasure from visiting a certain river; the pleasure may be described as an emotional attachment stemming from the river's pristine beauty") (quoting *Am. Soc'y For Prevention of Cruelty to Animals v. Ringling Bros. & Barnum & Bailey Circus*, 317 F.3d 334, 337 (D.C. Cir. 2003) (finding that "emotional attachment to a particular animal . . . could form the predicate of a claim of injury." (internal quotation marks omitted))).

interests in the affected area based on statements that he has "been visiting Tomales Point in the Point Reyes National Seashore on a regular basis—on average six times per year—for at least twenty-four years" . . . [h]e "come[s] to the Tomales Point park for aesthetic enjoyment, recreation, and spiritual renewal," and enjoys photographing the area, "including the magnificent Tule elk herd"). In fact, he states only that these observations remind him, generally, of how many whales humans have slaughtered around the world. After discussing his single whale-watching excursion in New York and New Jersey after this case was filed, which he cannot rely on for purposes of standing, he makes a passing mention that his future "ability" to "see, observe, and otherwise experience aesthetic and recreational value from the whales will be negatively affected by the ongoing IHAs/LOA." (Stern MSJ Decl. ¶ 4.)

The Court finds that this single vague and conclusory[47] statement falls short of the far more compelling averments that the court found "marginally sufficient" in *Nantucket Residents Against Turbines. See Nantucket Residents Against Turbines*, 675 F. Supp. 3d at 49; *Citizens to End Animal Suffering & Exploitation, Inc. v. New England Aquarium*, 836 F. Supp. 45, 52 (D. Mass. 1993) (finding that plaintiffs, who sought to challenge the transfer of a particular dolphin (Kama) from the New England Aquarium, failed to show injury in fact from the affidavits of two individuals who stated that they "attended dolphin shows and saw dolphins on public display [at the Aquarium] several times" because they did not "state that they ever observed Kama in particular, as opposed to dolphins in general, at the Aquarium," which "belie[d] any possible assertion that either of them

---

[47] "[E]nvironmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity." *Friends of the Earth, Inc. v. Laidlaw Env't. Servs. (TOC), Inc.*, 528 U.S. 167, 184 (2000) (internal quotation marks omitted) (noting that "general averments" and "conclusory allegations" of an "affiant['s] recreational, aesthetic, and economic interests" are "inadequate").

had established a relationship with Kama such that, as a result of his transfer, the very subject of [the member's] interest will no longer exist").

In terms of Ms. Oliver's representation that she had "concrete plans" to observe Right Whales in the future (which was coupled with statements regarding the enjoyment and enrichment that observing Right Whales brought to her life), this Court does not take its cue from the District of Massachusetts, but rather from the Supreme Court in *Lujan*. *Lujan* teaches that "'some day' intentions, without "any description of concrete plans, or indeed even any specification of *when* the some day will be," cannot establish imminent injury. *Lujan*, 504 U.S. at 564 (citation omitted). Dr. Stern's "some day" plans fail to meet this threshold. Thus, he lacks standing to pursue this action.

ii.   Associational Standing

As this Court held at the motion to dismiss stage, without Dr. Stern's standing, Save LBI itself cannot demonstrate associational standing. "[A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *New Jersey Coal. of Auto. Retailers, Inc. v. Mazda Motor of Am., Inc.*, 957 F.3d 390, 392 (3d Cir. 2020) (quoting *Hunt v. Wash. State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977)); *Franco v. Conn. Gen. Life Ins. Co.*, 647 F. App'x 76, 82 (3d Cir. 2016). Dr. Stern remains the only member of Save LBI referenced in this case and is the only member of Save LBI who has submitted evidence of standing. Without his injury in fact, Plaintiffs cannot satisfy the first prong

of the test for associational standing. Thus, Save LBI lacks standing on behalf of its members, and the Court grants summary judgment in Defendants' favor.[48]

### 3. Arbitrary and Capricious

The Court grants summary judgment in Defendants' favor on jurisdictional grounds. Challenges to Atlantic Shores and Bluepoint Wind's expired IHAs are both moot.[49] Plaintiffs lack standing to pursue claims based on the remaining IHAs (Vineyard Northeast, Attentive Energy, Invenergy Wind Offshore, and Community Offshore Wind) and Empire Wind's LOA because they have not met their burden to prove injury in fact. Notwithstanding these jurisdictional issues, Plaintiffs' claims fail on the merits. That is, the Court finds that Plaintiffs have failed to meet their high burden to prove that NMFS's take estimates of Right Whales and Humpback Whales were arbitrary and capricious under the MMPA's "small numbers" and "negligible impact" requirements and that NMFS's decision not to conduct a cumulative EIS or EA under NEPA before issuing the IHAs and LOA at issue was arbitrary and capricious. Indeed, the exhaustive and voluminous Administrative Record before this Court makes clear the reasonableness of the agency actions at issue here.

As this Court has already stated above regarding the legal standards governing this APA action, as long as an agency's action is "reasonable and reasonably explained," a court should uphold the agency's decision. *Prometheus Radio Project*, 592 U.S. at 423; *see also Fed. Commc'ns Comm'n v. Fox Television Stations, Inc.*, 556 U.S. 502, 513–14 (2009) (finding that a court's review of agency action is "narrow," a court may "not [] substitute its judgment for that of the

---

[48] Because the Court grants summary judgment on jurisdictional grounds, it will not reach the Federal Defendants' arguments regarding issue exhaustion or FAST-41's alleged bar on challenges to the Empire Wind LOA.

[49] As the Court noted above, even if it found that none of the challenges to the six expired IHAs were moot, Plaintiffs would still lack standing to pursue their claims as to all of them.

agency," and it "should uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned" (internal quotation marks omitted)). An agency action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 44 (1983).

i.    "Small Numbers" Under the MMPA

Plaintiffs first argue that NMFS failed to consider the cumulative impact of all IHAs and LOAs in the New York and New Jersey bight on Right Whales and Humpback Whales when estimating the number of takes of each mammal and, therefore, violated the MMPA's "small numbers" provision. (Pls. MSJ Br. at 21–27.)

Under the MMPA, an IHA "for periods of not more than 1 year" may be issued "[u]pon request therefor by citizens of the United States who engage in a specified activity (other than commercial fishing) within a specific geographic region" for "the incidental, but not intentional, taking by harassment of small numbers of marine mammals of a species or population stock by such citizens while engaging in that activity within that region." 16 U.S.C. § 1371(a)(5)(D)(i). A "specified activity" is defined as "any activity, other than commercial fishing, that takes place in a specified geographical region and potentially involves the taking of small numbers of marine mammals." 50 C.F.R. § 216.103. A "specified geographic region" is defined as "an area within which a specified activity is conducted and that has certain biogeographic characteristics." *Id*. Each IHA applicant must provide descriptions of the proposed specified activity and geographic region within which the incidental take may occur. 50 C.F.R. § 216.104(a)(1)–(2). Similarly, an LOA "during periods of not more than five consecutive years each" may be issued "upon request

58

therefor[e] by citizens of the United States who engage in a specified activity (other than commercial fishing) within a specified geographical region" for "the incidental, but not intentional, taking by citizens while engaging in that activity within that region of small numbers of marine mammals of a species or population stock." 16 U.S.C. § 1371(a)(5)(A)(i).

The MMPA does not define "small numbers." Congress recognized "the imprecision of the term 'small numbers,' but was unable to offer a more precise formulation because the concept is not capable of being expressed in absolute numerical limits." *Melone v. Coit*, 100 F.4th 21, 30 (1st Cir. 2024) (quoting H.R. Rep. No. 97-228, at 19 (1981), as reprinted in 1981 U.S.C.C.A.N. 1458, 1469). NMFS regulation, however, does provide a definition of "small numbers." 50 C.F.R. § 216.103. Under that definition, "[s]mall numbers means a portion of a marine mammal species or stock whose taking would have a negligible impact on that species or stock." *Id*. However, the United States District Court for the Central District of California, in granting a preliminary injunction to environmental organizations seeking to prevent the United States Navy's use of low frequency sonar systems for training, testing, and routine operations, determined that the plaintiffs were "likely to prevail on their contention that NMFS acted outside the scope of its authority in applying the definition of 'small numbers' that appears in 50 C.F.R. § 216.103." *Nat. Res. Def. Council, Inc. v. Evans*, 232 F. Supp. 2d 1003, 1027 (N.D. Cal. 2002). As a result of that case, NMFS no longer relies on the regulatory definition of "small numbers," (Fed. Defs. Br. at 43), and instead employs a "proportional approach" when assessing "small numbers." *Melone*, 100 F.4th at 30. It compares "the number of individuals taken to the most appropriate estimation of abundance of the relevant species to determine whether the authorized take is limited to 'small numbers' of that species." *Id*. (internal quotation marks omitted).

Here, NMFS applied this proportional standard to the IHAs and LOA at issue. NMFS estimated the Humpback Whale population to be 1,396 and Right Whale population to be 338. (NMFS_11; NMFS_286; NMFS_572; NMFS_646; NMFS_950; NMFS_8005; NMFS_8358.) Plaintiffs do not dispute these population estimates. Based on these estimates, NMFS authorized the following takes through non-lethal Level B Harassment of Right Whales and Humpback Whales by analyzing the number of authorized takes relative to the size of each affected population:

- <u>Atlantic Shores IHA</u>: Level B Harassment of up to 3 Humpback Whales and 2 Right Whales, which amounts to 0.2% of the Humpback Whale population and 0.6% of the Right Whale population. (NMFS_14.)

- <u>Attentive Energy IHA</u>: Level B Harassment of up to 24 Humpback Whales and 12 Right Whales, which amounts to 1.69% of the Humpback Whale population and 3.51% of the Right Whale population. (NMFS_289.)

- <u>Bluepoint Wind IHA</u>: Level B Harassment of up to 27 Humpback Whales and 11 Right Whales, which amounts to 1.9% of the Humpback Whale population and 3.3% of the Right Whale population. (NMFS_572.)

- <u>Community Offshore Wind IHA</u>: Level B Harassment of up to 46 Humpback Whales and 24 Right Whales, which amounts to 0.4% of the Humpback Whale population and 6.8% of the Right Whale population. (NMFS_650.)

- <u>Empire Wind LOA</u>: Level B Harassment of up to 97 Humpback Whales throughout the five-year period, with a maximum of 63 whales in any given year (amounting to a maximum of 4.5% of the Humpback Whale population in any given year), and Level B Harassment of 29 Right Whales throughout the five-year period, with a maximum of 13 Right Whales in any given year (amounting to a maximum of 3.8% of the Right Whales population in any given year). (NMFS_917.)

- <u>Invenergy Wind Offshore IHA</u>: Level B Harassment of up to 13 Humpback Whales and 6 Right Whales, which amounts to 0.95% of the Humpback Whale population and 1.87% of the Right Whale population. (NMFS_8008.)

- <u>Vineyard Wind Northeast IHA</u>: Level B Harassment of up to 12 Humpback Whales and 12 Right Whales, which amounts to 0.86% of the Humpback Whale population and 3.6% of the Right Whale population. (NMFS_8358.)

As evidenced by each of these authorizations, NMFS's non-lethal take estimates were well-below 10 percent of both the total Right Whale and Humpback Whale populations. The Court finds that NMFS's application of the proportional approach[50] and its determination that each of these take quantities met the MMPA's "small numbers" requirement were reasonable. *See Melone*, 100 F.4th at 30 (upholding NMFS's determination that Level B Harassment of 20 Right Whales— amounting to less than 5.5% of the population—over the course of one year was a "relatively small percentage of that stock"); *Native Vill. of Chickaloon v. Nat'l Marine Fisheries Serv.*, 947 F. Supp. 2d 1031, 1053 (D. Alaska 2013) (upholding NMFS's determination that Level B Harassment of 30 beluga whales—amounting to 10% of the population—over the course of one year was a "relatively limited or small portion" of the population); *see also Alaska Wildlife All. v. U.S. Fish & Wildlife Serv.*, No. 21-00209, 2023 WL 2986365, at *6 (D. Alaska Feb. 6, 2023), *R. & R. adopted as modified*, No. 21-00209, 2023 WL 2674760 (D. Alaska Mar. 29, 2023), *rev'd in part on other grounds*, No. 23-35299, 2024 WL 1169411 (9th Cir. Mar. 19, 2024) (finding that the annual non-lethal take rate of 10.4% of polar bears or 48.84% of polar bears over five years in an LOA issued by FWS was a reasonable assessment under the MMPA's small numbers requirement).

The Court is not persuaded by Plaintiffs' attempts to challenge these estimates. Plaintiffs cite to two California district court cases which they contend set a percentage limit on the number of takes that NMFS may authorize. (Pls. MSJ Br. at 22.) Plaintiffs' reliance on both cases is misplaced. The court in *NEC Corp. v. Intel Corp.* sought to interpret the language "a relatively

---

[50] *See Center for Biological Diversity v. Salazar*, 695 F.3d 893, 906–908 (9th Cir. 2012) (finding that FWS's application of the proportional approach under the MMPA to its issuance of taking regulations in connection with oil and gas activities on the coast of Alaska was reasonable); *see also Melone*, 100 F.4th at 30 (upholding NMFS's authorization of non-lethal harassment of 20 Right Whales based on the proportional approach to be reasonable).

small number of copies" in the Copyright Act, finding that a percentage of 10.6 did not qualify as a "relatively small number." No. 84-20799, 1989 WL 67434, at *4 (N.D. Cal. Feb. 6, 1989). This case does not aid in the Court's assessment under the MMPA as it dealt with an entirely different statute. Although *National Resources Defense Council, Inc. v. Evans* did concern the MMPA, the court's summary judgment decision rested on the holding that "small numbers" and "negligible impact" must be defined "so that each term has a separate meaning." 279 F. Supp. 2d 1129, 1152 (N.D. Cal. Aug. 26, 2003). In *dicta*, the court noted that "a definition of 'small number' that permits the potential taking of as much as 12% of the population of a species is plainly against Congress' intent." *Id*. The Court declines to adopt a bright-line rule based on the *dicta* of a single district court, but, even if it were persuaded to do so, NMFS's take estimates here fall well below the 12 percent threshold. *Id*. Indeed, the majority of the takes authorized are but a fraction of 12 percent and are, at most, roughly half that percentage. *See supra* Section III.B.3.a. at 59–60.

Plaintiffs also contend that NMFS was required to conduct a cumulative analysis of takes under the "small numbers" requirement of the MMPA. (Pls. MSJ Br. 21–26.) Not so. Neither the MMPA nor NMFS's implementing regulations require a cumulative assessment of takes under the "small numbers" provision. *See* 16 U.S.C. § 1371(a)(5)(D); 50 C.F.R. §§ 216.101–216.108. Indeed, the MMPA's plain language limits the take of "small numbers of marine mammals" to applicants "who engage in a specified activity . . . within a specific geographic region" during the one-year period that those applicants engage in "that activity within that region." 16 U.S.C. § 1371(a)(5)(A)(i), (D)(i).

The First Circuit recently addressed a similar question in *Melone v. Coit*. In that case, NMFS issued an IHA to a windfarm developer that authorized pile-driving activities in connection with the construction of up to 84 wind turbine generators. *Melone*, 100 F.4th at 27. As part of that

IHA, NMFS authorized non-lethal Level B harassment of 20 Right Whales. *Id*. The plaintiff challenged this IHA on several grounds, including that the MMPA "requires a collective approach to IHA approval, and that it was error for NMFS to consider only [the plaintiff]'s 'specified activity' rather than also those of others engaging in similar activities contemporaneously." *Id*. at 32. The plaintiff's "essential claim" was that NMFS's approach "improperly segments applicant activities and regions so that the IHA appears to authorize the non-lethal harassment of only 'small numbers' of right whales while ignoring its cumulative effect on the species." *Id*.

The First Circuit disagreed, reasoning that the IHA process is "plainly applicant-driven" and that "nothing in the MMPA expressly requires that NMFS analyze a broader range of activities outside the scope of an individual IHA application." *Id*. The court continued that the MMPA "does not require [NMFS] to consider takes resulting from *all* activities proposed by *all* citizens undertaking similar activities, but rather only those citizens who submit the request." *Id*. (emphasis in original). The court also reasoned that legislative history demonstrates Congress's intent that "specified activity" be "narrowly identified." *Id*. at 32–33 (citing H.R. Rep. No. 97-228, at 19 (Sept. 16, 1981)) ("That House Report noted that it would not 'be appropriate for the Secretary to specify an activity as broad and diverse as outer continental shelf oil and gas development,' but that activities 'should be separately specified as, for example, seismic exploration or core drilling.'"). The First Circuit explained that the plaintiff "misse[d] the mark" in arguing that NMFS "failed to consider the cumulative effect on right whales resulting from other activities apart from those proposed by [the plaintiff]" because it had considered "the effects of ongoing and past anthropogenic activities aside from [the plaintiff]'s project as part of its 'negligible impact' analysis." *Id*. at 33.

This Court is persuaded by the First Circuit's reasoning. It agrees that the issuance of IHAs and LOAs is plainly applicant driven. There is nothing in the MMPA or NMFS's regulations requiring NMFS to assess take numbers based on activities outside of the scope of each individual application. In addition, while the cumulative effect of approved activities is not part of the MMPA's "small numbers" analysis, NMFS considered cumulative effects to the impacted marine animals as part of their "negligible impact" analysis. (NMFS_20; NMFS_295; NMFS_573;[51] NMFS_656; NMFS_990; NMFS_8014; NMFS_8362[52].)

The regulatory language upon which Plaintiffs rely to prove their so-called "cumulative effect" requirement is inapposite. Plaintiffs cite to the note to subsection (b) of 50 C.F.R. § 18.27, which references "cumulative impacts" of potential takings, but that regulation is a U.S. Fish and Wildlife Service ("FWS") regulation, not an NMFS regulation. It also governs five-year authorizations issued by FWS, not one-year IHAs. 50 C.F.R. § 18.27(a). Furthermore, even this regulation does not require cumulative analysis across different authorizations. Plaintiffs also rely on language in the joint preamble to NMFS and FWS's regulations governing the "negligible impact" requirement, not the "small numbers" provision. *See* 54 Fed. Reg. 40338, 40342 (Sept. 29, 1989). "[S]mall numbers" and "negligible impact" have "separate meanings" and must be treated as different requirements. *See Evans*, 279 F. Supp. at 1152. This Court will not conflate them.

Plaintiffs ask this Court to apply broadly the "total taking" language in the joint preamble to all authorizations issued by NMFS. 54 Fed. Reg. 40338, 40342 ("In determining impact, [NMFS] must evaluate the 'total taking' expected from the specified activity in a specific

---

[51] *See also* 88 Fed. Reg. 13783, 13799 (Bluepoint Wind initial IHA).

[52] *See also* 87 Fed. Reg. 52913, 52929 (Vineyard Northeast initial IHA).

geographic area. The estimate of total taking involves the accumulation of impacts from all anticipated activities that are expected to be covered by the specific regulations."). However, the preamble language applies to Incidental Take Regulations ("ITRs"), which are distinct from IHAs and apply to the issuance of LOAs. *See* 54 Fed. Reg. 40338, 40342 ("The estimate of total taking involves the accumulation of impacts from all anticipated activities that are expected to be covered by the *specific regulations*." (emphasis added)); 50 C.F.R. § 216.105 (governing NMFS's issuance of ITRs and titled "Specific Regulations"). Unlike IHAs, separate LOAs may be issued under the same ITR. *See* 50 C.F.R. § 216.105. For multiple LOAs issued under the same ITR, "the total takings expected from all persons conducting the activities to be covered by the regulations must be determined." 54 Fed. Reg. 40338, 40342. Here, the LOA issued to Empire Wind is the only LOA issued under its governing ITR. 89 Fed. Reg. 11342 (Feb. 14, 2024); NMFS_883–928. In other words, NMFS was not required to total the number of takings across multiple LOAs issued under that ITR. The number of takings authorized in Empire Wind's LOA is the total number of takings expected under its governing ITR.

Finally, Plaintiffs argue that the Court should reject NMFS's take estimates based on its findings regarding noise source levels, noise transmission, and range affected by noise disturbance. (Pls. MSJ Br. at 28–33.) Plaintiffs ask this Court to supplant the scientific judgment of NFMS's experts with that of Dr. Stern. Indeed, they rely exclusively on Dr. Stern's Motion to Dismiss Declaration, (ECF No. 54-1), to support their arguments. (*Id.*) However, for the reasons set forth above, the Court will not consider this extra-record declaration. Plaintiffs take issue with the specific source values, transmission loss factors, and noise disturbance criteria relied on by NMFS for the specified activities at issue. (Pls. MSJ Br. at 28–33.) However, NMFS explained in detail

its methods for assessing noise source levels,[53] noise transmission,[54] and range affected by noise disturbance.[55] The Court defers to and credits this highly technical expertise. *See Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 377–378 (1989) ("Because analysis of the relevant documents requires a high level of technical expertise, we must defer to the informed discretion of the responsible federal agencies . . . [A]n agency must have discretion to rely on the reasonable opinions of its own qualified experts even if . . . a court might find contrary views more persuasive." (internal quotation marks and citations omitted)). It will not second-guess NMFS's reasonable determinations simply because Dr. Stern takes a different view. *Motor Vehicle Mfrs. Ass'n of U.S.*, 463 U.S. at 44 (finding that agency action is arbitrary and capricious if the court finds the agency's determinations "so implausible that it could not be ascribed to a difference in view or the product of agency expertise"). Accordingly, the Court finds that Plaintiffs have failed to meet their heavy burden to show that NMFS's take estimates were arbitrary and capricious under the "small numbers" requirement.[56]

---

[53] (NMFS_13; NMFS_287–288; NMFS_572; NMFS_648; NMFS_972–975; NMFS_3631–3632; NMFS_8129–8130; NMFS_8361); *see also* 87 Fed. Reg. 52913, 52924 (Vineyard Northeast initial IHA); 88 Fed. Reg. 13783, 13792 (Bluepoint Wind initial IHA).

[54] (NMFS_7; NMFS_13; NMFS_287–288; NMFS_572; NMFS_648; NMFS_972–975; NMFS_3631–3632; NMFS_8129–8130; NMFS_8361); *see also* 87 Fed. Reg. 52913, 52924 (Vineyard Northeast initial IHA); 88 Fed. Reg. 13783, 13792 (Bluepoint Wind initial IHA).

[55] (NMFS_10; NMFS_12–13; NMFS_287; NMFS_648; NMFS_953–954; NMFS_8219); *see also* 87 Fed. Reg. 52913, 52923–52924 (Vineyard Northeast initial IHA); 88 Fed. Reg. 13783, 13791–13792 (Bluepoint Wind initial IHA).

[56] Plaintiffs also argue that "small numbers" for Empire Wind's LOA "should be determined by assessing the total taking for a 5-year LOA." (Pls. MSJ Opp. at 19.) However, the Ninth Circuit recently upheld, "[a]s a matter of statutory interpretation" under the MMPA, that "an annual analysis is appropriate under the 'small numbers' prong" for LOAs. *Alaska Wildlife All. v. United States Fish & Wildlife Serv.*, No. 23-35299, 2024 WL 1169411, at *5 (9th Cir. Mar. 19, 2024). The court reasoned that "[n]othing in the MMPA" required an "assessment in the aggregate." *Id*. The Court agrees. NMFS assumed that the greatest number of takings anticipated in any one year will occur in each of the five years covered by the LOA and made its small numbers determination based on the annualized figure. (NMFS_0979.) The Court finds that this method of determining "small numbers" for Empire Wind's LOA was reasonable.

ii.  <u>Negligible Impact Under the MMPA</u>

Plaintiffs seek to challenge NMFS's "negligible impact" analysis, arguing that "marine site characterization surveys" have a "significant, deleterious effect, on marine mammal survival." (Pls. MSJ Br. at 34.) Their argument rests solely on extra-record materials, including Dr. Stern's Motion to Dismiss Declaration, (ECF No. 54-1), the Preliminary Report on a Beaked Whale Mass Stranding in Cyprus (ECF No. 117-5), and the Declaration of Michael Stocker, filed in support of Plaintiffs' Motion for Preliminary Injunction, (ECF No. 55-1). As this Court has already held, it will not consider these materials in its merits assessment.

Under the MMPA, NMFS may issue an IHA if it determines that the harassment "during each period concerned . . . will have a negligible impact on such species or stock." 16 U.S.C. § 1371(a)(5)(A)(i), (D)(i). NMFS defines "negligible impact" as "an impact resulting from the specified activity that cannot be reasonably expected to, and is not reasonably likely to, adversely affect the species or stock through effects on annual rates of recruitment or survival." 50 C.F.R. § 216.103. "A negligible impact finding is arbitrary and capricious under the MMPA only if the agency[, inter alia,] . . . entirely failed to consider an important aspect of the problem . . . ." *Ctr. For Biological Diversity v. Kempthorne*, 588 F.3d 701, 710 (9th Cir. 2009) (internal quotation marks omitted).

NMFS determined that any impacts to marine mammals from the approved surveying activities are expected to be temporary, minor, and unlikely to affect annual rates of recruitment or survival. (NMFS_20; NMFS_295; NMFS_573;[57] NMFS_656; NMFS_990; NMFS_8014; NMFS_8362[58].) In reaching this conclusion, NMFS relied on years of data identifying the leading

---

[57] *See also* 88 Fed. Reg. 13783, 13799 (Bluepoint Wind initial IHA).

[58] *See also* 87 Fed. Reg. 52913, 52929 (Vineyard Northeast initial IHA).

causes of death to Right Whales and Humpback Whales as fishing gear entanglements and vessel strikes, not marine characterization site surveys. (NMFS_157; NMFS_436; NMFS_449; NMFS_747; NMFS_951; NMFS_8124; *see also* 87 Fed. Reg. 30872, 30876 (Vineyard Northeast initial proposed IHA); 88 Fed. Reg. 2325, 2330 (Bluepoint Wind initial proposed IHA).) In addition, unlike the circumstances leading to whale strandings that Plaintiffs have pointed out, (Pls. MSJ Br. at 35–36 (air-guns and mid-frequency sonars)), NMFS determined that the site surveys at issue are "very different" from these circumstances, producing "smaller impact zones" at "lower levels" and of "shorter duration," all of which is "associated with less severe impacts." (NMFS_945; NMFS_160–161; NMFS_439; NMFS_750; NMFS_8127–8128); 87 Fed. Reg. 30872, 30879–30880 (Vineyard Northeast initial proposed IHA); 88 Fed. Reg. 2325, 2330 (Bluepoint Wind initial proposed IHA). The Court finds that NMFS's "negligible impact" analyses were reasonable, (NMFS_20; NMFS_295; NMFS_573;[59] NMFS_656; NMFS_990; NMFS_8014; NMFS_8362[60]), and that Plaintiffs have failed to satisfy the high burden of proof required to show that such analyses were arbitrary and capricious.[61]

### iii.  The National Environmental Policy Act

Plaintiffs argue that NMFS arbitrarily and capriciously failed to "undertake a cumulative environmental impact statement [] of the aggregate total of IHAs in the NY/NJ offshore waters."

---

[59] *See also* 88 Fed. Reg. 13783, 13799 (Bluepoint Wind initial IHA).

[60] *See also* 87 Fed. Reg. 52913, 52929 (Vineyard Northeast initial IHA).

[61] Plaintiffs also appear to challenge the authorizations at issue under the separate "least practicable adverse impact" requirement, 16 U.S.C. § 1371(a)(5)(A)(i)(II), (D)(ii)(I), for the first time at summary judgment. Plaintiffs' claims in the Amended Complaint are not based on this provision. Even if this Court permitted Plaintiffs to raise this new challenge at summary judgment, NMFS has implemented mandatory measures to ensure the least practical adverse impact on marine mammals, including work shutdown requirements, visual monitoring requirements, vessel speed restrictions, reporting requirements, and pre-start clearance and ramp up procedures. (*See* NMFS_35-50; NMFS_298–313; NMFS_574–586; NMFS_671–686; NMFS_883–928; NMFS_8017–8032; NMFS_8363–8379.) The Court finds that these mandatory measures reasonably satisfy the "least practicable adverse impact" requirement.

(Pls. MSJ Br. at 38.) They contend that NMFS "fallaciously" assigned the IHAs in this case to a "categorical exclusion category" to exempt NMFS from having to conduct an EIS under NEPA. (*Id*. at 37–40.)

"For certain infrastructure projects that are built, funded, or approved by the Federal Government, NEPA requires federal agencies to prepare an environmental impact statement, or EIS." *Seven Cnty. Infrastructure Coal. v. Eagle Cnty., Colorado*, No. 23-975, 2025 WL 1520964, at *2 (U.S. May 29, 2025). However, "NEPA does not require the agency to weigh environmental consequences in any particular way" but rather "as the agency reasonably sees fit under its governing statute and any relevant substantive environmental laws." *Id*. at *3. "Simply stated, NEPA is a procedural cross-check, not a substantive roadblock. The goal of the law is to inform agency decisionmaking, not to paralyze it." *Id*. Under NEPA, "the decision whether to prepare a programmatic impact statement is committed to the agency's discretion." *Izaak Walton League of Am. v. Marsh*, 655 F.2d 346, 374 n.73 (D.C. Cir. 1981); *see also Mayo v. Reynolds*, 875 F.3d 11, 23 (D.C. Cir. 2017) (explaining that "the agency, in its discretion, could have chosen to explore alternatives . . . in either a 'programmatic' or 'site-specific' format" (internal quotation marks omitted)). Indeed, "[t]he EIS need not address the effects of separate projects. In conducting that review, courts should afford substantial deference to the agency as to the scope and contents of the EIS." *Seven Cnty. Infrastructure Coalition*, 2025 WL 1520964, at *13.

Nothing in NEPA or the NEPA implementing regulations in effect at the time required NMFS to prepare a single programmatic EIS to assess the cumulative impact of the aggregate total of IHAs in the New York and New Jersey bight. Plaintiffs rely on older versions of the NEPA regulations, 40 C.F.R. §§ 1508.25, 1508.56, to argue this point. Those regulations stated that NMFS must prepare a single EIS for "cumulative actions." (Pls. MSJ Br. at 38.) However, this

"cumulative actions" provision is no longer operative. 85 Fed. Reg. 43304, 43326 (July 16, 2020). Indeed, the cases upon which Plaintiffs rely were decided based on inoperative regulatory provisions. *See Greater Yellowstone Coal. v. Reese*, 392 F. Supp. 2d 1234, 1240 (D. Idaho 2005) (finding that a single, comprehensive EIS did not need to be prepared under 40 C.F.R. § 1508.25); *see also Earth Island Inst. v. U.S. Forest Serv.*, 351 F.3d 1291, 1305 (9th Cir. 2003) (same). Furthermore, the Supreme Court's decision in *Kleppe v. Sierra Club*, which Plaintiffs also cite, made clear that agencies must weigh "a number of relevant factors" when deciding to issue a "comprehensive statement" under NEPA, the resolution of which requires a "high level of technical expertise and is properly left to the informed discretion of the responsible federal agencies." 427 U.S. 390, 412 (1976). In other words, it is within NMFS's discretion to determine whether to issue a comprehensive EIS.

Plaintiffs take issue with NMFS's determination that the IHAs at issue were categorically excluded and, thus, did not require a full NEPA analysis. "Categorical exclusions are classes of actions that an agency has determined do not 'have a significant effect on the human environment.'" *Salazar*, 706 F.3d at 1096 (quoting 40 C.F.R. § 1508.4 (repealed Apr. 11, 2025)); *see also Long Island Power Auth.*, 30 F.3d at 409–410 ("Agencies are directed to designate which classes of actions normally require EIS's, which classes normally require no environmental evaluation and may be regarded as categorical exclusions, and which classes fall in the middle and require Environmental Assessments [] to determine whether they will have a significant impact and thus require EIS's."). "[W]here a proposed action fits within a categorical exclusion, full NEPA analysis is not required." *Salazar*, 706 F.3d at 1097. "Application of a categorical exclusion is not an exemption from NEPA; rather, it is a form of NEPA compliance, albeit one that requires less than where an environmental impact statement or an environmental assessment is necessary."

*Id*. at 1096. Even if the agency applies a categorical exclusion, it must still "provide procedures for determining whether 'extraordinary circumstances' exist, such that the action, though normally excluded from full NEPA analysis, may have a significant environmental effect." *Id*. (internal quotation marks omitted).

NMFS determined that the IHAs at issue fit within Categorical Exclusion B4, which applies to authorizations "under section 101(a)(5)(A) and (D) of the MMPA for the incidental, but not intentional, take by harassment of marine mammals during specified activities and for which no serious injury or mortality is anticipated."[62] (NMFS_51–56; NMFS_325–329; NMFS_633–638; NMFS_659–664; NMFS_8039–8044; NMFS_8390–8395.) NMFS also conducted an "extraordinary circumstances" review as part of its NEPA analysis. (NMFS_52–56; NMFS_326–329; NMFS_634–638; NMFS_660–664; NMFS_8040–8044; NMFS_8391–8395.) In connection with its "extraordinary circumstances" assessment, NMFS considered the cumulative impact of issuing the IHAs when combined with other past, present, and reasonably foreseeable future actions. (NMFS_56; NMFS_329; NMFS_637; NMFS_664; NMFS_8044; NMFS_8395.) NMFS ultimately concluded that the IHAs did "not present the potential for significant cumulative impacts." *Id*. It explained that the effects of issuing the IHAs "are limited to very low-level behavioral effects on exposed marine mammals." *Id*. "These effects are the result of a limited number of vessels, which themselves do not add appreciably to vessel traffic in the region, transiting a defined area while using acoustic sources." *Id*. NMFS found that these sources also have only a limited acoustic footprint. *Id*. Thus, NMFS found that the effects of issuing each IHA would "be so limited in space and time" that they would not result in significant cumulative

---

[62] Appendix E, *Policy and Procedures for Compliance with the National Environmental Policy Act and Related Authorities*, Companion Manual for NOAA Administrative Order 216-6A, https://www.noaa.gov/sites/default/files/2021-10/NOAA-NAO-216-6A-Companion-Manual-03012018.

impacts. *Id.* NMFS also pointed out, in considering comments from the public, that it has addressed "cumulative impacts related to substantially similar activities in similar locations" in prior environmental analyses. (NMFS_282); *see also* Mayo, 875 F.3d at 21 ("An agency is not required to make a new assessment under NEPA every time it takes a step that implements a previously studied action. So long as the impacts of the steps that the agency takes were contemplated and analyzed by the earlier NEPA analysis, the agency need not supplement the original EIS or make a new assessment."). Thus, the Court finds that NMFS's decision to categorically exclude the IHAs at issue from the EIS requirement was reasonable.[63]

Plaintiffs' only basis for challenging NMFS's application of Categorical Exclusion B4 is that "NMFS cannot make assurances or guarantees that that the Level B harassment of marine mammals will not lead to 'serious injury or mortality.'" (Pls. MSJ Opp. at 30.) Yet, this argument rests solely on Dr. Stern's Motion to Dismiss Declaration and other information outside of the record. (*Id.*) For the reasons set forth above, the Court will not consider these extra-record materials. Accordingly, the Court finds that Plaintiffs have failed to meet their heavy burden to prove that NMFS's NEPA determinations were arbitrary and capricious.

---

[63] Regarding the Empire Wind LOA, NMFS was a cooperating agency on, and independently evaluated and adopted the BOEM EIS for the Empire Wind project. (NMFS_1996-2001, NMFS_2354–2431; NMFS_1774; NMFS_1776–1777; NMFS_1072; NMFS_939–942.) A summary of the cumulative impacts assessment is provided in the EIS's Table S-2. (NMFS_1996-2001.) Thus, Plaintiffs' argument that NMFS disregarded cumulative impacts in issuing the LOA to Empire Wind is unavailing.

## CONCLUSION

For the foregoing reasons, Federal Defendants' Motion to Exclude Plaintiffs' Extra-Record Materials, (ECF No. 122), is **GRANTED**. Intervenor-Defendants Atlantic Shores and Empire Wind's Motions to Join in Federal Defendants' Motion to Exclude Plaintiffs' Extra-Record Materials, (ECF Nos. 125, 126), and Atlantic Shores's Motion to Join in Federal Defendants' Reply in Further Support of Their Motion to Exclude Plaintiffs' Extra-Record Materials, (ECF No. 129), are **GRANTED**. Atlantic Shores's Motion for Summary Judgment, (ECF No. 120), is **DENIED as moot**. Plaintiffs' Motion for Summary Judgment, (ECF No. 117), is **DENIED**. Federal Defendants' Cross Motion for Summary Judgment, (ECF No. 118), is **GRANTED in part** and **DENIED in part**. Federal Defendants' Cross Motion for Summary Judgment, (ECF No. 118), is **DENIED** to the extent that it seeks dismissal of Plaintiffs' challenges to the IHAs issued to Vineyard Northeast, Invenergy Wind Offshore, Community Offshore Wind, and Attentive Energy as moot. Federal Defendants' Cross Motion for Summary Judgment, (ECF No. 118), is **GRANTED** to the extent that it seeks dismissal of Plaintiffs' challenges to (1) the IHAs issued to Bluepoint Wind and Atlantic Shores as moot and (2) all remaining IHAs (Vineyard Northeast, Invenergy Wind Offshore, Community Offshore Wind) and the LOA issued to Empire Wind for lack of standing. Empire Wind's Cross Motion for Summary Judgment, (ECF No. 121), is **GRANTED** on standing grounds. Alternatively, in the event that jurisdiction is found to exist, on the merits, summary judgment is **GRANTED** in favor of Federal Defendants and Empire Wind.

An appropriate Order will accompany this Opinion.

Dated: June 11, 2025

_____
ROBERT KIRSCH
UNITED STATES DISTRICT JUDGE